**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| COUNCIL OF PARENT ATTORNEYS<br>AND ADVOCATES, INC.,<br><br>    P.O. Box 6767<br>    Towson, Maryland 21285<br><br>                    Plaintiff,<br>        v.<br><br>ELISABETH (BETSY) DEVOS, *in her*<br>*official capacity as Secretary of Education*,<br><br>    400 Maryland Avenue, SW<br>    Washington, D.C. 20202<br><br>U.S. DEPARTMENT OF EDUCATION,<br><br>    400 Maryland Avenue, SW<br>    Washington, D.C. 20202<br><br>                    Defendant. | Civil Action No: |

**COMPLAINT TO SET ASIDE A REGULATION**
**AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

The Council of Parent Attorneys and Advocates, Inc. (COPAA) brings this action against the United States Secretary of Education, Elisabeth (Betsy) DeVos ("Secretary DeVos"), and the United States Department of Education (the "Department"), seeking an order to set aside an interim final rule that threatens to prevent the distribution of funds for K–12 public schools to respond to the global coronavirus pandemic as provided by Congress, a declaration that the rule is invalid, and an injunction against its enforcement.

**INTRODUCTION**

1.    The ongoing pandemic of COVID-19 infections has wreaked havoc on our nation's public schools.  Beginning in March 2020, public schools in most states were required to close

1

and to attempt to educate their students using technology for remote instruction in order to protect the health and safety of students and staff and to control against the spread of infection. Many public school districts across the country have announced that all instruction will be conducted remotely when the next school year begins, and for the large majority of public schools, at least a portion of instruction will be conducted remotely.

2.      Coping with the pandemic has imposed and will continue to impose extraordinary expenses for remote learning technology, increased staffing needs, and other additions to the costs for which the schools had budgeted.  Millions of American children, particularly children in low-income households, are at an academic disadvantage because they do not have sufficient internet access or a computer at home.[1]  At the same time, the pandemic has caused businesses to close, at least temporarily, and economic activity to slow.  All states are collecting diminished revenues now and most have been compelled to reduce their funding to public schools.

3.      In order to help public schools shoulder the sudden and substantial new expenses caused by this public health emergency, Congress appropriated billions of dollars to public K–12 schools in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act").  In addition to a separate pool of funds for which Congress made private schools eligible, *see infra* ¶¶ 27–29, the CARES Act further requires that public school districts provide "equitable services" to students enrolled in private schools by spending a proportion of their CARES Act

---

[1] *See* Alliance for Excellent Educ. et al, *Students of Color Caught in the Homework Gap*, at 1-2 (2020), available at https://futureready.org/wp-content/uploads/2020/07/HomeworkGap_FINAL7.22.2020.pdf; *see also New Analysis Shows Students of Color Far More Likely to Be Cut Off from Online Learning*, Future Ready Schools (July 21, 2020), https://futureready.org/new-analysis-shows-students-of-color-far-more-likely-to-be-cut-off-from-online-learning-data-from-education-and-civil-rights-groups-show-that-nearly-17-million-students-nationally-fall-into-homework-g/?highlight=students%20of%20color (blog post regarding release of report).

funds on private school students.  Specifically, section 18005(a) of the CARES Act requires school districts to provide equitable services to eligible private-school students and teachers "in the same manner as provided under section 1117" of Part A of Title I of the Elementary and Secondary Education Act of 1965 (ESEA), which allocates funds using a poverty-based formula based on the proportion of students from low-income backgrounds attending the private school.

4.     On July 1, 2020, Secretary DeVos and the Department of Education issued an interim final rule entitled "Providing Equitable Services to Students and Teachers in Non-public Schools," enacting 34 C.F.R. § 76.665, published at 85 Fed. Reg. 39,479 (July 1, 2020) (the IFR or "76.665").

5.     This IFR, if enforced, will deprive public schools of a significant amount of funding for public school students.  The IFR purports to interpret section 18005(a) of the CARES Act, but introduces new requirements and restrictions on the spending of funds as between public school students and private school students that are not present in the CARES Act itself.

6.     The IFR requires, as a default, that school districts use an enrollment-based formula in determining how much money they must spend on equitable services for private school students. The enrollment-based formula allowed by the IFR will divert more funding to private school students than would be the case if the funds were distributed under the poverty-based formula provided in section 1117 of ESEA.

7.     The IFR permits a school district to use the poverty-based formula set forth in section 1117 only if the district complies with two requirements not present in, and contrary to, the CARES Act itself.  One unlawful requirement is that the school district may *only* spend the funds for that CARES Act program on its schools that are funded under Title I of the ESEA (generally schools with higher concentrations of poverty), leaving its non-Title I schools with nothing.

Another unlawful requirement of the IFR is that CARES Act funding distributed in the same manner as under section 1117 of ESEA must conform to "supplement not supplant" restrictions that are present in a *different* section of the ESEA, and that Congress did not impose on CARES Act funding.  These restrictions are unlawful and appear designed as an incentive to school districts to allocate funds using an enrollment-based formula.

8.    The IFR violates the Administrative Procedure Act.  Congress did not authorize the Department to engage in rule-making on this subject under the CARES Act.  Furthermore, the IFR is contrary to law, contradicting the clear and unambiguous language of section 18005(a) of the CARES Act.  Moreover, the IFR imposes restrictions and conditions on CARES Act funding to K–12 public schools that are arbitrary and unreasonable.

9.    These unlawful restrictions will result in reduced funding available for educational services to millions of public school children.  This includes large numbers of students with disabilities, a population that Congress specifically intended the CARES Act funds to benefit. Plaintiff COPAA seeks to ensure that all students with disabilities receive the educational services and support they need, and its membership includes hundreds of parents whose children attend public schools.  Many COPAA members are parents of children enrolled in either schools that would be excluded entirely from receiving CARES Act funding under the IFR or schools for which it is highly probable that the amount of funding would be reduced under the IFR.

10.    During this time of crisis for America and the children of COPAA's members attending public school, the Court should declare the IFR to be contrary to law and arbitrary and capricious, and therefore strike it down and set it aside.

## PARTIES

11.   Plaintiff COPAA is a not-for-profit organization whose members are parents of children with disabilities, their attorneys, and their advocates.  COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families.

12.   COPAA has more than 2,600 members located across the United States.  Membership is open to all persons who are interested in furthering COPAA's purposes, and each member pays annual dues.  Persons who work for, or contract with, state, regional, or local education agencies (e.g., state departments of education or school districts) are presumptively not permitted to join COPAA, but a super-majority of the board of directors may permit such persons to join as members after an interview and other varied requirements.  The board of directors is composed exclusively of COPAA members.

13.   More than 500 of COPAA's current members joined as parent members.  This type of membership is open to persons who have a child with a disability or who are a family member of a child with a disability.  These COPAA parent members are located in 49 states and the District of Columbia.

14.   In its daily operations, COPAA accomplishes its mission by, among other things: providing resources, training, and information to parents, advocates, and attorneys to assist them in obtaining the equal educational opportunity to which children with disabilities are entitled under the federal civil rights laws; educating members of the public and policy makers, including federal agencies, about the educational experiences of children with disabilities and their families; and educating COPAA members about developments in the federal civil rights laws and policies affecting education of children with disabilities.

15.   COPAA maintains a resource library available to members only.  It also creates and makes available webinars for its members and others.  COPAA periodically submits comments on federal agencies' proposed rules and regulations to inform agencies about the impact of such proposals on the lives and rights of children with disabilities and their families.  COPAA also engages in litigation where necessary in response to denials and violations of rights under the Individuals with Disabilities Education Act (IDEA) and other legal protections of children with disabilities.

16.   Defendants are the U.S. Department of Education and current U.S. Secretary of Education Elisabeth (Betsy) DeVos.  Secretary DeVos is sued in her official capacity.

17.   As the Secretary of Education, Secretary DeVos is responsible for the administration of the Department in accordance with law, including adoption of rules and regulations pursuant to the rule-making procedures set out in the Administrative Procedure Act.

## JURISDICTION AND VENUE

18.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law, namely the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) & (2)(C).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1346(a)(2) because a department of the United States is a defendant.  Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201–2202.

19.   Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) because plaintiff COPAA maintains its principal place of business in Towson, Maryland, where its headquarters are located.

## STATEMENT OF FACTS

### The CARES Act

20.   On March 27, 2020, the President signed the CARES Act into law.  *See* Pub. L. No.

116-136, 134 Stat. 281.  The purpose of the Act was to address economic hardships of the

COVID-19 pandemic in the United States.

21.   In the part of the CARES Act regarding the U.S. Department of Education, Congress

appropriated $30,750,000,000 for the "Education Stabilization Fund," to remain available

through September 30, 2021 "to prevent, prepare for, and respond to coronavirus," including

aiding schools by distributing additional federal funding.  *Id.*

22.   Sections 18002 and 18003 of the CARES Act provide funding for public primary and

secondary school authorities, referred to formally as "Local Educational Agencies" or "LEAs,"[2]

or informally as school districts.

23.   Section 18002 created the "Governor's Emergency Education Relief Fund" (the GEER

fund).  Congress directed the Secretary of Education to make Emergency Education Relief grants

to Governors.  One of the three permitted uses of the GEER funding by the Governor, according

to section 18002(c)(1), is to:

> provide emergency support through grants to local educational agencies
> that the State educational agency deems have been most significantly
> impacted by coronavirus to support the ability of such local educational
> agencies to continue to provide educational services to their students and
> to support the on-going functionality of the local educational agency[.]

---

[2] "Local Education Agency" includes only public authorities that control or serve public primary
and secondary schools.  *See* section 18007(8) of the CARES Act (incorporating section
8101(30)(a) of the ESEA, 20 U.S.C. § 7801(30)(a)).

24.   Section 18003 created the "Elementary and Secondary Emergency Relief Fund" (the ESSER fund).  Section 18003(a) directs the secretary to make grants to each state educational agency that submits an approved application.  Section 18003(d) provides 12 categories of permitted uses of the ESSER funds by school districts.

25.   GEER funding comprises approximately $3 billion, some of which is for higher education, and ESSER funding comprises approximately $13 billion; the maximum amount that can be provided to individual primary and secondary public schools under these sections of the CARES Act is $16 billion.  If school districts used a poverty-based formula to determine how much of that $16 billion to allocate to equitable services for private school students, school districts would spend $140 million on equitable services.

26.   By contrast, if school districts used the enrollment-based formula favored by the IFR, school districts would spend over ten times as much on equitable services for private school students: $1,623 million.  Indeed, while seeking to downplay its effect, the IFR itself could only assert that something "less than 10% of the CARES Act funding nationwide"—*i.e.*, less than $1.6 billion—"would be provided for equitable services for non-public school students and teachers" under the IFR's preferred methodology.  85 Fed. Reg. at 39,483 n.5.  By this measure, the amount of *additional* money that the IFR would divert from public schools to private school students compared to what Congress provided by its reference to section 1117 could be as much as $1.5 billion.

27.   In other portions of the CARES Act, Congress made some federal funding available to non-public schools and not to public schools.  For example, private schools that operate as nonprofit organizations or small businesses with 500 or fewer employees—but not public schools other than nonprofit public charter schools—are eligible to participate in the Paycheck

Protection Program (PPP).  *See* CARES Act, § 1102(a)(1)(D)(i).  Congress has appropriated

$659 billion to the PPP.[3]  If certain conditions are met, the PPP loans will be forgiven.[4]

28.   Billions of dollars in CARES Act money has already been paid to private entities

classified as primary and secondary schools.  According to a private analysis of PPP data

released by the Small Business Administration on PPP loans of $150,000 or greater, the total

amount of funds given to 5,691 private schools is somewhere between $2.67 billion and

$6.47 billion.[5]  Many other private schools received loans of less than $150,000.  These federal

PPP funds are not available to public schools other than charter schools formed as nonprofit

organizations.

29.   Combined with the PPP funds, under the enrollment-based formula, private school

students will end up supported by CARES Act funds totaling at least $4.3 billion (and possibly

as much as $8.1 billion), despite the fact that they comprise no more than 10% of the K–12

students in the United States.  Meanwhile, under the same enrollment-based formula, the 90% of

the K–12 students in the United States who attend public school will end up with CARES Act

---

[3] *See The CARES Act Provides Assistance to Small Businesses*, U.S. Dep't of Treas., https://home.treasury.gov/policy-issues/cares/assistance-for-small-businesses (last visited Aug. 6, 2020).

[4] *See Paycheck Protection Program*, U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program#section-header-5 (last visited Aug. 6, 2020).

[5] Samantha Sokol et al., Americans United for Separation of Church and State, *The Paycheck Protection Program Has Provided Billions in Federal Funds to Private and Religious Schools*, at 1-2 (2020), https://www.au.org/sites/default/files/2020-07/PPP%20COVID%20Relief%20Money%20for%20Private%20Schools%207.29.20_0.pdf; *see also AU's New Report Details How Billions in Pandemic Relief Was Diverted to Private Schools*, Americans United for Separation of Church and State: Wall of Separation Blog (July 30, 2020), https://www.au.org/blogs/pandemic-aid-private-schools (blog post regarding release of report).

funds totaling, at most, $14.4 billion.  There is no reason to believe that Congress, unlike the Department, intended such a substantial disparity in support for public school students.

### Title I of the ESEA

30.   When enacting the CARES Act, Congress repeatedly chose to incorporate certain standards and concepts from Title I of the ESEA of 1965 ("Title I"), codified as amended at 20 U.S.C. §§ 6311–6339.  Four provisions relating to funding for K–12 schools under the CARES Act (in section 18002, two subsections of 18003, and section 18005) refer to components of the statutory formulas in Part A of Title I for allocating funds to assist primary and elementary schools.  In addition, section 18005 references section 1117 of Title I, 20 U.S.C. § 6320.

31.   Passed as part of President Lyndon Johnson's War on Poverty, the ESEA provides federal funding for primary and secondary education, emphasizing equal access to education and aiming to narrow the achievement gaps between students.  The law has been amended several times, including in 2015.  *See* Every Student Succeeds Act, Pub. L. No. 114-95, 129 Stat. 1802 (2015).  Title I of the ESEA is entitled "Improving the Academic Achievement of the Disadvantaged."

32.   Although Title I funds are allotted to states, school districts, and schools using four different statutory formulas, the IFR correctly notes that all four formulas try, in "varying degrees," to direct the funds to schools and school districts with "concentrations of poverty."  85 Fed. Reg. at 39,482 n.4.  Thus, the statutory formulas "direct funds to LEAs based primarily on the number of formula children," and "97 percent" of statutorily defined formula children "are children ages 5 through 17 in poverty in public and nonpublic schools as determined annually by the Census Bureau."  *Id*.  Thus, high numbers or high percentages of children from low-income families entitle school districts to more Title I funds.  Once received, however, schools are not

10

limited to spending the Title I funds for services only on children in poverty; children are eligible for Title I services based on a host of factors related to academic need or risk of academic failure. *See* 20 U.S.C. § 6315(c)(1)(B) (eligible children include those who are failing or at risk of failing to meet certain academic standards); § 6315(c)(2) (in addition to children who are "economically disadvantaged," eligible children include children with disabilities, migrant children, English learners, Head Start and preschool children, neglected or delinquent children, and homeless children).

33.   Section 18002(b)(2) refers to section 1124(c) of Title I, 20 U.S.C. § 6333(c), as the basis for allocating 40 percent of the GEER funds to states. Section 1124(c) describes the children to be counted for purposes of distributing funds under Title I, including "children aged 5 to 17" who are "from families below the poverty level," children "in institutions for neglected and delinquent children . . . or being supported in foster homes with public funds," and children "from families above the poverty level" but who receive payments under the Social Security Act, Title IV, Part A (Block Grants to States for Temporary Assistance for Needy Families). 20 U.S.C. § 6333(c)(1)(A)-(C), (c)(4)(A). But nothing in the CARES Act restricts the *use* of the GEER funds to assistance to low-income or Title I-eligible children. Section 18002(c)(1) explicitly describes uses of the GEER funds in terms that do not limit their use to assisting Title I-eligible children.

34.   Sections 18003(b) and (c) require ESSER funds to be allocated to states and LEAs, respectively, according to the same proportions received under Title I in the most recent fiscal year. However, as with the GEER funds, Congress did not limit the *use* of ESSER funds to assisting Title I-eligible students. To the contrary, section 18003(d) lists 12 categories of uses

permitted for ESSER funds, many of which do not restrict the uses to assisting Title I-eligible children.

### Section 1117 of the ESEA and Section 18005 of the CARES Act

35.   Under section 18005(a), LEAs are directed to "provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools."[6]

36.   Nothing in section 18005 of the CARES Act is directed to the Secretary or the Department, and nothing in the CARES Act authorizes them to instruct LEAs to disregard any of the contents of section 1117 of the ESEA or to resolve any perceived ambiguities.

37.   Section 18005 is directed to LEAs, which are also the bodies that section 1117 of the ESEA directs to provide equitable services to private schools.  Section 18005 of the CARES Act plainly tells LEAs to provide equitable services to non-public schools under the CARES Act according to the directions that they have experience in following under Title I of the ESEA.

38.   A close reading of section 1117 confirms that it sets distinct standards for determining which private school students are eligible for equitable services from the LEA compared to establishing the amount of federal funds that the LEA must spend on equitable services.  Thus, when Congress in the CARES Act directed that services for students enrolled at non-public primary and secondary schools should be provided "in the same manner as provided under section 1117 of the ESEA," Congress knew that it was invoking a provision of Title I directed to allocating federal funds based on the number of children from low-income households, and not

---

[6] "Non-public school" is defined in section 18007(6) of the CARES Act with reference to "Public school," defined in subsection (7).  Its meaning is the same as "private schools," the term used in section 1117 of the ESEA.  "Non-public schools" and "private schools" are used interchangeably in this complaint.

to the total population of K–12 schoolchildren, and that those services would go only to eligible

private school students.

39.   With regard to eligibility for equitable services, subsections 1117(a)(1) and (a)(3)

contain express language referring to the authorized purpose of the funding as for the benefit

children in private schools who are eligible for Title I.

40.   The first "General Requirement" stated at the beginning of section 1117(a)(1) is that:

> To the extent consistent with the number of eligible children identified
> under section 1115(c) of this title in the school district served by a local
> educational agency who are enrolled in private elementary schools and
> secondary schools, a local educational agency shall . . .  (A) . . . provide
> such children [services that address their educational needs.]

20 U.S.C. § 6320(a)(1).  Section 1115(c) of the ESEA, 20 U.S.C. § 6315(c),  provides the

standard for determining who are "Eligible Children" for services and benefits under Title I.  In

general, those children "are children identified by the school as failing, or most at risk of failing,

to meet the challenging State academic standards on the basis of multiple, educationally related,

objective criteria established by the local educational agency and supplemented by the school,"

section 1115(c)(1)(B), and the definition of eligible children  also includes migrant children and

homeless children, section 1115(c)(2).  Thus, section 1117's general purpose is to provide

services and benefits for those private primary and secondary school students who are eligible

for Title I assistance.

41.   The same criterion is used to define "Equity" in section 1117(a)(3).  Subparagraph (A)

provides: "In general.  Educational services and other benefits for *such* private school children

shall be equitable in comparison to services and other benefits for public school children

participating under this part . . . ."  20 U.S.C. § 6320(a)(3)(A) (Emphasis added.)  The word

"such" is a precise way for a statute to cross-reference an antecedent definition of words.  The

antecedent of "such private school children" is the phrase in section 1117(a)(1) that specifies "the number of eligible children identified under section 1115(c)."  Section 1117(a)(3) defines "Equity" as based on a comparison of the services and benefits available to that same subset of private school children who are eligible for Title I with the services and benefits available to public school children that participate in Title I programs.

42.   Subparagraph (B) of section 1117(a)(3), which states the duty of an Ombudsman, also states that the duty is "[t]o help ensure such equity for *such* private school children" (emphasis added).  The antecedent reference for "such private school children" is the same: those eligible under the standards for Title I as provided in section 1115(c) of the ESEA.

43.   At no point in these provisions does Congress ever contemplate serving all children enrolled in private schools.

44.   For purposes of determining how much an LEA must spend on equitable services, the counting of private school students is precisely stated, twice, in subsections 1117(a)(4)(A)(i) and 1117(c)(1) as based on the number of private school children from low-income households.  Nothing in section 1117 would allow an LEA to base the proportion of funding for equitable services to private schools on the entire population of students enrolled in private schools.

45.   Section 1117(a)(4) of the ESEA is entitled "Expenditures."  It provides in subparagraph (A)(i) that:

> Expenditures . . . to *eligible* private school children shall be equal to the proportion of funds allocated to participating school attendance areas based on the number of children from low-income families who attend private schools.

20 U.S.C. § 6320(a)(4)(A)(i).  (Emphasis added.)  In context, "eligible" can only mean the same thing as in the preceding references to eligible children in private schools: those who satisfy the requirements in section 1115(c) for Title I funding.  This states the purpose of the funding.  That

14

purpose is not contradicted by Congress's use of "the number of children from low-income families who attend private schools" to calculate the proportion of funds to be spent for equitable services to private school children.

46.   Subparagraph (B) of section 1117(a)(4) is entitled "Obligation of Funds."  It states:

> Funds allocated to a local educational agency for educational services and other benefits *to eligible private school children* shall be obligated in the fiscal year for which the funds are received by the agency.

20 U.S.C. § 6320(a)(4)(B).  (Emphasis added.)  To obligate funds for private school children who are not eligible would be contrary to section 1117(a)(4)(B), as well as to the other provisions noted above.

47.   Subparagraph (C) of section 1117(a)(4) requires giving notice of allocations.  It says that the appropriate private schools are to receive notice of the allocation of funds available for "eligible private school children."  Since the same word, "eligible" is used in the preceding section, the same meaning applies: the funds are for the benefit of private school students who qualify for assistance pursuant to the criteria in section 1115(c) for participation in Title I programs.

48.   Section 1117(c) is entitled "Allocation for Equitable Service to Private School Students."  Subsection (1), "Calculation," provides:

> A local educational agency shall have the final authority, consistent with the section, to calculate the number of children, ages 5 through 17, who are from low-income families and attend private schools . . . .

20 U.S.C. § 6320(c)(1).  (Emphasis added.)  Repeating and further specifying the basis for counting students for purposes of allocating funds, section 1117(c)(1) leaves no doubt that LEAs must apportion based on low-income students, not the total student population.

49.   If it had intended LEAs to provide services based on allocations derived from the number of enrolled private school students and not just enrolled low-income private school students, Congress would have incorporated the equitable services provision in Title VIII of the ESEA.  Section 8501 of the ESEA, 20 U.S.C. § 7881, is a general provision that measures the amount of money a public school has to spend on equitable services based on proportional total enrollments.  *Id.*, at 8501(a)(3)(A), 20 U.S.C. § 7881(a)(3)(A).  The CARES Act instead refers to section 1117 of the ESEA, which bases the allocation of funds on the number of low-income students.

### The Department's Guidance and Interim Final Rule

50.   On April 30, 2020, a month after the enactment of the CARES Act, the Department issued guidance called "Providing Equitable Services to Students and Teachers in Non-Public Schools under the CARES Act Programs" ("Equitable Services guidance").  The Department incorrectly asserted in the Equitable Services guidance that section 18005(a)'s reference to providing equitable services "in the same manner as provided under section 1117 of the ESEA" is ambiguous.  The Department then directed LEAs to allocate funding from the CARES Act for private schools based on *total* student enrollment (i.e., an enrollment-based formula) instead of *low-income* student enrollment (i.e., a poverty-based formula) as directed by Title I of the ESEA.

51.   As the Department acknowledges in the IFR, "[a] number of States took issue with the Department's guidance with respect to using total non-public school enrollment to determine the proportional share of CARES Act funds for equitable services."  85 Fed. Reg. at 39,480.  Likewise, an organization representing state education leaders across the country warned Secretary DeVos that the effect of the guidance would be that "non-public schools would receive an inequitable amount of funding, much more federal support than Congress intended, or LEAs

16

anticipated based upon the CARES statute."[7]  In addition, Senator Lamar Alexander, who in 2015 was the lead sponsor of the Every Student Succeeds Act, Pub. L. No. 114-95, 129 Stat. 1802, which formulated the current wording of section 1117, also objected to the Department's guidance, saying that "[m]y sense was that the money should have been distributed in the same way we distribute Title I money . . . .  I think that's what most of Congress was expecting."[8]

52.   The Department issued the IFR in an effort to overcome the positions of states and others declining to follow the nonbinding Equitable Services guidance.

53.   On July 1, 2020, the Department issued its interim final rule creating a new regulation, 34 C.F.R. § 76.665, entitled "Providing equitable services to students and teachers in non-public schools."  The IFR creates two options for determining the amount of funding to non-public schools, one of which maintains a poverty-based allocation but imposes illegal conditions on it, and one of which imposes an enrollment-based allocation method that contradicts the CARES Act and its adoption of the standards of section 1117 of the ESEA.

54.   Section 76.665(b)(2) of the IFR states:

> (2) Consultation must occur in accordance with section 1117(b) of the ESEA, except to the extent inconsistent with the CARES Act *and this section, such as section 1117(b)(1)(E) and (J)(ii).*

(Emphasis added.)  This section directly and explicitly conflicts with the CARES Act's requirement to provide services in the same manner as in ESEA section 1117.  Section

---

[7] Letter from Carissa Moffat Miller, Exec. Dir., Council of Chief State Sch. Officers, to Betsy D. DeVos, Sec'y, U.S. Dep't of Educ., at 2 (May 5, 2020), https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf.

[8] Nicole Gaudiano, *Alexander, DeVos split on stimulus support for private school kids*, Politico (May 22, 2020, 10:00 am EDT), https://www.politico.com/newsletters/morning-education/2020/05/22/alexander-devos-split-on-stimulus-support-for-private-school-kids-787837.

1117(b)(1)(E) states that equitable services are "to be provided to the eligible private school children" and section 1117(b)(1)(J)(ii) refers to using the "proportion of funds allocated under subsection (a)(4)(A) based on the number of children from low-income families who attend private schools." The IFR is contrary to law in purporting to deny effect to provisions of section 1117 that Congress expressly required to be used.

55. Section 76.665(c) of the IFR, entitled "Determining proportional share" begins as follows:

> (1) To determine the proportional share of funds for equitable services to students and teachers in non-public elementary and secondary schools for each CARES Act program, an LEA must use one of the following measures. The LEA need not use the same measure for each CARES Act program.

The CARES Act adopted "the same manner as provided under section 1117 of the ESEA" as the means for providing equitable services to students in non-public schools, and section 1117 contains one and only one method for determining the proportion of funding to be used for private schools. The IFR had no legal basis for creating two options for how LEAs determine the proportion of CARES Act funding.

56. The enrollment-based formula, which the IFR lists second, is the default. It is the only one that is available to all LEAs; it is the option that gives LEAs the maximum flexibility on where to spend the CARES Act funds within the district; and it avoids triggering a "supplement not supplant" requirement. But it offers the maximum flexibility on use of the funds at a price of the amount that must be spent on private school students.

57. Section 76.665(c)(1)(i) allows an LEA to "calculate the proportional share in accordance with paragraph (c)(1)(ii) of this section," *i.e.* the enrollment-based formula, even if it also meets the criteria for using a poverty-based formula. Section 76.665(c)(1)(ii), in turn, states:

(ii) Any other LEA must calculate the proportional share based on
enrollment in participating non-public elementary and secondary schools
in the LEA compared to the total enrollment in both public and
participating non-public elementary and secondary schools in the LEA.

58.   If LEAs want to use a poverty-based formula, as they do under section 1117 of the

ESEA, they must give up their right to use the CARES Act funds for non-Title I schools—which

the CARES Act expressly permits—and subject themselves to a "supplement not supplant"

requirement.  Thus, the IFR denies LEAs the unfettered ability to determine the proportion of

GEER or ESSER funding for private schools in the only way that the CARES Act permits.

59.   The opening paragraph of Section 76.665(c)(1)(i) imposes restrictions on LEAs

receiving CARES Act funds that wish to use a poverty-based formula rather than an enrollment-

based formula authorized by paragraph (c)(1)(ii):

(i) An LEA using *all* its funds under a CARES Act program to serve *only*
students and teachers in public schools participating under Title I, Part A
of the ESEA may calculate the proportional share in accordance with
paragraph (c)(1)(ii) of this section . . . .

Nothing in the CARES Act says, suggests, or delegates authority to the Department to require

that LEAs receiving CARES Act funds may use them only for students in public schools

participating in Title I, Part A of the ESEA.  To the contrary, the CARES Act states exactly the

contrary.

60.   Section 76.665(c)(1)(i)(A) states that an LEA subject to the conditions in 76.665(c)(1)

may use the following option for allocating equitable services:

(A) The proportional share of Title I, Part A funds it calculated under
section 1117(a)(4)(A) of the ESEA for the 2019-2020 school year[.]

Standing alone, this is a correct interpretation of Section 18005 of the CARES Act.  But it is

surrounded by unlawful provisions.

61.   Section 76.665(c)(1)(i)(B) states, as an alternative for an LEA subject to the conditions in 76.665(c)(1) that an LEA may allocate equitable services based on:

> (B) The number of children, ages 5 through 17, who attend each non-public school in the LEA that will participate under a CARES Act program and are from low-income families compared to the total number of children, ages 5 through 17, who are from low-income families in both Title I schools and participating non-public elementary and secondary schools in the LEA.

This departs from the poverty-based formula that Congress adopted by reference to ESEA section 1117 in that the denominator of the proportionality factor excludes public school children from low-income families unless they attend Title I schools.  By reducing the denominator of the fraction, this allocation method will result in a higher proportion of funds being directed to private schools than if LEAs follow section 1117's proportionality standard as Congress directed.

62.   Under either poverty-based formula, the IFR imposes a second condition designed to dissuade its use.  Section 76.665(c)(3) states:

> (3) An LEA using funds from a CARES Act program in Title I schools under paragraph (c)(1)(i) of this section must comply with the supplement not supplant requirement in section 1118(b) of the ESEA, which would prohibit the LEA from allocating CARES Act funds to Title I schools and then redirecting State or local funds to non-Title I schools, among other things.

Through this language in the IFR, Defendants have imposed a purported condition on LEAs' use of GEER or ESSER funds that is not stated in or authorized by anything in the CARES Act.  The section of the ESEA that Congress invoked, section 1117, contains no "supplement not supplant" requirement.  Congress did not make any explicit or implied reference in the CARES Act to section 1118(b) of the ESEA, which is the source of the "supplement not supplant" restrictions on Title I funds.  The fact that Congress expressly permitted the use of CARES Act funds to

enable school districts to "*maintain* the operation of and continuity of services" and to continue to employ "*existing* staff" demonstrates that this omission of any reference to a "supplement not supplant" requirement was intentional.  CARES Act § 18003(d)(12) (emphasis added); *see also id.* §18006 (requiring districts to continue to pay its employees and contractors "to the greatest extent practicable").

63.   The Department has previously acknowledged that the CARES Act does not itself require that LEAs supplement and not supplant the CARES Act funds.  In a Frequently Asked Questions document dated May 5, 2020 (six weeks prior to the IFR), the Department responded to the question, "Are ESSER funds subject to a supplanting prohibition?" with a clear "No."  The Department explained, "The ESSER Fund does not contain a supplanting prohibition.  As a result, ESSER funds may take the place of State or local funds for allowable activities."[9]

64.   Indeed, the IFR's "supplement not supplant" restriction on the uses of the GEER and ESSER funds would contradict the express descriptions of permitted uses of those funds in the CARES Act.  One of the other activities that is expressly allowed as a use of ESSER funds is the provision of services under the IDEA, — which is mentioned in both subsections 18003(d)(1) and (d)(8).  But traditionally, according to the Department, the "supplement not supplant" provision of Title I "require[s] that a Title I school receive the State and local funds necessary to provide services required by law for children with disabilities and English learners."[10]

---

[9] U.S. Dep't of Educ., *Elementary and Secondary School Emergency Relief Fund Frequently Asked Questions about the Elementary and Secondary School Emergency Relief Fund (ESSER Fund)*, https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf (Question 20).

[10] U.S. Dep't of Educ., *Supplement Not Supplant Under Title I, Part A of the Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act* (June 2019), https://www2.ed.gov/policy/elsec/leg/essa/snsfinalguidance06192019.pdf.

Accordingly, in a school district that uses the poverty-based formula in ESEA section 1117, the IFR would seemingly not permit LEAs to use CARES Act money for services required by IDEA for children with disabilities.  The Department's imposition of the "supplement not supplant" restriction through the IFR would preclude one of the prescribed uses of CARES Act funds.

65.  Section 76.665(d) states in part:

> (d) Equity. (1) Educational services and other benefits for students and teachers in non-public elementary and secondary schools must be equitable in comparison to services and other benefits for public school students and teachers participating in CARES Act programs, and must be provided in a timely manner.

This subsection purports to be based on the statutory definition of "Equity" in section 1117(a)(3) but omits anything reflecting the statute's words "*such* private school children" (emphasis added).  The IFR invokes equity arguments but seeks to contradict the explanation of "Equity" in section 1117 of the ESEA.

**Harmful Impact of the IFR to COPAA and Its Members**

66.  Public schools have incurred huge costs in responding to the COVID-19 pandemic. Some costs of responding to students' needs are greater for children from low-income families than for other children.  School closures require spending on distance learning technology, and many low-income families do not have the digital devices or the internet connectivity to participate fully.  Nearly 45 percent of households with children and an annual income below $25,000 do not have adequate internet and almost 29 percent do not have a computer at home.[11] The need to address this digital divide to ensure that all students can learn has put a financial strain on many districts.

---

[11] *See* Alliance for Excellent Educ. et al., *supra* n. 1 at 2, Table B1, and Table B3.

67.   Many children from low-income households depend on meals served by public schools to meet basic nutritional requirements, and schools have responded by spending more on making meals available.  There are many other examples of the need to spend more, including purchasing personal protective equipment, hiring cleaning companies, redesigning the layout of classrooms to allow for social distancing, adding protective shields in lobbies, and more.

68.   Public schools also have legal obligations to students with disabilities under federal, state, and local requirements that exceed the legal obligations of private schools.  For example, the Individuals with Disabilities Education Act applies to public schools but not to private schools.  COVID-19 has increased the cost of services to students with disabilities.

69.   These are expenditures by LEAs—defined statutorily as *public* educational authorities—for low-income students and students with disabilities that Congress expressly provided CARES Act funding to facilitate.  For example, an explicitly approved use of ESSER funds is "[p]lanning for and coordinating during long-term closures for how to provide meals to eligible students, how to provide technology for online learning to all students, [and] how to provide guidance for carrying our requirements under the Individuals with Disabilities Education Act (20 U.S.C. 1401 et. seq.)."  CARES Act § 18003(d)(8); *see also* §§ 18003(d)(2), (4), and (10).

70.   At the same time as pandemic-caused expenses to public schools have increased, state governments have less money with which to fund public schools.  States are experiencing budget deficits because of decreased revenue and increased expenses due to the pandemic.  Tax revenues are below what was budgeted before the pandemic, as COVID-19 has shrunken the economies of the states.  In most if not all states, an effect of reduced state budgets and the general prohibition of deficit spending by states will be a cut in state funding for K–12

education.  States have already modified or signaled they would incorporate the CARES Act

funds to fill the gaps in their public education budgets created by the pandemic.  As result of the

IFR, these gaps will not be able to be filled by state budgets, leaving holes in school districts'

budgets.

71.  Accordingly, any loss of funding for public schools will cause students at affected

schools to suffer harm.  This reverberates as harm to COPAA's members, who are parents of

children whose quality of education is impaired by reduced funding, and to their communities.

72.  The IFR unlawfully restricts and reduces the amount of CARES Act funding available

to provide services to public school students and their families, particularly those students

enrolled in schools that are not Title I participating schools ("non-Title I schools").

    a.    76.665(c)(3) prohibits LEAs that use the poverty-based formula of section 1117

of the ESEA, which Congress adopted in the CARES Act, from spending any

CARES Act money for schools that are non-Title I schools.  The IFR estimates

that 25% of LEAs that are subject to the equitable services requirement (2,530

LEAs) will implement this alternative.  85 Fed. Reg. at 39,487.  Students

attending those non-Title I schools will lose all support from the CARES Act.

    b.    Of those 2,530 LEAs, the IFR estimates that 315 of them would calculate the

poverty-based formula based on 76.665(c)(1)(i)(B).  85 Fed. Reg. at 39,487.  As

noted above, that subsection diverges from section 1117 of the ESEA by allowing

the proportion of funding for private schools' equitable services to be computed

using a denominator that excludes all the low-income students in public schools in

that district that are non-Title I schools.  *See supra* ¶ 61.  This provision would

divert CARES Act money from public school students to private school students in every district with any non-Title I schools.

c.   Finally, the IFR estimates that the remaining 75% of LEAs that are subject to the equitable service requirement (7,595 LEAs) will implement the enrollment-based formula.  85 Fed. Reg. at 39,487.  Most private schools that receive equitable services pursuant to section 1117 are attended by a smaller percentage of students from low-income families than the percentage of such children in the public schools of the LEA.  *See infra* ¶¶ 76–77.  As a result, more money would go to private school students and less to public school students under the second option, 76.665(c)(1)(ii), than under 76.665(c)(1)(i).

73.   The IFR also unlawfully narrows the permitted uses of CARES Act funding by public schools.  Section 76.665(c)(3) orders LEAs that elect to distribute funds using the poverty-based allocation of section 1117 of the ESEA to comply with the "supplement not supplant" requirement in section 1118(b) of the ESEA, which imposes additional restrictions on how money can be spent.  Those restrictions would prevent many uses of funds that Congress expressly permitted, including uses for students with disabilities mandated by IDEA.  The restrictions would also prevent school districts from relying on CARES Act funds to take the place of state-level funding cuts.

74.   A number of COPAA's parent members have children enrolled in non-Title I schools in school districts that will receive CARES Act funds from the ESSER fund.  One such COPAA member is a parent whose children attend Prosper High School and Rock Hill High School in the Prosper Independent School District in Texas; according to the most recent publicly available data, these are both non-Title I schools in a school district with at least one Title I school.

25

75.   Another COPAA parent member's children attend Bak Middle School of the Arts and Alexander W. Dreyfoos Junior School of the Arts in the Palm Beach School District in Florida; according to the most recent publicly available data, these are both non-Title I schools in a school district with at least one Title I school.  There are other similarly situated members, many of whom are school district taxpayers as well as parents of children enrolled in public schools.

76.   The Department's own National Center for Education Statistics reports that, in 2016, 18.3% of students in all public schools in grades 1 through 12 were poor and 22.2% were near-poor, as defined by the Census Bureau's poverty threshold.  By comparison, only 7.6% of students in all private schools in grades 1 through 12 were poor and 13.1% were near-poor.[12]

77.   Likewise, the Department's National Center for Education Statistics reports that 37% of all K–12 public school students received Title I services and 55.2% of all public K–12 students were approved for free or reduced price lunch.  By comparison, just 4% of all private K–12 students received Title I services and 8.7% of all private K–12 students were approved for free or reduced price lunch.[13]

78.   In each district described above in paragraphs 74–75, consistent with the national trends and on information and belief, the school district enrolls a higher percentage of students from low-income families than the percentage of low-income students attending private schools that participate in district's equitable services programs funded pursuant to section 1117 of the

---

[12] *See* U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *School Choice in the United States: 2019*, at 68 (Table 4.1) (Sept. 2019), https://nces.ed.gov/pubs2019/2019106.pdf.

[13] *See* U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *Characteristics of Public and Private Elementary and Secondary Schools in the United States: Results From the 2017–18 National Teacher and Principal Survey: First Look*, at 7–8 (Table 1) (Aug. 2019), https://nces.ed.gov/pubs2019/2019140.pdf.

ESEA.  In addition, on information and belief, each district identified above has low-income students that attend non-Title I schools.

79.   Compliance with the IFR will imminently injure the COPAA parent members and their children, including those described above in paragraphs 74–75 in one of two ways.  If their district elects to use the poverty-based proportionality options of 76.665(c)(1)(i), none of the CARES Act money can be used at the non-Title I school attended by their children. Alternatively, if their district elects to use the enrollment-based proportionality option of 76.665(c)(1)(ii), a greater amount of the CARES Act money will be diverted from serving public school students in the district, including these children of COPAA parent members, to serving private school students.  All options permitted by the IFR will force the school district to provide less CARES Act funding for the education of the children of these COPAA parent members than the approach to proportionality between private and public schools that Congress required in CARES Act section 18005(a), to wit a poverty-based approach that does not preclude using CARES Act funds in non-Title I schools.

80.   For example, the Palm Beach County School District, which has both Title I and non-Title I schools, reports that it would allocate roughly $1.51 million in equitable services using the poverty-based proportionality option.  If the district chooses this option, its non-Title I students, including the children of at least one COPAA member, will not benefit from *any* of the CARES Act funds.  Under the enrollment-based proportionality option, the district reports that it would be required to allocate roughly $2.32 million in equitable services, representing a 53 percent increase in the allocation and a loss of $800,266 in CARES Act funds for the public schools in the district.  If the district chooses this option, all public school students in the Palm Beach County School District will have fewer CARES Act funds available to their schools. While these

public school students stand to lose CARES Act funding under the IFR, on information and belief, at least eight private schools in Palm Beach County have benefited from PPP funds under the CARES Act, four of which received loans over $1 million each.

81.   Through the CARES Act, Congress repeatedly and explicitly encouraged use of ESSER and GEER funds to support education for students with disabilities, including the added expense for remote learning and other consequences of COVID-19.  But as is described in paragraphs 9, 25–26, and 72 above, the unlawful restrictions on CARES Act funds that would result from 76.665(c)(1) and (3) will reduce funding for services to all public school students, including students with disabilities, compared to the amounts of money and uses permitted pursuant to the CARES Act that are contradicted by 76.665.  At a time when students with disabilities are likely to have an increased need for academic and socio-emotional services and supports due to the disruption of their educations during the pandemic, the Department through the IFR has illegally limited the resources available to these students instead.  Challenging this unlawful reduction of educational resources for students with disabilities on behalf of COPAA's parent members and their children in this action is squarely within COPAA's organizational purpose.

82.   Absent declaratory and injunctive relief, COPAA and its members and their children will be immediately, continuously, and irreparably harmed by the IFR and Defendants' unlawful actions.

**CLAIM FOR REL1EF**

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) & (2)(C)**

83.   Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

84.   Under the Administrative Procedure Act, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

85.   In the CARES Act, Congress did not delegate authority to the Department to regulate on the subject of the proportion of CARES Acts funds that LEAs must or may use for services to non-public schools.  Both section 18005 and its adopted provisions in ESEA section 1117 direct the conduct of LEAs, with no reference to any rule-making or other exercise of authority by the Department or the Secretary.

86.   Based on the facts alleged above, each of the following provisions is in excess of statutory authority and not in accordance with the CARES Act: 76.665(a)(1); the portion of 76.665(b)(2) stating "except to the extent inconsistent with . . . this section, such as section 1117(b)(1)(E) and (J)(ii)"; 76.665(c)(1) (first paragraph); 76.665(c)(1)(i); 76.665(c)(1)(i)(B); 76.665(c)(1)(ii); 76.665(c)(3); and 76.665(d)(1).  These unlawful sections constitute the substance of the IFR, aside from provisions that simply restate statutory subsections.

87.   The IFR is also arbitrary and capricious.  Defendants have relied on factors that Congress did not intend for them to consider; entirely failed to consider important aspects of the problem; and offered explanations that run counter to the evidence before the Department or are so implausible that they cannot be ascribed to a difference in view or the product of agency expertise.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment:

A.  Setting aside Defendants' IFR in its entirety;

B.  Declaring that Defendants' IFR is illegal;

C.  Enjoining the Department of Education and its officers, employees, and agents from implementing or enforcing the IFR;

D.  Awarding Plaintiff its reasonable costs and attorney's fees incurred in the prosecution of this action; and

E.  Awarding such other equitable and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 10th day of August, 2020

By:   */s/ G. Brian Busey*
G. Brian Busey

Seth Galanter (*Pro Hac Vice Pending*)
Alice Y. Abrokwa (*Pro Hac Vice Pending*)
NATIONAL CENTER FOR YOUTH LAW
1313 L Street, N.W., Suite 130
Washington, D.C. 20005
Tel: (202) 868-4781
Fax: (202) 868-4788
sgalanter@youthlaw.org
aabrokwa@youthlaw.org

G. Brian Busey (D.MD. Bar Number 03918)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 887-1500
Fax: (202) 887-0763
gbusey@mofo.com

Rachel E. M. Velcoff Hults (*Pro Hac Vice Pending*)
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, California 94612
Tel: (510) 835-8098
Fax: (510) 835-8099
rvelcoff@youthlaw.org

Jack W. Londen (*Pro Hac Vice Pending*)
Jessica L. Grant (*Pro Hac Vice Pending*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel: (415) 268-7000
Fax: (415) 268-7522
jlonden@mofo.com
Jgrant@mofo.com