**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.,<br><br>              Plaintiff,<br><br>    v.<br><br>ELISABETH (BETSY) DEVOS, *in her official capacity as Secretary of Education, et al.*<br><br>              Defendants. | Case 1:20-cv-02310-GLR |

**<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
COPAA'S MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 1

LEGAL STANDARD.............................................................................................. 4

ARGUMENT ........................................................................................................... 4

I.     THE COURT SHOULD SET THE IFR ASIDE BECAUSE IT IS CONTRARY TO THE PLAIN LANGUAGE OF THE CARES ACT................................................. 5

    A.     Section 18005(a) Means What It Unambiguously Says. ............................... 6

    B.     The IFR's Interpretation Contradicts the Plain Language of Section 18005(a) and Undermines Its Purpose.................................................................................... 9

        1.     Allocation of Funds to Private Schools Based on Poverty Is Not Merely Incidental To or Dispensable From ESEA Section 1117................................. 9

        2.     Congress Could Have Referred To a Different Statute To Authorize Allocation Based on Total Private School Enrollment, But It Chose Section 1117 Instead. ........................................................................................... 12

    C.     The IFR's Contrived Arguments Fail to Identify any Ambiguity in Section 18005(a) That Could Justify Changing the Basis for the Amount of Funds Allocated to Private Schools.................................................................................................. 13

II.     THE COURT SHOULD SET THE IFR ASIDE BECAUSE DEFENDANTS HAVE ACTED IN EXCESS OF THEIR AUTHORITY............................................... 17

III.     DEFENDANTS' INTERPRETATION OF THE CARES ACT IS NOT ENTITLED TO DEFERENCE. ................................................................................................ 21

    A.     The IFR Fails the Tests for *Chevron* Deference. ..................................... 21

        1.     Defendants' Arguments About Equity Misread the Statute and Unreasonably Substitute a Different Policy Choice for the One Made by Congress. ........... 23

        2.     The "Supplement Not Supplant" Condition that Defendants Impose Upon an LEA's Choice to follow section 1117 Conflicts With Guidance that Defendants Issued in the Past and Have Not Withdrawn. .............................. 25

    B.     The IFR Does Not Merit *Skidmore* Deference Because Defendants' Reasoning is Not Persuasive. .................................................................................................. 27

IV.     COPAA HAS STANDING TO CHALLENGE THE IFR. ................................. 28

V.     THE LEGALLY MANDATED REMEDY IS AN ORDER FINDING THE IFR UNLAWFUL AND SETTING IT ASIDE. ........................................................ 33

CONCLUSION........................................................................................................ 35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Academy of Pediatrics v. Food and Drug Admin.*,
   399 F.Supp.3d 479 (D. Md. 2019) ........................................................................33

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   271 F.3d 262 (D.C. Cir. 2001) ...............................................................................4

*Barton v. Barr*,
   140 S. Ct. 1442 (2020) .........................................................................................15

*Blue Water Baltimore, Inc. v. Wheeler*,
   No. GLR-17-1253, 2019 WL 1317087 (D. Md. Mar. 22, 2019) ...........................4

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ................................................................................4

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ...................................................................................... *passim*

*City of Columbus v. Trump*,
   No. CV DKC 18-2364, 2020 WL 1820074 (D. Md. Apr. 10, 2020) .......................4

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*,
   365 F. Supp. 3d 28 (D.D.C. 2019), *appeal dismissed*, No. 19-5137, 2019 WL
   4565514 (D.C. Cir. Sept. 18, 2019) ....................................................................33

*Cuomo v. Clearing House Ass'n, L.L.C.*,
   557 U.S. 519 (2009) ........................................................................................15, 16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) .....................................................................................26, 34

*Doe v. Tenenbaum*,
   127 F. Supp. 3d 426 (D. Md. 2012) ......................................................................21

*In re Fed. Bureau of Prisons' Execution Protocol Cases*,
   955 F.3d 106 (D.C. Cir. 2020) ..............................................................................8

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ..............................................................................................20

*Gwinn Area Cmty. Sch. v. State of Mich.*,
   741 F.2d 840 (6th Cir. 1984), *abrogated on other grounds by Lapides v. Bd. of
   Reg. of Univ. of Ga.*, 122 S. Ct. 1640 (2002) ...................................................31, 32

*Jimenez-Cedillo v. Sessions*,
  885 F.3d 292 (4th Cir. 2018) ...................................................................................26

*Johnson v. U.S. Dep't of Educ.*,
  2018 WL 3420016 (D. Md. July 13, 2018)..................................................................6

*Koenick v. Felton*,
  190 F.3d 259 (4th Cir. 1999) ...................................................................................32

*Kravitz v. U.S. Depart't of Commerce*,
  366 F. Supp. 3d 681 (D. Md. 2019), *remanded on other grounds by La Union
  Del Pueblo Entero v. Ross*, 771 Fed. App'x 323 (4th Cir. 2019) ...........................31

*Mayo Found. for Med. Educ. & Research v. United States*,
  562 U.S. 44 (2011)...................................................................................................22

*Michigan v. DeVos*,
  No. 3:20-cv-04478-JD, ECF No. 82 (N.D. Cal. Aug. 26, 2020) ...............................5

*Microsoft Corp. v. i4i L. P.*,
  564 U. S. 91 (2011)..................................................................................................15

*Mowbray v. Kozlowski*,
  914 F.2d 593 (4th Cir. 1990) ...................................................................................21

*N.C. Growers' Ass'n v. UFW*,
  702 F.3d 755 (4th Cir. 2012) .....................................................................................4

*National Association for the Advancement of Colored People v. Trump*,
  315 F.Supp.3d 457 (D.D.C. 2018)............................................................................34

*New York v. U.S. Dep't of Health & Human Servs.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019).......................................................................22

*Oakley v. DeVos*,
  No. 20-CV-03215-YGR, 2020 WL 3268661 (N.D. Cal. June 17, 2020) .................19

*Perez v. Cuccinelli*,
  949 F.3d 865 (4th Cir. 2020) .....................................................................................6

*Rendelman v. Rouse*,
  569 F.3d 182 (4th Cir. 2009) ...................................................................................21

*Russello v. United States*,
  464 U.S. 16 (1983)...................................................................................................18

*Sch. Bd. of the City of Richmond, Va. v. Baliles*,
  829 F.2d 1308 (4th Cir. 1987) .................................................................................32

*Shepheard v. Godwin*,
    280 F. Supp. 869 (E.D. Va. 1968) ..................................................32

*Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ......................................................28

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944) ...........................................................27, 35

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..............................................................29

*Thompson v. U.S. Dep't of Hous. & Urban Dev.*,
    348 F. Supp. 2d 398 (D. Md. 2005) ..................................................6

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ..............................................................21

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) ..............................................................21

*Washington v. DeVos*,
    No. 2:20-cv-01119-BJR, 2020 WL 5079038 (E.D. Wash. Aug. 21, 2020).......................5, 31

*Washington v. DeVos*,
    No. 2:20-CV-0182-TOR, 2020 WL 3125916 (E.D. Wash. June 12, 2020) ...........................19

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*,
    550 U.S. 516 (2007) ..............................................................28

**Statutes**

5 U.S.C.
    § 706(2)(A) ...................................................................5, 33
    § 706(2)(C)...................................................................5, 33

20 U.S.C.
    § 1221e-3 ....................................................................20, 22
    § 3474........................................................................20, 22
    §§ 6311–6339, ESEA Title I....................................................10
    § 6320(a), ESEA section 1117..................................................6
    § 6320(a)(3)(A), ESEA section 1117(a)(3)(A)....................................7, 23
    § 6320(a)(4)(A)(i), ESEA section 1117(a)(4)(A)(i)..............................8
    § 6320(a)(4)(D), ESEA section 1117(a)(4)(D)...................................8
    § 6320(b)(1)(F), ESEA section 1117(b)(1)(F)...................................11
    § 6320(b)(1)(J)(i) & (ii), ESEA section 1117(b)(1)(J)(i) & (ii)................11
    § 7881, ESEA § 8501..........................................................12
    § 7881(a)(4)(A), ESEA § 8501(a)(4)(A) ......................................12

§ 7881(b), ESEA § 8501(b) ...........................................................................12, 13

Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020)
    Coranvirus Aid, Relief, Economic Security Act ("CARES Act") .................................. *passim*

**Regulations**

34 C.F.R.
    § 76.665.........................................................................................................2
    § 76.665(c)(1)(i)..............................................................................................5
    § 76.665(c)(1)(ii).............................................................................................6
    § 76.665(c)(3) .................................................................................................5

85 Fed. Reg. 39,479 (July 1, 2020)..................................................................... *passim*

**Federal Guidance**

Memorandum from Cong. Research Service to House Comm. on Educ. and
    Labor, *Analysis of the CARES Act's Equitable Services Provision* (July 1,
    2020) ...........................................................................................................7, 17

Office of Educ., Dep't of Health Educ. and Welfare, *History of Title I ESEA* (Jun.
    1969), available at https://eric.ed.gov/?id=ED033459 ...........................................10

*Paycheck Protection Program*, U.S. Small Bus. Admin.,
    https://www.sba.gov/funding-programs/loans/coronavirus-relief-
    options/paycheck-protection-program#section-header-5 (last visited Aug. 6,
    2020) ...............................................................................................................24

*The CARES Act Provides Assistance to Small Businesses*,
    U.S. Dep't of Treas., https://home.treasury.gov/policy-issues/cares/assistance-
    for-small-businesses (last visited Aug. 6, 2020)...................................................24

U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *Characteristics of Public and
    Private Elementary and Secondary Schools in the United States: Results From
    the 2017-18 National Teacher and Principal Survey: First Look* (Aug. 2019),
    https://nces.ed.gov/pubs2019/2019140.pdf ...........................................................3

U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *School Choice in the United
    States: 2019* (Sept. 2019), https://nces.ed.gov/pubs2019/2019106.pdf....................3

U.S. Dep't of Educ., *Elementary and Secondary School Emergency Relief Fund:
    Frequently Asked Questions about the Elementary and Secondary School
    Emergency Relief Fund (ESSER Fund)*,
    https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-
    Questions.pdf ....................................................................................................26

**Treatises**

Ballentine's Law Dictionary (2010) ................................................8

Black's Law Dictionary (11th ed. 2019).............................................7

Merriam-Webster, https://www.merriam-webster.com/dictionary/provide ...................................7

**Other Authorities**

*AU's New Report Details How Billions in Pandemic Relief Was Diverted to Private Schools*, Americans United for Separation of Church and State: Wall of Separation Blog (July 30, 2020), https://www.au.org/blogs/pandemic-aid-private-schools ................................................25

Emma Brown, *The Overwhelming Whiteness of U.S. Private Schools, in Six Maps and Charts*, Wash. Post (Mar. 29, 2016), https://www.washingtonpost.com/news/education/wp/2016/03/29/the-overwhelming-whiteness-of-u-s-private-schools-in-six-maps-and-charts/ ..............................3

Samantha Sokol et al., Americans United for Separation of Church and State, *The Paycheck Protection Program Has Provided Billions in Federal Funds to Private and Religious Schools* (2020), https://www.au.org/sites/default/files/2020-07/PPP%20COVID%20Relief%20Money%20for%20Private%20Schools%207.29.20_0.pdf ................................................25

## INTRODUCTION

On July 1, 2020, Secretary Betsy DeVos and the U.S. Department of Education issued an interim final rule that changes how funding is distributed under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act"), Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020).[1]  The interim final rule improperly diverts emergency relief funding from economically disadvantaged public schools to less disadvantaged private schools. If allowed to stand, this interim final rule would therefore result in public schools losing a significant amount of funding, which would be particularly devastating given the current economic shortfall currently faced by many public schools due to the COVID-19 pandemic.  As shown below, Congress neither explicitly nor implicitly granted Defendants the authority to promulgate the interim final rule, its promulgation was in excess of statutory authority, and was not in accordance with law.  The interim final rule is also contrary to the language of the CARES Act and its overall scheme, and therefore must be set aside.

## BACKGROUND

The ongoing COVID-19 pandemic has wreaked havoc on our nation's public schools. Beginning in March 2020, public schools in most states were required to close and forced to try to educate their students remotely in order to protect the health and safety of students and staff. Coping with the pandemic has imposed and will continue to impose extraordinary expenses for remote learning technology, increased staffing needs, and other additions to the costs for which the schools had budgeted.  Millions of American children, particularly children in low-income households, are at an academic disadvantage because they do not have sufficient internet access

---

[1] Published version available at https://www.congress.gov/116/plaws/publ136/PLAW-116publ136.pdf.

or a computer at home.  At the same time, the pandemic has caused many businesses to close, at least temporarily, and economic activity to slow.  As a result of diminished revenues, most states have been compelled to reduce their funding to public schools.

To help public schools shoulder the sudden and substantial new expenses caused by this public health emergency, Congress appropriated billions of dollars to public K–12 schools in the CARES Act.  In addition to providing a huge separate pool of federal funds for which private schools are eligible, the CARES Act further requires that public school districts provide "equitable services" to students enrolled in private schools by spending a proportion of the districts' CARES Act funds on private school students.  Specifically, section 18005(a) of the CARES Act requires school districts to provide equitable services to eligible private school students and teachers "in the same manner as provided under section 1117" of Part A of Title I of the Elementary and Secondary Education Act of 1965 ("ESEA"), which allocates federal funds using a poverty-based formula based on the proportion of students from low-income backgrounds attending the private school.

Instead of allowing states and school districts to comply with the plain language of the statute, the U.S. Department of Education and Secretary Betsy DeVos used the COVID-19 public health crisis to further their own agenda to divert more federal funds to support students enrolled in private schools.  They issued an interim final rule, effective July 1, 2020, entitled "Providing Equitable Services to Students and Teachers in Non-public Schools," enacting 34 C.F.R. § 76.665, published at 85 Fed. Reg. 39,479 (July 1, 2020) (the "IFR").  This IFR unlawfully deprives public schools of a significant portion of the funding Congress made available for public school students.  The IFR purports to resolve ambiguities in section 18005(a) of the CARES Act, but it instead disregards the plain language of the statute.  And though the

IFR purports to interpret section 18005(a), instead it introduces new requirements and restrictions on the spending of funds as between public school students and private school students that are not present in the CARES Act itself.

This impermissible diversion of funds will exacerbate the inequity between public and private school students because compared to public school students, private school students are less likely to be students with disabilities, students of color, students for whom English is not their first language, or students from low-income families.  For example, private schools only serve 7.2% of all students with disabilities.[2]  The diversion of funds under the IFR will also injure the members of Plaintiff Council of Parent Attorneys and Advocates, Inc. ("COPAA").  COPAA is a national nonprofit organization that includes more than 500 members who have a child with a disability, or who are family members of a child with a disability.  Almazan Decl. ¶ 4.  These members are located in 49 states and the District of Columbia.  *Id.*  COPAA, as the representative of parents whose children attend public schools in districts whose funding will be diverted under the IFR, seeks an order under the Administrative Procedure Act ("APA") setting aside the IFR and declaring it unlawful.

---

[2] *See* U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *Characteristics of Public and Private Elementary and Secondary Schools in the United States: Results From the 2017-18 National Teacher and Principal Survey: First Look,* at 7-8, 9-10 (Tables 1, 2) (Aug. 2019), https://nces.ed.gov/pubs2019/2019140.pdf; U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *School Choice in the United States: 2019,* at 21, 30 (Figs. 3.1, 4.3), 56 (Table 1.3) (Sept. 2019), https://nces.ed.gov/pubs2019/2019106.pdf; Emma Brown, *The Overwhelming Whiteness of U.S. Private Schools, in Six Maps and Charts*, Wash. Post (Mar. 29, 2016), https://www.washingtonpost.com/news/education/wp/2016/03/29/the-overwhelming-whiteness-of-u-s-private-schools-in-six-maps-and-charts/.

**LEGAL STANDARD**

In APA cases, "[t]he district court decides as a matter of law, 'whether the agency action is . . . consistent with the APA standard of review.'" *Blue Water Baltimore, Inc. v. Wheeler*, No. GLR-17-1253, 2019 WL 1317087, at *2 (D. Md. Mar. 22, 2019) (quoting *Red Wolf Coalition v. U.S. Fish & Wildlife Serv.*, 346 F. Supp. 3d 802, 809 (E.D.N.C. 2018)), *appeal dismissed*, 2019 WL 6173493 (4th Cir. June 6, 2019).  Determining whether an agency's actions are "contrary to law presents such a question of law" that can "be resolved on a motion for summary judgment" without recourse to any administrative record. *City of Columbus v. Trump*, No. CV DKC 18-2364, 2020 WL 1820074, at *20 (D. Md. Apr. 10, 2020); *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266–67 (D.C. Cir. 2001) (rejecting argument that court could not act on APA claims in absence of administrative record; "we agree with the district court that the [plaintiff's] argument that the challenged provisions violate the [statute] can be resolved with nothing more than the statute and its legislative history").

Summary judgment on an APA claim and on standing is appropriate when there is no genuine issue of material fact.  *N.C. Growers' Ass'n v. UFW*, 702 F.3d 755, 763 (4th Cir. 2012); *Bostic v. Schaefer*, 760 F.3d 352, 370-71 (4th Cir. 2014); Fed. R. Civ. P. 56(a).

**ARGUMENT**

COPAA is entitled to summary judgment.  The clear and unambiguous language of section 18005(a) of the CARES Act requires school districts to provide equitable services to eligible private school students and teachers "in the same manner as provided under section 1117" of Title I.  The IFR contradicts this mandate and imposes unlawful restrictions and conditions on CARES Act funding to K–12 public schools that Congress did not prescribe or authorize Defendants to prescribe.  Such an action constitutes a violation of the APA because it is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or

4

limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).  COPAA has standing to challenge the IFR on behalf of its members and therefore, for the reasons detailed below, the IFR should be set aside and held unlawful.

While granting motions for preliminary injunctions against enforcement of the IFR, two district courts have already ruled that plaintiffs are likely to succeed on the merits on the same claim under the APA as in this case — that the IFR is unauthorized and contrary to law. *Washington v. DeVos*, No. 2:20-cv-01119-BJR, 2020 WL 5079038 (E.D. Wash. Aug. 21, 2020); *Michigan v. DeVos*, No. 3:20-cv-04478-JD, ECF No. 82 (N.D. Cal. Aug. 26, 2020).  COPAA is likewise entitled, based on material facts that are undisputed, to a judgment setting the IFR aside.

## I.   THE COURT SHOULD SET THE IFR ASIDE BECAUSE IT IS CONTRARY TO THE PLAIN LANGUAGE OF THE CARES ACT.

No one questions that under the CARES Act, school districts must provide "equitable services" to eligible students enrolled in private schools.  The relevant interpretive question is how much districts must spend on such services for those private school students.  Under the IFR, Defendants have given school districts two options for determining the amount of CARES Act funding to spend on private school students.  The first option maintains a poverty-based allocation but imposes illegal conditions on the funding.  Under this option, if a school district elects to use the poverty-based formula set forth in section 1117 of the ESEA, it must: (1) spend the CARES Act funds only on schools that are funded under Title I of the ESEA, 34 C.F.R. § 76.665(c)(1)(i); and (2) conform to "supplement not supplant" restrictions that are present in a different section of the ESEA but not adopted by the CARES Act, *id.* § 76.665(c)(3).  Both are unlawful restrictions that Congress did not impose on CARES Act funding.  The IFR's other option imposes an enrollment-based allocation formula based on the number of enrolled private school students rather than, as with section 1117, on the number of low-income students

attending the private school.  *Id.* § 76.665(c)(1)(ii).  This enrollment-based allocation method

contradicts the CARES Act and its adoption of the standards of section 1117 of the ESEA.

### A.   Section 18005(a) Means What It Unambiguously Says.

Section 18005(a) of the CARES Act mandates that funds be distributed to non-public

school children using section 1117's poverty-based allocation.  134 Stat. at 568.  By enacting the

IFR, Defendants disregard and fail to act in accordance with the CARES Act's plain language.

*See, e.g.*, *Perez v. Cuccinelli*, 949 F.3d 865 (4th Cir. 2020) (en banc) (holding that the United

States Citizenship and Immigration Services' interpretation of a provision of the act was not in

accordance with law, where the statute clearly and unambiguously meant one thing); *Johnson v.*

*U.S. Dep't of Educ.,* 2018 WL 3420016, at *3 (D. Md. July 13, 2018) ("An agency's

construction of a statute it administers can only be deemed 'not in accordance with law' if the

relevant statute unambiguously forecloses the agency's interpretation, or if the agency's

interpretation is not a permissible construction of the statute." (citing *Chevron, U.S.A., Inc. v.*

*Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984))); *Thompson v. U.S. Dep't of Hous. &*

*Urban Dev.*, 348 F. Supp. 2d 398, 421 (D. Md. 2005) ("Statutory violations, of course, may

constitute agency action 'not in accordance with law' within the meaning of the APA.").

The meaning of the relevant statutory provision, section 18005(a) of the CARES Act, is

plain.  Section 18005(a) requires Local Educational Agencies ("LEAs") to "provide equitable

services *in the same manner as provided under section 1117* of the [Elementary and Secondary

Education Act of 1965 (ESEA)] to students and teachers in non-public schools, as determined in

consultation with representatives of non-public schools."  (Emphasis added.)  Section 1117, in

turn, requires LEAs to provide funding for equitable services for students and teachers in private

schools based on the proportion of low-income children in the district that attend such private

schools.  20 U.S.C. § 6320(a).  Thus, under the plain terms of section 18005(a), LEAs must

allocate CARES Act funds to private school students "in the same manner" as is required under section 1117—that is, based on the proportion of low-income children who attend such schools.

This straightforward reading of the statutory text follows from the plain meaning of each of its relevant components. The IFR nowhere contends that the first key phrase in section 18005(a)—"provide equitable services"—is ambiguous. *See* 85 Fed. Reg. at 39,481/1-2. Although the CARES Act does not specifically define any of these words, their meaning in this context is clear. The word "provide" generally means "to supply or make available (something wanted or needed)." *Provide*, Merriam-Webster, https://www.merriam-webster.com/dictionary/provide. And "equitable services" is a term-of-art used in the cross-referenced ESEA, which provides an explicit standard for what is considered "equitable." ESEA section 1117(a)(3)(A), 20 U.S.C. § 6320(a)(3)(A). As Defendants acknowledge, it refers to section 1117's requirement that private school students receive "[e]ducational services" that are "equitable in comparison to the services" provided to "public school children participating" in Title I programs. *Id.*; s*ee, e.g.*, 85 Fed. Reg. at 39,482/3; *see also* Memorandum from Cong. Research Service to House Comm. on Educ. and Labor, *Analysis of the CARES Act's Equitable Services Provision*, at 8 (July 1, 2020) ("CRS Analysis Memo").[3]

And how are LEAs to decide how they must allocate funds for those equitable services? Section 18005(a)'s next phrase supplies the answer: "in the same manner as provided under section 1117 of the ESEA." This language is likewise unambiguous. The word "same" ordinarily means "identical or equal" or "resembling in every relevant respect." *Same*, Black's

---

[3] Available at https://blogs.edweek.org/edweek/campaign-k-12/CRS%20Analysis%20of%20CARES%20Act%27s%20Equitable%20Services%20Provision%20%282%29.pdf.

Law Dictionary (11th ed. 2019).  And "manner" refers to the "way, mode, method of doing anything, or mode of proceeding in any case or situation."  *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 114 (D.C. Cir. 2020) (Katsas, J., concurring) (quoting *Manner*, Black's Law Dictionary (6th ed. 1990)); *accord*, *e.g.*, *Manner*, Ballentine's Law Dictionary (2010) ("Way of performing or executing; method; custom; habitual practice."). ESEA section 1117(a)(4(A)(1) and (c)(1) state the way LEAs must determine the amount of money to spend on equitable services for private schools — by counting the low-income private school students.  LEAs must allocate funds under section 18005(a) of the CARES Act in the identical way that they do "as provided under section 1117 of the ESEA."

Finally, the allocation method that Section 18005(a) incorporates from Section 1117 is likewise unambiguous.  The "equitable share," ESEA section 1117(a)(4)(D), 20 U.S.C. § 6320(a)(4)(D) —that is, the amount of money that a school district must spend on equitable services for eligible private school children—in section 1117 is "based on the number of children from low-income families who attend private schools."  ESEA section 1117(a)(4)(A)(i), 20 U.S.C. § 6320(a)(4)(A)(i).  In other words, the proportion of funding that must be allocated to support private school students and teachers depends on the proportion of low-income children attending those schools.  Section 1117 contains no other method for determining how such funds must be allocated.  To "provide equitable services in the same manner as provided under Section 1117 of the ESEA," then, LEAs necessarily must use section 1117's poverty-based allocation. No other reading is permissible.

Because section 18005 of the CARES Act plainly tells LEAs how to provide equitable services to non-public schools under the CARES Act according to section 1117 of the ESEA, Defendants' interpretation runs counter to the law and should be invalidated.

### B.   The IFR's Interpretation Contradicts the Plain Language of Section 18005(a) and Undermines Its Purpose.

The plain language of the statute is confirmed by the context in which Congress enacted the CARES Act.  Repeatedly in the CARES Act, for the sake of speed in getting money to those in need, Congress referred to already-established allocation formulas in other statutes.  The CARES Act contains many cross-references to other statutes.[4]  School districts have decades of experience in providing equitable services to private schools with funding they obtain under Title I of the ESEA.  ESEA section 1117 is the provision that school districts have followed in doing so.  Rather than create a new standard and procedure, Congress chose to reference section 1117 when it directed that LEAs use some CARES Act funding for equitable services to private schools.  Congress's choice must be respected.  Nothing authorizes or justifies Defendants' attempt to impose a new and different manner of allocating money to private schools.

### 1.   Allocation of Funds to Private Schools Based on Poverty Is Not Merely Incidental To or Dispensable From ESEA Section 1117.

The rationale of the IFR depends on the notion that Congress could sensibly have said "in the same manner as provided under section 1117 of the ESEA" without meaning to include the poverty-based allocation of section 1117(a)(1)(4)(A)(i).  This argument overlooks that Congress specifically invoked ESEA Title I distributions as the source of other allocations of CARES Act money for public schools.  It also assumes that Congress said "in the same manner as provided in section 1117" without realizing that the poverty-based allocation standard appears in *four* subsections of section 1117.

---

[4] Seventeen of the 21 times the words "in the same manner" appear in the CARES Act are in cross-references to other federal statutes, Federal regulations, or state laws.  *See* footnote 7, *infra*.

a.     **Defendants Ignore How the CARES Act Invokes Title I of the
ESEA as a Source of Allocation Standards for Public Schools.**

Defendants do not and cannot deny that Congress invoked the equitable services

provision of Title I of the ESEA for the manner of providing equitable services to private schools

with CARES Act funds.  Passed in 1965 as part of President Lyndon Johnson's War on Poverty,

the ESEA provides federal funding for elementary and secondary education, emphasizing equal

access to education and aiming to narrow the achievement gaps between students.  *See* Office of

Educ., Dep't of Health Educ. and Welfare, *History of Title I ESEA* (Jun. 1969), available at

https://eric.ed.gov/?id=ED033459.  Title I of the ESEA ("Title I"), codified as amended at 20

U.S.C. §§ 6311–6339, is entitled "Improving the Academic Achievement of the Disadvantaged."

State education agencies and school districts have decades of experience in allocating and using

federal grant funds as specified in Title I.

Although Title I funds are allotted to states, school districts, and schools using four

different statutory formulas, the result of the allocations corresponds closely to the proportions of

low-income students.  The IFR correctly notes that all four Title I formulas try in "varying

degrees" to direct the funds to schools and school districts with "concentrations of poverty."  85

Fed. Reg. at 39,482 n.4.  Thus, as Defendants acknowledge, the statutory formulas "direct funds

to LEAs based primarily on [the number] of formula children," and "97 percent" of statutorily-

defined formula children "are children ages 5 through 17 in poverty in public and nonpublic

schools as determined annually by the Census Bureau."  *Id.*

Congress repeatedly referred to Title I for principles of allocation of funds for K–12

schools.  The CARES Act authorized the Governor's Emergency Education Relief (GEER) Fund

for grants to assist public K–12 and/or post-secondary schools, and it allocated 40% of the funds

as among the states according to the proportions of Title I funds to the states.  CARES Act

§ 18002(b)(2), 134 Stat. at 564-65.  All of the CARES Act money available to K–12 schools

from the Elementary and Secondary School Emergency Relief (ESSER) Fund is allocated among

the states in proportion to Title I funding, *see* CARES Act section 18003(b), 134 Stat. at 565, and

then among school districts within the state again in proportion to Title I funding, *see* CARES

Act section 18003(c), 134 Stat. at 565.  Title I funding proportions thus control the allocation of

most of the money available to the states for K–12 schools, and the proportions of total student

populations has no role in the allocations to the states.

Section 1117 is the ESEA's provision for using Title I funds to provide equitable services

to private schools.  Since Congress used Title I funding proportions to provide CARES Act

funding to the states for aid to K–12 schools, it is entirely consistent that Congress referred to

ESEA section 1117, including its allocation standard, for the manner of providing CARES Act

funds to provide equitable services to non-public schools.

### b. Poverty-Based Allocation of Funds Appears Not Just Once, But in Four Subsections within Section 1117.

Section 1117(a)(1)(4)(A)(i) mandates allocation of Title I funds for equitable services to

students at private schools according to the number of low-income students in private schools.

Section 1117(b)(1)(F) provides for consultation between districts and private schools on "the

method or sources of data that are used," stating that the funding proportion is to be based on

"the number of children from low-income families . . . who attend private schools."  20 U.S.C.

§ 6320(b)(1)(F).  Similarly, two subsections of 1117(b)(1)(J) allow the use of either pooled funds

or specific allocations, but either permitted choice must be based on the number of "children

from low-income families" who attend private schools.  20 U.S.C. § 6320(b)(1)(J)(i) and (J)(ii).

In addition, section 1117(c)(1) ("Allocation for Equitable Service to Private School Students,"

"Calculation") instructs that LEAs "shall have final authority, consistent with this section, to

calculate the number of children, ages 5 through 17, who are from low-income families and attend private schools."

Total school enrollment is never mentioned in section 1117 or in Title I as a whole as a basis for allocation of funds or for determination of eligibility.

> **2.    Congress Could Have Referred To a Different Statute To Authorize Allocation Based on Total Private School Enrollment, But It Chose Section 1117 Instead.**

True to form with other provisions of the CARES Act, Congress used a cross reference to an existing provision for the procedures and standards to allocate funds for a specified program. If it had intended LEAs to use the total number of enrolled private school students and not just enrolled low-income private school students, Congress could have incorporated section 8501 of the ESEA, 20 U.S.C. § 7881, which is the equitable services provision in Title VIII of the ESEA. Section 8501 governs the amount of money a public school must spend on equitable services for private school students under five parts of the ESEA other than Title I, part A.[5]  Section 8501(a)(4)(A) provides that school district expenditures for equitable services "shall be equal, taking into account the number and educational needs of the children to be served, to the expenditures for participating public school children."  20 U.S.C. § 7881(a)(4)(A).  Thus, the allocation formula in section 8501 is based on total enrollments in private and public schools.  *Id*. Congress did not choose ESEA section 8501 to reference for the manner of providing equitable services to private K–12 schools.  The CARES Act instead refers to section 1117 of the ESEA, which bases the allocation of funds on the number of low-income students.

---

[5] The five parts are: (A) part C of title I; (B) part A of title II; (C) part A of title III; (D) part A of title IV; and (E) part B of title IV.  Section 8501(b) of the ESEA, 20 U.S.C. § 7881(b)

Aside from the difference in fund allocation standards, section 8501 has many provisions similar to those in section 1117.[6]  The fundamental substantive difference between sections 1117 and 8501 is that the former is focused on Title I-eligible private school students and uses low-income private students as the basis for allocation of funds.  Congress chose section 1117, not section 8501.  Defendants cannot lawfully import their preferred enrollment-based formula when doing so departs from the poverty-based allocation formula in the section that Congress chose.

Defendants' rationale for the IFR depends on assuming that Congress overlooked four provisions in ESEA section 1117 on allocation of funds and overlooked a different section of the ESEA, section 8501, which uses Defendants' preferred allocation method — but which Congress did not choose to reference in section 18005(a).  The IFR fails to give effect to the CARES Act provision it purports to interpret and thus must be set aside.

**C.    The IFR's Contrived Arguments Fail to Identify any Ambiguity in Section 18005(a) That Could Justify Changing the Basis for the Amount of Funds Allocated to Private Schools.**

Defendants predicate the IFR upon purported ambiguity in section 18005(a).  However, the statute could hardly be more clear, and none of "ambiguities" claimed by Defendants exist.

_____

[6] ESEA section 1117(a) and section 8501(a) are closely parallel, except that: 1117(a)(3) and 8501(a)(3)(A) provide explicitly different descriptions of the comparisons considered to be equitable; and 1117(a)(1)(4) on "Expenditures" differs (as discussed in the text above), between the poverty-based allocation method of 1117(a)(1)(4)(A) and the allocation not so limited in 8501(a)(3)(A).  Section 8501(b)(1) provides for applicability to provisions of the ESEA other than Title I, Part A, and 8501(b)(2) defines "eligible children" with reference to those provisions and not Title I, Part A.  The "Consultation" provisions in 1117(b) and 8501(c) are parallel in substance (with no references in 8501(c) to the poverty-based allocation method of 1117).  Section 1117(c) on "Allocation for Equitable Service to Private School Students," which focuses on the calculation of low income private students, has no analogue in 8501.  Sections 1117(d) and 8501(d) are largely parallel "Public Control of Funds" provisions.  Section 1117(e) on "Standards for a Bypass" has no analogue in 8501.

Defendants first claim that "Congress did not need to use the words 'in the same manner' if it simply intended to incorporate 'section 1117 of the ESEA of 1965' by reference in the CARES Act." 85 Fed. Reg. at 39,481. Defendants assert that "[t]he unqualified phrase 'as provided in' alone would have been sufficient." *Id.* But even if Defendants were correct that section 18005(a) could have been expressed in fewer words, that would not make the statute ambiguous. Defendants identify no way to understand the phrase "in the same manner" to mean anything other than "in the identical way" or its equivalent.[7] Rather, Defendants' ultimate contention —that this phrase somehow grants them discretion to ignore section 1117's requirements entirely—is not remotely plausible given that the IFR nowhere contends that section 18005(a) or section 1117 contains any other allocation formula than based on proportion of low-income children in private schools.

The IFR's second claimed ambiguity is that section 18005(a) could not have imported the whole of ESEA section 1117 because some of the latter's provisions would be redundant. 85 Fed. Reg. at 39,481. The IFR notes that CARES Act 18005(a) requires consultation with private

---

[7] Other uses of the phrase "the same manner" in the CARES Act provide no support for the IFR. A text search of the CARES Act identifies 21 uses of that phrase. All refer to other laws, sources of law, or regulations in three categories:
(a) Cross-references to other CARES Act provisions — Sections 2102(c)(3)(A) [134 Stat. at 315] (in which the phrase cross-references another subsection of the CARES Act that includes a minimum funding level for unemployment benefits); and 2306(a) [134 Stat. at 358].
(b) Cross-references to other federal statutes and regulations — Section 1102(a)(1) [134 Stat. at 289]; 2104(b)(2)(A) [134 Stat. at 318]; 2201(c)(2)(C) [134 Stat. at 338]; 2301(b)(3)(B) [134 Stat. at 347]; 2303(b)(1) [134 Stat. at 353]; 2305(d)(2)A)(i) [134 Stat. at 357]; 3221(f) [134 Stat. at 377]; 3221(h) [134 Stat. at 378]; 3611(9) [134 Stat. at 415]; 3708(e) [134 Stat. at 421]; 3851(a) [134 Stat. at 440, 442]("the same manner" appears twice); Division B, Title II, Department of Commerce (an unnumbered proviso to appropriation language) [134 Stat. at 511]; 15010(e)(4)(C) [134 Stat. at 538]; 18005(a) [134 Stat. at 568].
(c) Cross-references to bodies of state law — Sections 2104(f)(4) [134 Stat. at 320]; 2104(g) [134 Stat. at 320]; 2105(f) [134 Stat. at 322]; and 2107(e)(4) [134 Stat. at 328].

schools about equitable services, as do several section 1117 provisions; and it notes "a public control of funds provision in section 18005(b), notwithstanding the fact that section 1117 contains precisely parallel provisions." *Id*. Defendants assert that this redundancy must be taken to imply that no "wholesale" incorporation of section 1117 was intended. *Id*. But repetition can be used to add emphasis, without any resulting ambiguity or conflict in meaning to be resolved by agency interpretation. "[R]edundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Barton v. Barr*, 140 S. Ct. 1442, 1453 (2020). For that reason, "[t]he canon against superfluity assists only where a competing interpretation gives effect to every clause and word of a statute." *Microsoft Corp. v. i4i L. P.*, 564 U. S. 91, 106 (2011) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2011)).

Even if repetition regarding consultation and public control did raise issues for interpretation, those are not the subject on which the IFR seeks to change what Congress provided in its reference to section 1117. A regulatory agency can provide meaning to uncertain statutory language only "within the bounds of that uncertainty" and not "to cover virtually any interpretation of" the statute. *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 525 (2009) (ambiguity in the meaning of "visitorial powers" in the National Bank Act did not allow the Office of the Comptroller to issue a regulation forbidding state judicial enforcement actions). The IFR points to no redundancy or ambiguity in section 18005(a) or ESEA section 1117 on the question of the amount of CARES Act funds that LEAs must allocate for equitable services to private schools. A single, unambiguous answer to that question — to use poverty-based apportionment — appears in four provisions of section 1117.

The IFR presents an example of a purported problem that it says requires a selective and not "wholesale" incorporation of section 1117:

> *Compare, e.g.,* section 1117(a)(1) (meeting the needs of non-public school students who are low-achieving and reside in a participating Title I public school attendance area) *with* sections 18002(c)(1) (emergency support for LEAs significantly impacted by COVID-19 to continue education services to their students and to support on-going functionality of the LEAs) and 18003(d) (support any activity from a broad array of permissible purposes for any student and staff without limitation on income, residence, or school attendance).

85 Fed. Reg. at 39,481.  The premise of this supposed problem is that section 1117(a)(1) should be read to prohibit any use of funds that would not be permissible for Title I funds, whereas Congress intended for CARES Act funds to be used broadly for all impacted students.  But section 1117(a)(1) imposes an affirmative duty on LEAs to provide services to eligible children; but it states no prohibitions.  Its list of permitted types of services is very broad, and it does not say that uses that are not listed or that benefit other children are forbidden.  Sections of Title I *other* than section 1117 do prohibit nonconforming uses of Title I funds (including, significantly, the "supplement not supplant" provision of ESEA section 1118(b)), but Congress did not reference those other sections in CARES Act section 18005(a).  The other uses that the CARES Act permits are clearly allowable; and no doubt on that is created by the reference to section 1117.

Moreover, if there were any conflict between sections 18002(c)(1) and 18003(d) and ESEA section 1117(a)(1), it would implicate only the permitted *uses* of CARES Act funds, not the *amounts* of funds that LEAs are required to devote to equitable services.  Uncertainty about the interpretations that Congress intended allows regulatory interpretation only "within the bounds of that uncertainty."  *See Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. at 525.  Ambiguity about *uses* of CARES Act funds thus would do nothing to support Defendants'

introduction of new policy choices about the *amounts* of funds for private schools.[8]

The IFR then poses the substantially the same argument as its third ambiguity argument:

> Finally, the CARES Act is a separate appropriation allowing
> separate permissible uses of taxpayer funds. By definition, the
> provisions in section 1117 relating to funding and eligibility for
> services, e.g., section 1117(a)(1) and (4) and (b)(1)(E) and (J)(ii),
> are inapposite in a CARES Act frame.. . .

*Id*.  As discussed above, the eligibility and use provisions in section 1117(a)(1) do not literally

preclude other uses, and therefore do not conflict with the CARES Act's permitted uses.  Further,

despite the words "by definition," there is nothing at all in the CARES Act that is inconsistent

with section 1117(a) (4) and (b)(1)(E) and (J)(ii) with regard to the allocation of funds.

Congress created no ambiguity and left no gap in section 18005(a) of the CARES Act

with regard to the amount of funds that LEAs must devote to equitable services.

## II.    THE COURT SHOULD SET THE IFR ASIDE BECAUSE DEFENDANTS HAVE ACTED IN EXCESS OF THEIR AUTHORITY.

The CARES Act nowhere indicates that Congress intended to give Defendants

rulemaking authority over the distribution of funding for school districts.  *See* CARES Act

§§ 18001-06.  This silence is particularly glaring because in numerous provisions of the CARES

Act other agencies are authorized and/or required to issue various regulations.[9]  But there is

---

[8] *See* CRS Analysis Memo at 11-12 ("Congress likely meant to indicate *how* LEAs should provide equitable services with relief funds rather than *for what* or t*o whom*—questions largely addressed in the sections establishing the relief funds.").  Thus, for example, schools entitled to receive CARES Act equitable services may use them as allowed by the CARES Act.

[9] *See, e.g.*, CARES Act § 1106(k) [134 Stat. at 301] ("Not later than 30 days after the date of enactment of this Act, the Administrator shall issue guidance and regulations implementing this section."); § 1109(d)(1) [134 Stat. at 305] ("The Secretary [of the Treasury] may issue regulations and guidance as necessary to carry out the purposes of this section . . . ."); § 1109(e) 134 Stat. at 306  ("The Secretary [of the Treasury] may issue regulations and guidance as necessary to carry out the purposes of this section. . . ."); § 1114 [134 Stat. at 312] ("Not later

nothing similar in the CARES Act regarding section 18005 or Defendants.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal citations omitted).  Section 18005 places the full responsibility for "provid[ing] equitable services" on school districts.

The language of sections 18001 through 18004 requires the Secretary to allocate funds.

---

than 15 days after the date of enactment of this Act, the Administrator shall issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under section 553(b) of title 5, United States Code."); § 2112(b) [134 Stat. at 333] ("The Railroad Retirement Board may prescribe any operating instructions or regulations necessary to carry out this section."); § 2201(a) [134 Stat. at 337] ("The Secretary [of the Treasury] shall prescribe such regulations or other guidance as may be necessary to carry out the purposes of this section . . . ."); § 2301(l) [134 Stat. at 350] ("The Secretary [of the Treasury] shall issue such forms, instructions, regulations, and guidance as are necessary . . . ."); § 2302(f) [134 Stat. at 352] ("The Secretary [of the Treasury] shall issue such regulations or other guidance as necessary to carry out the purposes of this section . . . ."); § 3221(i)(1) [134 Stat. at 378] ("The Secretary of Health and Human Services, in consultation with appropriate Federal agencies, shall make such revisions to regulations as may be necessary for implementing and enforcing the amendments made by this section, such that such amendments shall apply with respect to uses . . . ."); § 3708(f) [134 Stat. at 421] ("The Secretary of Health and Human Services shall prescribe regulations to apply the amendments made by this section to items and services furnished . . . ."); § 4003(f) [134 Stat. at 475] ("The Secretary [of the Treasury] is authorized to take such actions as the Secretary deems necessary to carry out the authorities in this subtitle, including, without limitation … (4) issuing such regulations and other guidance as may be necessary or appropriate to carry out the authorities or purposes of this subtitle."); § 4003(h)(2) [134 Stat. at 476] ("The Secretary of the Treasury (or the Secretary's delegate) shall prescribe such regulations or guidance as may be necessary or appropriate to carry out the purposes of this section . . . ."); § 18115(c) [134 Stat. at 574] ("The Secretary [of Health and Human Services] may make prescriptions under this section by regulation, including by interim final rule, or by guidance, and may issue such regulations or guidance without regard to the procedures otherwise required by section 553 of title 5, United States Code."); § 19005(c) [134 Stat. at 578] ("The Architect of the Capitol shall promulgate such regulations as may be necessary to carry out this section.").

*See* CARES Act § 18001 ("From the amount made available under this heading . . . the Secretary shall first allocate . . ."); § 18004 ("The Secretary shall allocate funding under this section . . ."). Sections 18002 and 18003 require the Secretary to "make . . . grants." *See* CARES Act § 18002 ("the Secretary shall make Emergency Education Relief grants"); § 18003 ("the Secretary shall make elementary and secondary school emergency relief grants"). None of those provisions attributes any discretion to the Secretary regarding the allocation of GEER and ESSER funds. It only strengthens the analysis to note that a different provision, section 18004, expressly gives the Secretary discretion to allocate funds to institutions of higher education "that the Secretary determines have the greatest unmet needs related to coronavirus," making clear that the omission of any similar discretion in section 18005 was intentional. *See Washington v. DeVos*, No. 2:20-CV-0182-TOR, 2020 WL 3125916, at *9 (E.D. Wash. June 12, 2020) (citing *Navajo Nation v. Dep't. of Health and Human Servs., Sec'y*, 325 F.3d 1133, 1139-40 (9th Cir. 2003)).

The language of section 18005(a), which is the subject of the IFR, does not implicate the Secretary at all: "*A local educational agency* . . . shall provide equitable services in the same manner as provided under section 1117 of the ESEA . . . ." CARES Act § 18005(a) (emphasis added). *Id.* If Congress wished to give the Secretary authority over equitable services, it could have named the Secretary in section 18005(a) and used any of the formulations it did in other parts of the Act to confer regulatory authority on other agencies. *See, e.g.*, note 9, *supra*. This Court should "interpret[] the absence of any . . . grant of authority to the Secretary" in section 18005 "as intentional." *Oakley v. DeVos*, No. 20-CV-03215-YGR, 2020 WL 3268661, at *9 (N.D. Cal. June 17, 2020); *see also Washington v. DeVos,* No. 2:20-CV-0182-TOR, 2020 WL 3125916, at *9 (E.D. Wash. June 12, 2020) ("Nothing in the CARES Act grants Defendants authority to use their general rulemaking power under the HEA to impose conditions on the

general allocations made in the CARES Act.").

Because the CARES Act does not grant the Defendants authority to make rules, Defendants attempt to support their exercise of rulemaking power using generic grants of authority from other statutes. The IFR quotes 20 U.S.C. § 1221e-3, which authorizes the Secretary to issue regulations "governing the applicable programs administered by[] the Department." 85 Fed. Reg. at 39,481. But that statute only authorizes regulations "in order to carry out functions otherwise vested in the Secretary by law." 20 U.S.C. § 1221e-3. There is no function vested in the Secretary relating to equitable services to private schools using CARES Act funds. Under section 18005(a), these responsibilities fall solely on the school districts. Similarly, 20 U.S.C. § 3474 (which is cited in the IFR but not separately discussed) authorizes "[t]he Secretary . . . to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department." 85 Fed. Reg. at 39,481. Again, Defendants point to no authorized "functions of the Secretary or the Department" that the regulation seeks to administer or manage.

Nothing suggests that Congress intended to delegate rule-making authority to Defendants on the amount of CARES Act money LEAs must spend on equitable services for private schools. The contrary conclusion follows from the political and economic importance of the distribution of CARES Act money. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (Congress would not implicitly delegate a question of "economic and political magnitude" to an administrative agency). In issuing the IFR, the Secretary has claimed power over the allocation of billions of dollars in federal funding. The importance of this claim is all the more acute during the COVID-19 pandemic, as most school districts grapple with the heavy cost of the shift to distance learning. Particularly given that Congress explicitly delegated

regulatory authority to other agencies elsewhere in the CARES Act, *see supra* note 9, there is no reason why Congress would have authorized this "enormous and transformative expansion in []  regulatory authority" to Defendants without explicit comment. *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (refusing to defer to the EPA because Congress would not have implicitly delegated "extravagant statutory power over the national economy").

The requirement that conditions on federal funds must, under the Spending Clause, be made "in clear and unmistakable statutory terms," reinforces the requirement that Congress, not the agency, must "affirmatively impose" such conditions on recipients. *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (quoting *Madison v. Virginia*, 474 F.3d 118, 125 (4th Cir. 2006)); *see Mowbray v. Kozlowski*, 914 F.2d 593, 598 (4th Cir. 1990) (requirement that Congress "speak with a clear voice" about conditions on federal funds is rooted in concern that "the states must not be left to guess at federal intentions in their own budgetary planning process" (first citation omitted)).  In sum, the IFR is unlawful because Defendants lack regulatory authority to alter the allocation directive of section 18005(a).

## III.   DEFENDANTS' INTERPRETATION OF THE CARES ACT IS NOT ENTITLED TO DEFERENCE.

### A.   The IFR Fails the Tests for *Chevron* Deference.

The IFR's attempt to invoke deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) is unavailing.

Courts analyze agency regulations under *Chevron* only if Congress actually intended to delegate rulemaking authority to the agency. *United States v. Mead Corp.*, 533 U.S. 218, 226-29 (2001).  This threshold inquiry is sometimes referred to as *Chevron* "step zero."  *See Mead Corp.*, 533 U.S. at 226-29 (establishing the threshold inquiry); *see also Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 446 (D. Md. 2012) (describing the *Mead* inquiry as "*Chevron s*tep zero").  If

*Chevron* step zero is not satisfied, courts do not proceed to the *Chevron* analysis.

Here, as explained in Section II, *supra*, Congress neither explicitly nor implicitly delegated rule-making authority to Defendants; and the generic rule-making provisions that the IFR cites, 20 U.S.C. §§ 1221e-3 and 3474, are exactly the type of generic provisions that courts have made clear are not sufficient to trigger *Chevron* deference.  *See, e.g.*, *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 520 n.17 (S.D.N.Y. 2019) (agency's citations to general housekeeping statutes were insufficient to establish substantive rulemaking authority).  Accordingly, the IFR fails to meet the criteria of *Chevron* Step Zero.

Even if the Court were to proceed with Step One of the *Chevron* analysis, Section 18005(a) of the CARES Act is clear and unambiguous.  *See supra* section I.A.  Therefore, Defendants' action is not entitled to deference, and the inquiry should stop there.

If the Court found sufficient ambiguity to proceed with the *Chevron* analysis, the question for the Court at *Chevron* Step Two is "whether the agency's answer [to the interpretive question] is based on a permissible construction of the statute."  *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 54 (2011) (quoting *Chevron*, 467 U.S. at 843).  While this is a deferential standard, an agency interpretation can fail *Chevron* Step Two if it is "arbitrary or capricious in substance, or manifestly contrary to the statute."  *Id*. at 53 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242 (2004)).  An agency's interpretation is "arbitrary, capricious, or manifestly contrary to the statute" if it is not "reasonable."  *See Mayo*, 562 U.S. at 58 ("[T]he second step of *Chevron* . . .  asks whether the [agency's] rule is a 'reasonable interpretation' of the enacted text." (quoting *Chevron*, 467 U.S. at 844)).  For those reasons outlined above in Section I and for those detailed below, Defendants' interpretation is contrary to the statute and not reasonable.  It therefore cannot be afforded *Chevron* deference.

1.      **Defendants' Arguments About Equity Misread the Statute and
        Unreasonably Substitute a Different Policy Choice for the One Made
        by Congress.**

Defendants appeal to equity as the basis for their interpretation of section 18005(a).  First,

this is a policy matter that Defendants have no authority to address.  Second, it is predicated on

misconstruing the CARES Act and section 1117 of the ESEA.

Defendants suggest in the IFR that applying section 1117 would "disadvantage some

students based simply on where they live."  85 Fed. Reg. at 39,479.  This argument fails because

it constitutes an impermissible disagreement with Congress on a policy choice.  Congress

expressly allowed Governors to make different GEER grants to some districts and not others;

and Congress directed ESSER funding to districts in the same proportion as their Title I funding.

It was intentionally the case in both schemes that students at schools in different locations can

receive different amounts of CARES Act funding.

Defendants argue that:

> [O]nly the use of enrollment data ensures that sufficient CARES
> Act funds are reserved to provide services to non-public school
> students and teachers that are equitable in comparison to their
> public school counterparts. In fact, this is the only way to give
> meaning to the phrase "in the same manner" consistent with
> section 1117(a)(3) of the ESEA, which requires that benefits for
> "private school children shall be equitable in comparison to
> services and other benefits for public school children."

85 Fed. Reg. at 39,483 (footnote omitted).  Similarly, the IFR states:

> Only if services and other benefits to students and teachers in non-
> public schools are comparable to those provided to public school
> students and teachers they can be equitable.

*Id.*  However, section 1117(a)(3) defines "Equity" as follows: "In general.  Educational services

and other benefits for *such* private school children shall be equitable in comparison to services

and other benefits for public school children *participating under this part . . . .*"  20 U.S.C.

§ 6320(a)(3)(A) (emphasis added).  The word "such" is a precise way to cross-reference an antecedent definition of words.  The antecedent of "such private school children" is in section 1117(a)(1)'s reference to children who are eligible to participate in Title I programs.  Thus, in section 1117, Congress defined equity in a way that *excludes the IFR's argument* that the total population of private schools must receive equitable services proportionate to the services to all public school children.

Defendants further argue that "[n]othing in the CARES Act suggests Congress intended to differentiate between students based upon the public or non-public nature of their school with respect to eligibility for relief," and thus that an enrollment-based formula is the only way to ensure equity between public and private schools.  85 Fed. Reg. at 39,479.  However, quite the opposite is true because *the IFR fails to consider that Congress already provided funding for private schools in other sections of the CARES Act*.  In other portions of the CARES Act, Congress made some federal funding available to non-public schools even while making that funding unavailable to public schools.  For example, private schools that operate as nonprofit organizations or small businesses with 500 or fewer employees — but not public schools other than nonprofit public charter schools — are eligible to participate in the Paycheck Protection Program ("PPP").  *See* CARES Act § 1102(a)(1)(D)(i).  Congress has appropriated $659 billion to the PPP.  *See The CARES Act Provides Assistance to Small Businesses*, U.S. Dep't of Treas., https://home.treasury.gov/policy-issues/cares/assistance-for-small-businesses (last visited Aug. 6, 2020).  If certain conditions are met, the PPP loans will be forgiven.  *See Paycheck Protection Program*, U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-program#section-header-5 (last visited Aug. 6, 2020).

Billions of dollars in CARES Act funds have already gone to private entities classified as primary and secondary schools.  According to a private analysis of PPP data released by the Small Business Administration on PPP loans of $150,000 or greater, the total amount of funds given to 5,691 private schools is somewhere between $2.67 billion and $6.47 billion.[10]  Many other private schools received loans of less than $150,000.  These federal PPP funds are not available to public schools other than charter schools formed as nonprofit organizations.  There is no reason to believe that Congress intended for the equitable services provision of the CARES Act to substantially expand the amount of support that public schools were to provide to private school students in addition to this separate funding stream.  Defendants' choice to prioritize private schools' financial difficulty while ignoring public schools' financial struggles, in contradiction to clearly expressed statutory provisions, is unreasonable.

  2.      **The "Supplement Not Supplant" Condition that Defendants Impose Upon an LEA's Choice to follow section 1117 Conflicts With Guidance that Defendants Issued in the Past and Have Not Withdrawn.**

Defendants' interpretation regarding "supplement not supplant" restrictions is also an unreasonable interpretation of the CARES Act.  Under the IFR, if a district elects to allocate CARES Act funding in the same manner as under section 1117 of ESEA, it must conform to "supplement not supplant" restrictions that are present in an entirely different section of the ESEA, section 1118(b), one that is never mentioned in the CARES Act.  Congress simply did not

---

[10] Samantha Sokol et al., Americans United for Separation of Church and State, *The Paycheck Protection Program Has Provided Billions in Federal Funds to Private and Religious Schools*, at 1-2 (2020), https://www.au.org/sites/default/files/2020-07/PPP%20COVID%20Relief%20Money%20for%20Private%20Schools%207.29.20_0.pdf; *see also AU's New Report Details How Billions in Pandemic Relief Was Diverted to Private Schools*, Americans United for Separation of Church and State:  Wall of Separation Blog (July 30, 2020), https://www.au.org/blogs/pandemic-aid-private-schools.

impose supplement not supplant restrictions on CARES Act funding as the IFR purports to do. Defendants have previously acknowledged that the CARES Act does *not* require that LEAs supplement and not supplant the CARES Act funds.  In a "Frequently Asked Questions" document issued on May 5, 2020 (weeks prior to the IFR), Defendants responded to the question, "Are ESSER funds subject to a supplanting prohibition?" with a clear "No."  It explained that "[t]he ESSER Fund does not contain a supplanting prohibition.  As a result, ESSER funds may take the place of State or local funds for allowable activities."[11]  In the IFR, Defendants thus seek to impose a requirement that does not appear anywhere in the CARES Act and is inconsistent with the agency's own guidance, which is still in effect.  A new regulation that changes an agency's policy requires a recognition of that change and an explicit discussion of the reasons for the change, as well as consideration of any reliance interests that may be affected.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *see also Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018) ("At a minimum, an agency must 'display awareness that it is changing position and show that there are good reasons for the new policy.'" (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016))).

For all of the reasons stated above, the IFR is not reasonable, failing *Chevron* Step Two. It contravenes basic principles of statutory interpretation and logic, *see supra* Section I.  The IFR is also inconsistent with Defendants' prior position regarding the supplement-not-supplant restriction, and Defendants have failed to proffer any justification for this inconsistency or demonstrated that they thoroughly considered how the IFR will impact those districts that will be

---

[11] U.S. Dep't of Educ., *Elementary and Secondary School Emergency Relief Fund: Frequently Asked Questions about the Elementary and Secondary School Emergency Relief Fund (ESSER Fund)*, https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf (Question 20).

subject to supplement-not-supplant.

**B.     The IFR Does Not Merit *Skidmore* Deference Because Defendants' Reasoning is Not Persuasive.**

Even when an agency's interpretation does not merit *Chevron* deference, a court may nonetheless defer to it under *Skidmore*, based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  However, because Defendants have not offered a persuasive rationale for the IFR, it does not merit deference under *Skidmore*.

Defendants' interpretation is contrary to the purpose of the CARES Act.  The IFR notes the "current national emergency" and acknowledges that "CARES Act programs were enacted to address the *immediate* effects of COVID-19."  85 Fed. Reg. at 39,483 (emphasis added). Defendants further acknowledge "the importance of ensuring that LEAs provide services immediately under the CARES Act to students and teachers in schools."  85 Fed. Reg. at 39,485. However, Defendants' interpretation frustrates the speed that Congress intended.

To expedite the distribution of funds, Congress instructed LEAs to provide equitable services in the same manner—using existing data sources and the same formulas as under section 1117, based on poverty—to allocate CARES Act money to private schools.  However, under the IFR's proportional share approach, not every district can rely on the existing data to determine the amount of equitable services to which private school students are entitled.  In fact, the IFR estimates that 75% of districts will need to collect additional data from their SEAs or private schools to make the determination.  85 Fed. Reg. at 39,487.  Creating extra hurdles and imposing new requirements is contrary to the speedy distribution of funds mandated by Congress.

IV.     **COPAA HAS STANDING TO CHALLENGE THE IFR.**

COPAA has standing to bring this APA claim as the representative of its individual

members who are being injured by the IFR.  An organization may bring a lawsuit on behalf of its

individual members when (1) its "members would otherwise have standing to sue in their own

right"; (2) "the interests at stake [are] germane to the organization's purpose"; and (3) "neither

the claim asserted nor the relief requested requires participation of individual members in the

lawsuit."  *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 282 & n.9 (4th Cir. 2018)

(quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81

(2000)).  Each of those criteria is met here.

First, for COPAA's members to establish standing, one of them "must show (1) [the

member has] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will

be redressed by a favorable decision." *Sierra Club*, 899 F.3d at 283 (quoting *Laidlaw*).  COPAA

has a number of members who are local taxpayers and parents of minor children who will be

injured as a direct result of the IFR and would have standing to sue in their own right.  *See*

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007) ("It is not a

novel proposition to say that parents have a recognized legal interest in the education and

upbringing of their child.").  This summary judgment motion discusses the circumstances of four

identified members who have children in four different school districts, but similar injuries are

being experienced by COPAA members across the country.  Each of these identified members

and their minor children will experience injury-in-fact as a result of the IFR, regardless of which

option their district chooses.  This Court need only find one member has standing to sustain

COPAA's standing.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("at least one" identified member must have suffered or would suffer harm).

If a COPAA member's district elects to calculate its equitable services allocation using the poverty-based calculation option under the IFR, then the district can spend ESSER dollars only on its Title I schools.  But each identified member has one or more children enrolled in a non-Title I public school in districts receiving ESSER funds.  Galanter Decl. ¶¶ 4-6.  Their children's schools will therefore receive no ESSER funds whatsoever under this option and the children will receive no benefit from those funds whatsoever.

Alternatively, if their district selects the enrollment-based calculation option under the IFR, their children's schools are substantially likely to receive a significantly smaller amount of ESSER funds than they would have under the poverty-based calculation required by section 1117, because each district will need to divert a larger amount of funds to serve private school students, thus leaving a smaller pool to allocate amongst its public schools.

For example, COPAA member Janet Preston is a parent of a child enrolled in DeKalb County School District in Georgia.  Preston Decl. ¶ 3.  The district expects to receive $33,585,162 in ESSER funds.  Galanter Exh. 3 (Mailliard Decl. ¶ 9).  Under the enrollment-based allocation method, which the state has directed districts to use in response to the IFR, the district would be required to spend approximately $1.4 to $1.6 million more than under the poverty-based allocation.  *Id.* ¶¶ 9-10.  Ms. Preston's child will be harmed by this increased diversion of resources to students in private schools, which decreases the total amount of funding available for public schools. Preston Decl. ¶ 6.  According to the district, CARES Act funds are being used for personal protective equipment (PPE), cleaning supplies, internet access and remote learning, and other student supports, and "the loss of approximately $1.4 to 1.6 million in

CARES Act funds will make it impossible for [the district] to safely reopen its public schools this coming school year." Galanter Exh. 3 (Mailliard Decl. ¶¶ 11-12).

Similarly, COPAA member Jeanette Taylor is a parent of a child enrolled in Prince George's County Public Schools in Maryland. Taylor Decl. ¶ 3. If the district uses the enrollment-based allocation, her child will be harmed because nearly $1 million in federal funds will be unavailable for public school students in the district. Galanter Exh. 4 (Goldson Decl. ¶¶ 18, 21, 23). To put these numbers in perspective, the district reports that each diversion of $246 will result in "a public schools student los[ing] out on needed internet-connected device," and each diversion of $91,735 could result in a public school teacher losing their job. *Id.* ¶¶ 24-25.

Likewise, COPAA member Shahar Pasch is a parent of children enrolled in Palm Beach County School District in Florida. Pasch Decl. ¶ 3. If the district uses the enrollment-based allocation, the diversion of more than $800,000 in federal funds to private school students would be significantly likely to reduce the regular and special education services and supports that her children will receive. *Id.* ¶ 7; Galanter Exh 5 (Naik Decl. ¶¶ 4-6 & Exh. F-1).[12]

And finally, COPAA member Rob Harris is a parent of children enrolled in Mesa County Valley School District No. 51 in Colorado. Harris Decl. ¶ 3. Using a poverty-based allocation method, the district will spend 0.5% of its Title I funds on equitable services for private school students enrolled in three private schools. Galanter Decl. ¶ 9. But, under the enrollment-based allocation method, it will spend 2.6% of its ESSER funds on equitable services for private school

---

[12] Even after the district court in Washington issued a preliminary injunction against enforcing the IFR, the Florida Department of Education instructed school districts that "we are still obligated to continue abiding by the Interim Final Rule" because it believed the injunction did not extend outside the State of Washington. Galanter Exh. 6 (Memorandum from Jacob Oliva, Chancellor of Public Schools to School District Superintendents (Aug. 25, 2020)).

students enrolled in those same three private schools, and another 0.7% on equitable services for

students in three other private schools.  Galanter Decl. ¶ 13.  If the district uses the enrollment-

based allocation, there is a substantial risk that the diversion of federal funds will reduce services

available to students in the district, including Mr. Harris's children.  Harris Decl. ¶ 7.

The injuries of each of the identified members and their children parallel the injuries

found to be sufficient to support standing in *Kravitz v. United States Department of Commerce*,

366 F. Supp. 3d 681 (D. Md. 2019), *remanded on other grounds by La Union Del Pueblo Entero

v. Ross*, 771 Fed. App'x 323 (4th Cir. 2019).  In that case, parents and others challenged actions

around the federal census that they alleged would undercount people in their school districts

which, in turn, would result in a reduction of Title I funding for their school districts.  The court

held that the parents had standing because "there is a substantial risk that a loss in . . . education

funding to a school district will reduce educational services available to students in the school

district, including the children of" the parent plaintiffs.  *Id*. at 739.  The same is true for these

identified COPAA members, particularly in these times where public schools are starving for

funds.  *See Washington v. DeVos*, No. 2:20-cv-01119-BJR, 2020 WL 5079038, at *9-10 (W.D.

Wash. Aug. 21, 2020) (holding that public schools, particularly the poorest public school

students, suffer "great[] and irreparable" harm from "the Interim Final Rule's diversion of

CARES Act funding to private schools," and that the denial of access to these funds "creates

unnecessary risk, to both the health and education" of public school students); *see also Gwinn

Area Cmty. Sch. v. State of Mich*., 741 F.2d 840, 844 (6th Cir. 1984) (holding that public school

students have standing to challenge state law that reduced funding to school district because "the

district students are in positions to suffer direct and tangible injuries from the deduction of

federal impact aid from state aid payments"), *abrogated on other grounds by Lapides v. Bd. of*

*Reg. of Univ. of Ga.*, 122 S. Ct. 1640 (2002); *Sch. Bd. of the City of Richmond, Va. v. Baliles*, 829 F.2d 1308, 1311 (4th Cir. 1987) (holding that school board had standing to pursue appeal on behalf of its students to seek funds from state to further desegregation efforts); *Shepheard v. Godwin*, 280 F. Supp. 869, 874 (E.D. Va. 1968) (three-judge court) (diverting federal funds intended for public schools "severely injures both the community and the pupil" because "the result may be to lower the standard of education provided").

In addition, as the IFR itself acknowledges and the affidavits confirm, the IFR forces school districts to incur additional costs to accurately determine the equitable services allocations. *See* 85 Fed. Reg. 39,485/3-486/2 (estimating that 19% of all school districts subject to the equitable services requirement (1900/10125) will spend a total of $2.7 million to determine allocation of equitable services); Galanter Exh. 3 (Mailliard Decl. ¶ 14). Three of the identified members have averred that they pay property taxes that support their school districts. *See* Pasch Decl. ¶ 2; Preston Decl. ¶ 2; Taylor Decl. ¶ 2. They have standing in this capacity to challenge the IFR because it compels the school district to improperly expend school funds. *See Koenick v. Felton*, 190 F.3d 259, 263 (4th Cir. 1999) (permitting county taxpayer to challenge state law that required school district to spend funds because "she is injured by the expenditures of her tax revenues"); *Gwinn*, 741 F.2d at 844 ("district taxpayer" also has standing to challenge state law that reduces total funds available to district).

The other necessary elements of Article III standing for the identified members— causation and redressability—are also easily met. It is the IFR that is causing each of the identified members' school districts to choose between two injurious options: no funds for their child's non-Title I school or reduced funds for their child's public schools. Each of the identified members would be better off if their district followed the one option the IFR denies their districts

but the CARES Act requires: using ESSER funds for all public schools while calculating

equitable services allocation using a poverty-based calculation.  A favorable decision by the

Court setting aside the IFR would redress the injury to COPAA's members.

Finally, the other two requirements for COPAA to bring this suit on behalf of its

members are met here.  *See Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F.

Supp. 3d 28, 46 (D.D.C. 2019) (holding COPAA had standing  to sue on behalf of its members),

*appeal dismissed*, No. 19-5137, 2019 WL 4565514 (D.C. Cir. Sept. 18, 2019). COPAA is a

national nonprofit whose mission is to "protect and enforce the legal and civil rights of students

with disabilities and their families" and its central goal is "to secure high quality educational

services and to promote excellence in advocacy."  Almazan Decl. ¶ 3.  The IFR directly threatens

the rights of public school students with disabilities by diverting much-needed resources to

private school students (enrollment-based allocation) or by prohibiting districts from using these

resources to serve students in non-Title I schools (poverty-based allocation); preventing these

injuries is germane to COPAA's core mission.  In addition, COPAA is well placed to bring these

claims on behalf of its parent members, without those individuals needing to participate as

parties to the litigation.

## V.  THE LEGALLY MANDATED REMEDY IS AN ORDER FINDING THE IFR UNLAWFUL AND SETTING IT ASIDE.

Under the Administrative Procedure Act, a court shall "hold unlawful and set aside

agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).  "[T]his

Court has observed that the words 'set aside' need not be interpreted narrowly when devising an

appropriate remedy."  *Am. Academy of Pediatrics v. Food and Drug Admin.*, 399 F.Supp.3d 479,

486 (D. Md. 2019) (internal quotation marks omitted) (citing *Thompson v. U.S. Dep't of Hous. &*
*Urban Dev.*, 348 F.Supp.2d 398, 464 (D. Md. 2005)) (discussing further remedies following
vacatur of agency guidance upon grant of summary judgment to national organization).

     Neither a declaration of illegality nor an order to set aside a regulation constitutes an
injunction, and neither is subject to the current debate about nationwide injunctions.  In
*Department of Homeland Security v. Regents of the University of California,* 140 S. Ct. 1891
(2020), the Supreme Court affirmed a District Court's decision setting aside an agency action
with nationwide effect.  In the decision the Supreme Court affirmed, *National Association for the*
*Advancement of Colored People v. Trump,* 315 F.Supp.3d 457, 474 n.13 (D.D.C. 2018), the
District Court did not issue an injunction but instead set aside the administrative action, saying:

> That debate [about the propriety of nationwide injunctions] is not
> implicated here, however, where the Court is vacating an agency
> action pursuant to the APA, as opposed to enjoining it as a
> violation of the Constitution or other applicable law. *See* 5 U.S.C.
> § 706(2)(A) ("The reviewing court shall ... hold unlawful and set
> aside agency action ... found to be ... arbitrary, capricious, an abuse
> of discretion, or otherwise not in accordance with law."); *Harmon*
> *v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a
> reviewing court determines that agency regulations are unlawful,
> the ordinary result is that the rules are vacated—not that their
> application to the individual petitioners is proscribed.").

     In affirming that opinion, the Supreme Court stated: "[o]ur affirmance of the *NAACP* order
vacating the rescission makes it unnecessary to examine the propriety of the nationwide scope of
the injunctions issued by the District Courts in *Regents* and *Batalla Vidal*."  140 S. Ct. at 1916 n.7.
The Supreme Court was only able to avoid reaching the question of nationwide injunctions based
on the indisputable nationwide effect of the district court order setting aside an unlawful
administrative action pursuant to section 706.  Such relief is required by the APA and warranted
here as well.

## CONCLUSION

In promulgating the IFR, Defendants acted in excess of their authority and contrary to law.  The IFR is arbitrary and capricious, and Defendants are not entitled to *Chevron* or *Skidmore* deference.  Plaintiff therefore respectfully requests the Court grant its motion for summary judgment declaring the IFR unlawful and setting it aside, with nationwide effect.

RESPECTFULLY SUBMITTED this 3rd day of September, 2020

By:  */s/ Jack W. Londen*
Jack W. Londen

Seth Galanter (D.MD. Bar No. 813890)
Alice Y. Abrokwa (D.MD. Bar No. 813895)
NATIONAL CENTER FOR YOUTH LAW
1313 L Street, N.W., Suite 130
Washington, D.C. 20005
Tel: (202) 868-4781
Fax: (202) 868-4788
sgalanter@youthlaw.org
aabrokwa@youthlaw.org

Rachel E. M. Velcoff Hults (D.MD. Bar No. 813893)
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, California 94612
Tel: (510) 835-8098
Fax: (510) 835-8099
rvelcoff@youthlaw.org

Jack W. Londen (D.MD. Bar No. 813892)
Jessica L. Grant (D.MD. Bar No. 813891)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Tel: (415) 268-7000
Fax: (415) 268-7522
jlonden@mofo.com
Jgrant@mofo.com

G. Brian Busey (D.MD. Bar No. 03918)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 887-1500
Fax: (202) 887-0763
gbusey@mofo.com

Attorneys for Plaintiff COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.