# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

COUNCIL OF PARENT ATTORNEYS
AND ADVOCATES, INC.,

                              Plaintiffs,

        v.

ELISABETH (Betsy) DEVOS, *et al.,*

                              Defendants.

Civil Case No. 1:20-cv-02310-GLR

## THE COUNCIL OF THE GREAT CITY SCHOOLS'
## AMICUS CURIAE BRIEF IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

STATEMENT OF INTEREST ............................................................................................... 1

SUMMARY OF ARGUMENT .............................................................................................. 2

BACKGROUND ................................................................................................................... 4

ARGUMENT ........................................................................................................................ 4

    I.    The Department Unlawfully Replaced the Equitable Services Allocation
        Method Adopted by Congress with Its Own Preferred Approach. ........................ 4

        A.    The Department's funding formula erroneously considers all
                private school students rather than only low-income students
                residing in the district ................................................................... 6

        B.    There were good reasons for Congress to choose the specific
                allocation formula that it did ......................................................... 9

        C.    There is bi-partisan support that Congress's intent was that funds
                be allocated based on the Title I formula .................................... 11

    II.    The Chaotic Manner in which the Department has Acted Has Delayed the
        Distribution of Critical Resources and Placed School Districts in Legal
        Jeopardy. .............................................................................................. 13

        A.    The Guidance created unnecessary confusion for school districts
                and put them at legal risk. ............................................................. 14

        B.    The Rule effectively mandates the Department's flawed
                interpretation and increases confusion and hardship for school
                districts ........................................................................................ 16

        C.    The Department's inconsistent interpretation also has resulted in
                delay in the distribution of critical resources. ............................. 19

    III.    The Interim Final Rule Adopted by the Department Would Divert
        Hundreds of Millions of Dollars from Public Schools to Private Schools
        with Devastating Consequences for School Districts and their Students. ........... 21

        A.    The amount of funds diverted is substantial. ............................... 21

B.    The diversion would deprive millions of public school students of critical resources and life-saving services during the pandemic.............. 23

CONCLUSION.................................................................................................................... 25

CERTIFICATE OF SERVICE ....................................................................................................a

# <u>TABLE OF AUTHORITIES</u>

<b><u>Page(s)</u></b>

**<u>Cases</u>**

*Michigan et al. v. Devos et al*,
   Case No. 3:20-cv-04478-JD, 2020 WL 5074397 (N.D. Cal. Aug. 26, 2020) ......................... 5

*NAACP v. Devos*,
   Case No. 20-cv-1996-DLF, 2020 WL 5291406 (D.D.C. Sept. 4, 2020) .................................. 5

*Washington v. Devos et al.*,
   Case No. 2:20-cv-01119-BJR, 2020 WL 5079038 (W.D. Wash. Aug. 21, 2020) .......... *passim*

**<u>Statutory Authorities</u>**

20 U.S.C. § 3401 ........................................................................................................................... 4

20 U.S.C. § 6301 *et seq* ................................................................................................................. 1

20 U.S.C. § 6320 ........................................................................................................................... 6

CARES Act, PL 116-136, 134 Stat. 281 (codified in scattered titles and sections of
   U.S.C.) ...................................................................................................................... *passim*

**<u>Rules and Regulations</u>**

85 Federal Register 20,811 (April 15, 2020) .............................................................................. 10

85 Federal Register 39,479 (July 1, 2020) ............................................................................. 1, 17

**<u>Additional Authorities</u>**

Andrew Ujifusa, *DeVos to Release Rule Cementing COVID Aid Push for Private School
   Students*, EDUCATION WEEK (May 26, 2020) ......................................................... 16

Andrew Ujifusa, *Sen. Alexander Splits from Betsy DeVos on COVID-19 Aid to Help
   Private Schools*, EDUCATION WEEK (May 21, 2020) ............................................... 12

Bianca Quilantan, *Weekly Education: States Push Back Against Steering Coronavirus
   Funds to Private Schools*, POLITICO (June 1, 2020) ........................................... 16, 17

*Letter from Betsy DeVos, Secretary, U.S. Department of Education, to Carissa Moffat
   Miller, Executive Director, Council of Chief State School Officers* (May 22, 2020) ......... 16, 17

*Letter from Carissa Miller, Executive Director, Council of Chief State School Officers,
   to Lamar Alexander, U.S. Congress* (June 24, 2020) ............................................... 19

*Letter from Carissa Moffat Miller, Executive Director, Council of Chief State School Officers, to Betsy DeVos, Secretary, U.S. Department of Education* (May 5, 2020) .............. 16

*Letter from Robert C. "Bobby" Scott, Rosa L. DeLauro, and Patty Murray, U.S. Congress, to Betsy DeVos, Secretary, U.S. Department of Education* (May 20, 2020) ........... 12

*Memorandum from State of New Mexico Public Education Department* (May 14, 2020).......... 17

*Memorandum from Congressional Research Service to House Committee on Education and Labor* (July 1, 2020) ..................................................................................................... 6, 13

Morgan Craven and Roy L. Johnson, *An Analysis of How the Department of Education's Equitable Services Rule Will Harm Texas Students and School Districts*, IDRA ISSUE BRIEF (July 16, 2020).................................................................................................... 22, 24

Stephen Rich et al., *Explore the SBA Data on Businesses that Received PPP Loans*, THE WASHINGTON POST (July 6, 2020) ........................................................................................ 10

Texas Education Agency, *Providing Equitable Services to Students and Teachers in Participating Private Non-Profit Schools Under the CARES Act Programs* (updated July 9, 2020) ..................................................................................................................... 20, 21

U.S. Department of Education, *Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund)* (April 2020) ................................................................................ 15

U.S. Department of Education, *Notice Announcing Availability of Funds and Deadline for the Elementary and Secondary School Emergency Relief Fund* (April 23, 2020)........ 14, 15

U.S. Department of Education, *Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance* (Oct. 7, 2019) ....... 6, 15

U.S. Department of Education, *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs* (April 30, 2020) ........................................... 3

**STATEMENT OF INTEREST**

*Amicus curiae*, the Council of the Great City Schools ("Council"), is a coalition of 76 of the nation's largest urban public school districts and is the only national organization exclusively representing the needs of urban public schools. The Council and its members are deeply concerned that the U.S. Department of Education's ("Department") recently announced interim final rule ("Rule") regarding the provision of equitable services under emergency relief funds will divert hundreds of millions of dollars of desperately needed funds away from their primary intended recipients—public schools serving at-risk students. *See* CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools, 85 Fed. Reg. 39,479 (July 1, 2020).

Through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act" or "Act"), Congress in March 2020 appropriated approximately $16 billion that could be used to support elementary and secondary education, including $13 billion specifically to allow school districts to address needs arising out of the COVID-19 pandemic. The Act expressly required those funds to be allocated pursuant to well-established formulas under Title I of the Elementary and Secondary Education Act ("ESEA"), 20 U.S.C. § 6301 *et seq.*, including a requirement for school districts to reserve funding to provide "equitable services" to students and teachers in private schools based on the number of low-income students residing in the district and attending private schools. In disregard of this clear directive, the Rule adopted by the Department would force school districts to allocate funds not based on *low-income* private school students *residing* in the districts but based on *all* students attending private schools in the district *wherever* they live. The Council, therefore, submits this brief to underscore the outrageousness of the Department's actions and their potentially devastating impact on public school districts struggling to find ways to operate safely and effectively during the COVID-19 pandemic.

## **SUMMARY OF ARGUMENT**

The Department has tried to unlawfully rewrite important emergency legislation to support its own spending priorities rather than those of Congress. In particular, the Department seeks to divert hundreds of millions of dollars that Congress intended to support public schools grappling with the pandemic, including thousands of schools in Council member districts, to private schools, regardless of the financial need of private school students.

In the CARES Act, Congress appropriated approximately $13 billion directly for use by elementary and secondary schools and directed school districts to allocate a portion of that money to provide equitable services to private schools based on the number of low-income students residing in the district and attending private schools. While an early version of the bill would have allocated funds to private schools based on their total enrollment of district resident students, Congress rejected that approach and instead directed that funds be allocated based on a long-established and well-known Title I formula. This made sense in part because Congress already had allocated significant resources to private schools, but not to most public schools, in the form of forgivable loans under the Paycheck Protection Program ("PPP"), CARES Act § 1102, as well as a variety of tax credits.

Moreover, congressional leaders on both sides of the aisle have made clear that Congress intended the requirement that school districts provide "equitable services" under the CARES Act to be based on low-income private school students residing in their districts and not on all private school students regardless of their affluence or residence. Likewise, the non-partisan Congressional Research Service concluded this is the proper interpretation of the CARES Act.

Not only is the Department's attempt to rewrite the CARES Act substantively wrong, it has also been done in a chaotic manner that itself has been damaging to public school districts. More than a month after the Act was passed, the Department first issued non-binding regulatory

guidance directing that equitable services should be provided to private schools based on their total enrollment. *See* U.S. Dept. of Educ., *Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs* (April 30, 2020) (the "Guidance"). Many states and school districts, seeing that this "interpretation" directly contradicted the language of the Act, indicated that they would not follow it in making their allocations under that CARES Act. In response, two months later, and more than three months after the enactment of the Act, the Department, without notice and comment, adopted the Rule that effectively required the immediate adoption and implementation of its "interpretation" of the CARES Act's equitable services requirement as first set forth in the Guidance. As a result, more than three months after the enactment of the Act, most states and school districts have not yet been able to allocate the desperately needed resources appropriated by Congress to schools. Even after the Rule was enjoined by two separate federal courts, the Department continued its effort to implement it in some states, claiming that the injunctions lack nationwide effect.

The approach demanded by the Department also will divert hundreds of millions of dollars from public schools to private schools, regardless of the financial need of their students. The effect on Council members, their schools, and the students they serve will be devastating. This money is needed to fund counselors, social workers and nurses, and to purchase equipment like computers, face masks, thermometers, hand sanitizer, and COVID-19 tests. The need to protect the safety of students, staff, and faculty today is paramount. Moreover, many of the schools in Council member districts serve disadvantaged communities where schools must address the digital divide in order to equitably provide on-line educational opportunities. The Department's unlawful rewrite of the CARES Act severely undermines this critical work.

## BACKGROUND

The CARES Act authorized the Department to create three categories of Education Stabilization Funds ("ESF") grants that would be administered through state education agencies ("SEAs"). One of these, the Elementary and Secondary School Emergency Relief ("ESSER") Fund, CARES Act § 18003, provides CARES Act funds earmarked specifically for Local Education Agencies ("LEAs")—i.e., school districts. The purpose of the ESSER Fund was to provide financial support to schools, students, and teachers during the COVID-19 pandemic in a flexible manner, as outlined in a non-exhaustive list of broad possible uses for the funding. CARES Act § 18003(d).[1] Most of this money is directed to states and public school districts, but—as with other federal grants—a certain portion of the funding must be used to provide equitable services to non-public school students and teachers. The CARES Act *expressly* states that ESSER funding must be allocated "in the same manner" as funds are allocated in section 1117 of the ESEA, which is known as the Title I funding formula. *See* CARES Act § 18005.

## ARGUMENT

I.   **The Department Unlawfully Replaced the Equitable Services Allocation Method Adopted by Congress with Its Own Preferred Approach.**

The CARES Act, as enacted, is clear that the allocation for private schools is to be based on the low-income population residing in the relevant school district just like Title I equitable service calculations. Significantly, two federal courts have recently ordered preliminary injunctions preventing the Department from implementing the Rule, with both courts finding that Congress's intent that the Title I funding formula be used was clear and unambiguous. *See*

---

[1] CARES Act, PL 116-136, 134 Stat 281. Because the CARES Act was codified in scattered titles of the United States Code, including as statutory notes, and for ease of reference, all CARES Act provisions enacted in Public Law 116-136, 134 Stat. 281, are cited herein simply as CARES Act § ____. CARES Act sections 18003 and 18005 are codified at 20 U.S.C. § 3401 note.

*Washington v. Devos et al.*, Case No. 2:20-cv-01119-BJR, 2020 WL 5079038 (W.D. Wash. Aug. 21, 2020); *Michigan et al. v. Devos et al*, Case No. 3:20-cv-04478-JD, 2020 WL 5074397 (N.D. Cal. Aug. 26, 2020). The Western District of Washington found that the "statute could hardly be less ambiguous," writing that the "directive, referring to a simple, familiar, and time-tested formula, includes all the hallmarks of inflexibility, such as an explicit command in the use of 'shall' and an overt statutory cross-reference." *Washington*, 2020 WL 5079038, at *7. In the words of the Northern District of California, "Congress's intent in Section 18005(a) is plain as day. . . The statute's quintessentially plain language, and the surgical precision with which Congress incorporated Section 1117 into Section 18005(a), leave no room for any other reading." *Michigan*, 2020 WL 5074397 at *5. More recently, the United States District Court for the District of Columbia granted summary judgment in a third case, setting aside the Rule. The court wrote, "Congress expressed a clear and unambiguous preference for apportioning funding . . . based on the number of children from low-income families . . .. In the end, it is difficult to imagine how Congress could have been clearer." *NAACP v. Devos*, Case No. 20-cv-1996-DLF, 2020 WL 5291406, at *4 (D.D.C. Sept. 4, 2020).

Indeed, Congress considered and did not adopt a draft bill that specifically would have provided equitable services for private school students and teachers based on total private school enrollment, as the Department's Rule attempts to do. Congress rejected that allocation methodology justifiably as low-income and minority communities, like those served by Title I, have been disproportionately affected by the pandemic, and because the CARES Act and other emergency legislation also provide additional resources to private schools that are not available to public school districts. Finally, there is bi-partisan and non-partisan support for the view that Congress intended the allocations to be made according to the Title I formula.

**A.    The Department's funding formula erroneously considers all private school students rather than only low-income students residing in the district.**

Equitable services allocations under the CARES Act are expressly tied to the well-established formula set forth in Title I. Under the CARES Act, school districts receiving funding under the Act "shall provide equitable services **in the same manner** as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools." CARES Act § 18005 (emphasis added).[2] Section 1117 of the ESEA, or Title I, requires schools to provide equitable services "[t]o the extent consistent with **the number of _eligible_ children . . . in the school district** . . . who are enrolled in private" school. 20 U.S.C. § 6320(a)(1) (emphasis added). Title I requires that "[e]xpenditures for educational services and other benefits to eligible private school children shall be equal to the proportion of funds allocated to participating school attendance areas **based on the number of children from low-income families who attend private schools**." _Id._ § 6320(4)(A)(i) (emphasis added). Congress and the Department have long been aware of this methodology and, as recently as October 2019, the Department instructed school districts to "[e]nsure that its expenditures for equitable services [under section 1117 of Title I] are equal to the proportion of funds generated by children from low-income families who reside in participating Title I public school attendance areas and attend private schools."[3]

The Department's directive under the Rule—that CARES Act funds should be provided to private schools on the basis of the _total number of students attending private school within the_

---

[2] Section 18005 of the CARES Act specifically addresses _allocation_ of funds between public and private schools based on the formula contained in section 1117 of the ESEA. The CARES Act addresses use of the funds in section 18003. _See Mem. from Congressional Research Service to House Comm. on Educ. and Labor_ 2 (July 1, 2020), _infra_ (attached hereto as Exhibit D).

[3] U.S. Dep't of Educ., _Providing Equitable Services to Eligible Private School Children, Teachers, and Families Updated Non-Regulatory Guidance_ (Oct. 7, 2019), https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf (emphasis added) ("October 2019 Guidance").

*school district's boundaries*, regardless of where those students live, rather than on the basis of the number of *low-income students residing in the school district*—is expressly contrary to the statute for two reasons.

**Poverty.** First, the use of *all* students rather than *low-income* students is not supported by the legislative history of the Act. An early draft of the appropriations provision of the CARES Act, received by amicus curiae on March 22, 2020, would have expressly allocated funds to private schools based on their total enrollment. Specifically, the early version included a section titled "Assistance to Non-Public Schools," which provided as follows:

> SEC. 18005. (a) IN GENERAL. — A local educational agency receiving funds under sections 802 or 803 shall provide equitable services to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools. The level of such services *shall reflect the proportion of students residing within the boundaries of the local educational agency who attend non-public schools.*

*See* Exhibit A, Declaration of Jeff Simering; Exhibit A-1, HEN20279 (emphasis added).

The enacted CARES Act *rejected* this approach, expressly mandating use of the familiar Title I formula:

> SEC. 18005. (a) IN GENERAL. — A local educational agency receiving funds under sections 18002 or 18003 of this title shall provide equitable services *in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools*, as determined in consultation with representatives of non-public schools.

CARES Act § 18005(a) (emphasis added). By choosing to instead to enact a bill that specifically refers to section 1117 of the ESEA, Congress recognized that funds to support private schools should be based on the number of *low-income* students, not based on *all* students at private

schools.[4] The directive to use the formula set forth in section 1117 of the ESEA permits less money to flow to private schools than would have occurred under the previous draft of the CARES Act; the proportionate share is not based on all the private school students who reside in the district's jurisdiction, or even the attendance areas of the district's Title I schools attendance areas, but only those low-income students who do. Congress knew how to write an allocation formula like the one that the Department wants. Indeed, it did write one. It just chose not to enact that version into law.

The difference between these two versions of the bill—the earlier draft basing equitable services on *the proportionate share of all private school students residing in the local education agency* and the later enacted bill basing equitable services on *the number of low-income students residing in participating Title I attendance areas*—is of critical importance. The Department's Rule may track early development of the CARES Act, but entirely fails to follow its *enacted* provisions.

In enacting the CARES Act, Congress thus declined to use a formula which would allow for more money to flow through public schools to serve private schools than is allowed by the longstanding method set forth in section 1117 of the ESEA. The Department's position is not only contrary to the plain language of the CARES Act, but also to clear Congressional intent as demonstrated by the Act's context and legislative history.

**Residence.** Second, the Department's position that the proportionate share is based on the number of students *who attend a private school that is located in the district*—rather than the number of *low-income students residing in the district who attend a private school*—

---

[4] Significantly, section 8501 of the ESEA, which does, in fact, direct equitable services to all eligible private school students regardless of residence status, is *not* referenced in the CARES Act.

impermissibly focuses on *attendance* in the district as opposed to *residence*. As with the use of *all* private school students rather than only *low-income* students, using attendance as the metric *regardless of where the students reside* diverts more money to private schools. It is also plainly inconsistent with the text of the CARES Act and the ESEA. Congress expressly chose to require that equitable services be provided to private schools "in the same manner" as that required in Title I, or section 1117 of ESEA. The Department cannot override the statutory text of the CARES Act, and its interpretation must be declared arbitrary and capricious.

### B.   There were good reasons for Congress to choose the specific allocation formula that it did.

First, it is well documented that the COVID-19 pandemic is disproportionately affecting low-income and minority communities. As the primary source of federal support for elementary and secondary education, Title I targets precisely these communities, many of whom are in Council member districts. It also makes sense, for this same reason, to allocate resources based on *low-income* students rather than all students and to focus on the students in private schools *residing* in these urban areas rather than those that may be commuting to those private schools from affluent suburbs. Indeed, in some Council member districts near state borders, students commute from other states to attend expensive private schools. Thus, allocating resources where they are most needed, which Congress did, makes sense. As the Western District of Washington noted:

> "Distribution of funds under the poverty-based formula will not result in private schools receiving no ESF funding; only in receiving funding a smaller proportion than they would under the Department-created formula. **This reflects Congress's stated intent in the CARES Act to distribute education funding to all, but to concentrate on those in direst need.**"

*Washington*, 2020 WL 5079038, at *7 (emphasis added). And again later on, in finding that the "potential harm is great, and irreparable" the court noted that "Congress, in its wisdom and

without equivocation, determined that funding to schools should be distributed according to the same formula found in Section 1117 of the ESEA; to allow otherwise under the guise of a manufactured ambiguity runs counter to the APA and to Congressional intent." *Id*. at *10.

Second, allocating these CARES Act funds to private schools based on their total enrollment and thereby dramatically increasing their proportionate allocation would have been unreasonable and unfair for Congress to do, because private schools are eligible for other federal resources that public school districts are not. For example, the CARES Act also created the Paycheck Protection Program ("PPP"), through which the Small Business Administration ("SBA") provided forgivable loans—to the tune of millions of dollars—to small businesses and 501(c)(3) non-profit organizations. CARES Act § 1102(a)(2)(D).[5] The 500-employee cap as well as the inclusion of Section 501(c)(3) nonprofits opened the door for private schools to secure PPP loans. Just in Council member school districts alone, over 75 private schools each received over a million dollars from the PPP, with some individual schools receiving close to 10 million dollars.[6] Here are a few examples of such schools:[7]

| School Name | City, State | PPP Loan Range |
|---|---|---|
| St. Ann's School | NYC, NY | $5–$10 million |
| Columbia Grammar and Preparatory School | NYC, NY | $5–$10 million |
| Poly Prep Country Day School | NYC, NY | $5–$10 million |
| Albuquerque Academy | Albuquerque, NM | $2–$5 million |
| Head-Royce School | Oakland, CA | $2–$5 million |
| Francis Parker School | San Diego, CA | $2–$5 million |
| De Paul College Prep | Chicago, IL | $1–$2 million |
| Cincinnati Hills Christian Academy | Cincinnati, OH | $2-$5 million |
| Sidwell Friends School | Washington, D.C. | $5–$10 million |

---

[5] *See also* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20,811 (April 15, 2020) (the SBA interim final rule regarding implementation of CARES Act §§ 1102, 1106).

[6] Stephen Rich et al., *Explore the SBA Data on Businesses that Received PPP Loans*, THE WASHINGTON POST (July 6, 2020),
https://www.washingtonpost.com/graphics/2020/business/sba-ppp-data/; *see also* Exhibit B.

[7] *See* Exhibit B (citations contained therein).

| School Name | City, State | PPP Loan Range |
|---|---|---|
| St. Louis University High School | St. Louis, MO | $2-$5 million |
| Bishop Lynch High School | Dallas, TX | $2–$5 million |
| Antonian College Preparatory High School | San Antonio, TX | $1–$2 million |
| Christopher Columbus High School | Miami, FL | $2–$5 million |
| Central Catholic High School | Portland, OR | $2–$5 million |

Private schools are also eligible for tax credits that are not available to public school districts. For example, private schools benefit from payroll tax credits under the Families First Coronavirus Response Act (the "FFCRA"), signed by President Trump on March 18, 2020. PL 116-127, March 18, 2020, 134 Stat 178, Division G, §§ 7001–7005. The FFCRA provides small and midsize employers refundable tax credits that reimburse them, dollar-for-dollar, for the cost of providing paid sick and family leave wages to their employees for leave related to COVID-19. *Id.* §§ 7001 ("Payroll Credit for Required Paid Sick Leave"), 7003 ("Payroll Credit for Required Paid Family Leave"). Similarly, private schools, but not public school districts, also benefit from the Employee Retention Credit, which is a refundable tax credit against certain employment taxes equal to 50 percent of the qualified wages CARES Act, § 2301. Congress clearly has provided many significant COVID-19-related financial benefits to private schools that it has not provided to public school districts.

Thus, for at least two obvious reasons, it made sense for Congress to reject a bill that would have allocated CARES Act resources to private schools based on their total enrollment and to instead mandate the Title I allocation methodology be used.

### C. There is bi-partisan support that Congress's intent was that funds be allocated based on the Title I formula.

Even if in some manner the relevant text of the CARES Act were ambiguous—which it is not—and the legislative history were unpersuasive—which it is not—the drafters of the bill themselves have clearly indicated that it was their intent in drafting and passing the bill that

equitable services be provided to private schools using the Title I funding formula. For example, on May 20, 2020, three Democratic congressional leaders—Representative Bobby Scott, Representative Rosa DeLauro, and Senator Patty Murray—wrote to Secretary DeVos, stating:

> [T]he Department broke with statutory requirements of the CARES Act and longstanding precedent of the equitable services provision in section 1117 of ESEA by issuing guidance that directs LEAs to use emergency relief funds for the provision of services to students at private schools regardless of their wealth or residence. This action also contradicts the Department's equitable services non-regulatory guidance issued on October 7, 2019.

Exhibit C.[8] The members, all of whom are congressional committee chairs or ranking members on committees specific to education and/or appropriations, went on to say, "[t]he statutory language and Congressional intent is clear: LEAs should use these emergency relief funds to provide equitable services only based on the number of low-income students attending private schools in their LEA, not all students attending private schools in the LEA." *Id.* This Congressional intent was confirmed by senior Republican Senator Lamar Alexander, chairman of the Senate Committee on Health, Education, Labor, and Pensions and former U.S. Secretary of Education, the next day. On May 21, 2020, Senator Alexander was asked about the Department's Guidance, and said, "I thought, and I think most of Congress thought, that money from the CARES Act would be distributed in the same way that Title I is distributed."[9]

Moreover, the non-partisan Congressional Research Service ("CRS") extensively analyzed the text of the CARES Act and its legislative history concluding that "a straightforward reading of section 18005(a) based on its text and context suggest that the CARES Act requires

---

[8] *Letter from Robert C. "Bobby" Scott, Rosa L. DeLauro, and Patty Murray, U.S. Congress, to Betsy DeVos, Sec'y, U.S. Dep't of Educ.* (May 20, 2020), https://edlabor.house.gov/imo/media/doc/2020-5-z0%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf (attached hereto at Exhibit C).
[9] Andrew Ujifusa, *Sen. Alexander Splits from Betsy DeVos on COVID-19 Aid to Help Private Schools*, EDUCATION WEEK (May 21, 2020), https://blogs.edweek.org/edweek/campaign-k-12/2020/05/alexander-devos-COVID-aid-private-schools-CDC-reopening.html.

LEAs to follow section 1117's method for determining the proportional share, and thus to allocate funding for services for private school students and teachers based on the number of low income children attending private schools." *Mem. from CRS to House Comm. on Educ. and Labor* 2 (July 1, 2020) (attached hereto as Exhibit D). The CRS further concluded that the relevant number for this calculation is the "number of private-school children from low-income families residing in the LEA's participating public school attendance areas." *Id.* at 3.

Thus, Congress clearly intended that the funds provided to school districts under the CARES Act be proportionately shared with private schools *based on the number of low-income students residing in the school district's Title I school attendance areas*. This clear Congressional intent, supported by the statutory text itself as well its context and legislative history, is controlling. The Department does not have any authority to depart from that clear intent or to rewrite the plain language of the Act.

## II.     The Chaotic Manner in which the Department has Acted Has Delayed the Distribution of Critical Resources and Placed School Districts in Legal Jeopardy.

In addition to being an unlawful abuse of agency authority resulting in significant harms—including the potential deprivation of hundreds of millions of dollars of much-needed funds for our nation's most vulnerable students, as detailed in Section III below—the Department's arbitrary and *ad hoc* actions also have led to considerable confusion that has delayed the distribution of critical resources. The Department's interpretation of the Act has constantly shifted since its enactment. For example, the Rule issued on July 1, 2020 contains new substantive requirements that differ from those in the Act (enacted in March), the Department's initial notice, and the Department's April 30, 2020 Guidance. More recently, despite two courts issuing preliminary injunctions preventing the implementation of the Department's Rule, the Department continues to argue double down on its untenable position arguing that the

injunctions are limited to those specific states. Moreover, by virtue of its interim nature, the Rule also creates the possibility for yet additional changes in the Department's policy after the 30-day comment period. Throughout this period of uncertainty, however, the Department has consistently done one thing: presented school districts with an impossible choice between compliance with its current "interpretation" or with the actual terms of the Act. The Department's actions over the last four months thus have created an untenable situation.

A.    **The Guidance created unnecessary confusion for school districts and put them at legal risk.**

Section 18002(a) of the Act mandated: "[T]he Secretary *shall* make Emergency Education Relief grants to the Governor of each State with an approved application"; "*shall* issue a notice inviting applications not later than 30 days of enactment of this Act"; and "*shall* approve or deny applications not later than 30 days after receipt." CARES Act § 18002(a) (emphasis added).

Accordingly, on April 23, 2020, the Department published a notice which included a July 1, 2020 "Deadline for Transmittal of Certification and Agreement." *See* U.S. Dep't of Educ., *Notice Announcing Availability of Funds and Deadline for the Elementary and Secondary School Emergency Relief Fund* at 2 (April 23, 2020)[10] (the "Notice"). The Notice also indicated that "[e]ach SEA's Certification and Agreement will be processed as it is received and funds will be obligated on a rolling, expedited basis with the expectation that State educational agencies (SEAs) and local educational agencies (LEAs) will also use every effort to expend the funds quickly to address exigent student needs." *Id.* The Notice emphasized the urgency of applying for and utilizing the emergency funding:

---

[10] Available at *https://oese.ed.gov/files/2020/04/ESSER-Fund-Notice-Final.pdf.*

> Consistent with section 18003(d) of the CARES Act, LEAs may use ESSER funds to address the impact that COVID19 has had, and continues to have, on elementary and secondary schools across the Nation. The Department encourages SEAs that use funds for remote learning to make strategic investments that promote student achievement through long-term improvements in infrastructure and operations so that students may receive educational services whether school campuses are open or closed.

*Id.* at 4. With respect to equitable services, the Notice restated the text of section 18005(a), without any indication that it would be deviating from the approach recently reaffirmed[11] in its 2019 Title I equitable services guidance. *See Id.* at 6.[12]

Consistent with the Act, the Notice included "Certification and Agreement" instructions, requiring each applicant to "provide an assurance that it will comply with all requirements that apply to the ESSER Fund," including the statute's equitable services provision. Relevant here, the certification form required applicants for CARES Act funds to allocate funds on the basis of "respective shares of funds received" under Title I and "***ensure that an LEA receiving ESSER funds will provide equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA***.[13] Many states and school districts, including Council members, executed certifications that they would comply. It was not until the non-binding Guidance was issued on April 30, 2020 (more than a

---

[11] *See* October 2019 Guidance, *supra* n. 3.

[12] Although the equitable services provision of the Notice indicated that, "[t]he Department will provide additional guidance to LEAs on equitable services requirements," no reasonable state or school district could have predicted the Department's arbitrary conditions imposed on the provision of ESSSER funds first in the Guidance on April 30 and then in the Rule issued on July 1. *See* U.S. Dep't of Educ., *Notice Announcing Availability of Funds and Deadline for the Elementary and Secondary School Emergency Relief Fund* (April 23, 2020).

[13] U.S. Dep't of Educ., *Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund)* at 2–3 (April 2020), https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf (emphasis added).

15

month after the Act was enacted) that school districts had any idea the Department might encourage—or mandate—a different approach.

As a result, school districts can either comply with the Department and, along with forfeiting hundreds of millions of dollars in aid, face legal risk by failing comply with their certification or comply with the Act and face potential penalties from the Department. Either way, the Department has put school districts in an impossible situation.

**B.    The Rule effectively mandates the Department's flawed interpretation and increases confusion and hardship for school districts.**

Recognizing the significant hardships the Guidance imposed on school districts, multiple educational associations, spearheaded by the Council of Chief State School Officers ("CCSSO"), alerted the Department of its flawed interpretation of the CARES Act and put the Department on notice of the significant confusion and harm the Guidance was causing for both states and school districts. *See Letter from Carissa Moffat Miller, Exec. Dir., CCSSO, to Betsy DeVos, Sec'y, U.S. Dep't of Educ.* (May 5, 2020).[14] In response, the Department doubled down, accusing the CCSSO of "improperly discriminat[ing] against an entire class of children," despite the fact that Congress, not the CCSSO, had selected the allocation formula.[15]

Subsequently, many states and school districts decided to expressly reject the Department's Guidance and follow the statute. According to one report,[16] numerous states led by

---

[14] *Available at* https://ccsso.org/sites/default/files/2020-05/DeVosESLetter050520.pdf.

[15] *See Letter from Betsy DeVos, Sec'y, U.S. Dep't of Educ., to Carissa Moffat Miller, Exec. Dir., CCSSO* (May 22, 2020), https://blogs.edweek.org/edweek/campaign-k-12/Secretary%20DeVos%20Response%20to%20Carrisa%20Moffat%20Miller%205%2022%20 20.pdf (hereinafter "DeVos Letter"); *see also* Andrew Ujifusa, *DeVos to Release Rule Cementing COVID Aid Push for Private School Students*, EDUCATION WEEK (May 26, 2020), https://blogs.edweek.org/edweek/campaign-k-12/2020/05/devoscovid-aid-private-school-students-rule.html.

[16] *See* Bianca Quilantan, *Weekly Education: States Push Back Against Steering Coronavirus Funds to Private Schools*, POLITICO (June 1, 2020),

both Republican and Democratic governors—including Oklahoma, Mississippi, Indiana, Maine, Washington, Pennsylvania, New Mexico and Wisconsin—rejected the Department's interpretation and began calculating allocations according to the plain text of the statute. New Mexico, for example, stated it would follow the plain language of the CARES Act, noting in a letter to superintendents and charter school heads that "[t]his advisory aligns with the plain language of the CARES Act and is consistent with longstanding equitable services calculations under Title I criteria, as well as U.S. Department of Education's interpretations of the [ESEA] over decades and as recently as October 2019." *Mem. from State of New Mexico Public Educ. Dep't* 5 (May 14, 2020) (attached hereto as Exhibit E).

In early June, ten states indicated they would or were likely to follow the Department's guidance.[17] States including Colorado, Illinois and Ohio have followed the Department's cautionary directive in its letter response to CCSSO[18] and advised school districts to calculate the equitable share based on students in poverty, but to set aside the difference in funding in an escrow account.[19] Other states remained unsure and are still waiting to see what happens.

In response, however, more than three months after the CARES Act was enacted, the Department concluded its Guidance was inadequate and it adopted the Rule on July 1, 2020, publishing it in the Federal Register without notice and comment, and made it effective immediately. 85 Fed. Reg. 39,479. In so doing, the Department added yet another layer of confusion and complexity to Congress's simple mandate to "make Emergency Education Relief

---

https://www.politico.com/newsletters/morning-education/2020/06/01/meet-acts-new-top-executive-788066.

[17] *Id*.

[18] *See* DeVos Letter, *supra* n. 15, at 1 ("If they or their district superintendents insist on acting contrary to the Department's stated position, they should, at minimum, put into an escrow account the difference between the amount generated by the proportional-student enrollment formula and the Title I, Part A formula.").

[19] Quilantan, *supra* n. 16.

grants to the Governor of each State with an approved application." *See* CARES Act § 18002(a). As the Western District of Washington put it, "[t]he Department's convoluted reading essentially create[d] an ambiguity to justify resolving it, thereby thwarting Congress's obvious intent. This the APA does not allow." *Washington*, 2020 WL 5079038, at *8.

Indeed, instead of merely codifying the Guidance's already flawed and inequitable approach, the Rule effectively created two ostensible "choices" for school districts with respect to how to calculate the proportional share of CARES Act funds for equitable services. However, neither "choice" is viable. Under the Rule, districts can either (1) follow the Department's preferred approach, in violation of the Act, and forfeit a substantial share of their CARES Act funds, but maintain their congressionally-granted discretion regarding use of those funds; or (2) maintain the full funding intended for public schools under the CARES Act, but give up the ability to serve all of their students and adhere to severe restrictions on how the money can be spent.

Neither option is allowed by the Act, as discussed above, and neither one is workable for school districts. First, the funds allocated are desperately needed by school districts trying to reopen during the pandemic. COVID-19 has drastically affected public education. School districts across the nation were ordered to close and transition to online learning in the spring, incurring significant additional expenses to ensure all students (particularly low-income students like many of those served by Council members) had adequate access to necessary technology. Since then, states have faced declining revenue and corresponding budget cuts, including billions of dollars in reduction to funding for public education. These cuts come at the same time when the additional costs of re-opening schools safely, according to protocols recommended by the Centers for Disease Control and Prevention, are estimated by the CCSSO to amount to

somewhere between $158 and $245 billion.[20] School districts cannot afford to lose any resources at this time.

Similarly, it is impractical for school districts, including Council members, to give up their ability under the CARES Act to use these funds with flexibility in any school in which they are needed. Some of the emergency funds authorized by Congress are desperately needed precisely to make up for lost state and local revenue, an approach complicated if not made unworkable by the Rule, particularly if a school district follows the Act's allocation method rather than the Department's. Likewise, as discussed in Section III below, resources to open schools for in-person instruction safely, such as personal protective equipment or masks, and technology to support online instruction are needed at all schools, not only Title I schools, but the Rule would restrict districts from using the funds in this manner, unless they adopt the Department's allocation method. The result is that the Rule does not give school districts any actual choice.

The Rule also increases the pressure on school districts because it purports to be legally binding, even though it directly contradicts the Act. And, to make matters worse, as an interim rule, the Rule itself is subject to further modification by the Department. In sum, the Rule exacerbates the problems for school districts caused by the Guidance and further underscores the arbitrary nature of the Department's approach to equitable services under the CARES Act.

**C.     The Department's inconsistent interpretation also has resulted in delay in the distribution of critical resources.**

The changing interpretations and the introduction of entirely new formulas for calculating the proportionate share under the Guidance and then the Rule leave little to no consensus or

---

[20] *Letter from Carissa Miller, Exec. Dir., CCSSO, to Lamar Alexander, U.S. Congress* (June 24, 2020), *available at* https://ccsso.org/sites/default/files/2020-06/HELPLetterFinal.pdf.

clarity regarding the actual dollar amounts available for school districts to rely on in order to plan appropriately for their use. Because of the Department's actions, the academic (and fiscal) year during which the pandemic began disrupting delivery of in-person education and other operations expired without school districts having access to Congressionally appropriated emergency funds. Moreover, with each new interpretation, school districts must re-analyze and re-assess current budgets, undermining school administrators' ability to focus on the real emergencies at hand: initially, the continuation of high-quality education with schools closed and, now, the safe return of students and teachers to schools (if possible) in the midst of a global pandemic.

In addition, under the CARES Act, as under Title I, school districts must engage in a consultation process with private schools in order to provide appropriate services to students in those private schools.[21] With each new interpretation from the Department, school districts have had to delay, restart, or repeat this consultation process, which has harmed not only public school students, but also disadvantaged students in private schools who should be benefitting from these resources. In some states, like Texas, state educational authorities have gone so far as to expressly require school districts to restart a consultation requirement based on the Department's July 1 Rule.[22] As mandated by the Act, it is critical for school districts to engage in a meaningful

---

[21] *See* CARES Act § 18005(a) (requiring LEAs to provide equitable services "in consultation with representatives of non-public schools"); *see also* Notice, *supra* note 10, at 6 ("An SEA must ensure that an LEA that receives an ESSER Fund subgrant provides equitable services to students and teachers in non-public schools located within the LEA in the same manner as provided under section 1117 of the ESEA, *as determined through timely and meaningful consultation with representatives of non-public schools*.") (emphasis added).

[22] *See* Tex. Educ. Agency, *Providing Equitable Services to Students and Teachers in Participating Private Non-Profit Schools Under the CARES Act Programs* 3 (updated July 9, 2020), https://tea.texas.gov/sites/default/files/covid/COVID-19-CARES-Act-Equitable-Services-FAQ.pdf ("If consultation has already been completed and the district is changing the calculation option, the consultation process must be reopened. The revised consultation process must be

consultation process with private school representatives to ensure that the funds are utilized in an effective way.

The Department's chaotic deployment of its preferred policy position through the Guidance and then the Rule has unnecessarily delayed that process to the detriment of school districts and private schools nationwide.

III.    **The Interim Final Rule Adopted by the Department Would Divert Hundreds of Millions of Dollars from Public Schools to Private Schools with Devastating Consequences for School Districts and their Students.**

If the approach to CARES Act equitable services allocations suggested in the Guidance and mandated by the Rule is allowed to stand, it would divert hundreds of millions of dollars away from public school districts that are already facing massive budget cuts and exacerbate the challenges of operating safely and effectively during an ongoing global pandemic. The consequences of this diversion would be devastating for students and teachers nationwide, including the millions in Council member districts.

A.      **The amount of funds diverted is substantial.**

The approach now mandated by the Department would dramatically increase the percentage of the funds appropriated by Congress under the CARES Act to support elementary and secondary education that flow to private schools, regardless of the number of low-income students they serve. For example, in response to a poll of the Council's member districts, one district reported an increase by as much at 1280%. *See* Exhibit. F, Declaration of Manish Naik; Exhibit F-1. The diversion of funds to private schools, regardless of need, would dramatically reduce the funds available to public school districts. In polling its members, the Council learned that the dollar amount lost to private schools in 16 member districts would range from about

documented. TEA recommends extending consultation timeline to ensure the new requirements are discussed with private school officials.").

21

$628,000 to $6,485,000. *See* Exhibit F ¶¶ 3–6; Exhibit F-1. The total amount lost by these districts would be approximately $33,337,000. *Id.* Three other Council members, the New York City Department of Education, Chicago Public Schools, and the San Francisco Unified School District, disclosed in written testimony that they would lose about $53,000,000, $10,170,000, and $1,740,000 respectively. *See* Exhibit F ¶¶ 7, 9. If the amount of CARES Act funding lost through the Department's approach was similar in other school districts relative to their total low-income population, the Council projects that its 76 member districts would lose a total of about $292,000,000 of these much-needed, emergency resources. *Id.* ¶ 11.

Moreover, the Council's members, though relatively large, are just a small fraction of the public school districts in the United States. An analysis of the effect of the Department's approach on the 185 school districts in Texas alone, for example, indicates that those districts would collectively lose about $38 million in CARES Act funds.[23]

The allocation method effectively mandated by the Rule would also divert resources from private schools that serve a large number of low-income students. In Cleveland, for example, where a large number of low-income students attend private schools due to Ohio's voucher program, Council member the Cleveland Metropolitan School District ("CMSD") estimates that most private schools will lose money under the Department's methodology, which favors a select few private schools who serve few low-income students. *Id.* ¶¶ 13–14. Overall, the cumulative effect of allocating funds for equitable services based on total enrollment in Cleveland's private schools would be to divert about $822,952 away from CMSD's public schools, reallocate

---

[23] Morgan Craven and Roy L. Johnson, *An Analysis of How the Department of Education's Equitable Services Rule Will Harm Texas Students and School Districts*, IDRA Issue Brief (July 16, 2020), https://www.idra.org/wp-content/uploads/2020/07/Cutting-Public-School-Relief-Funds-to-Subsidize-Private-Schools-IDRA-Issue-Brief-July-16-2020.pdf ("IDRA Issue Brief").

approximately $890,000 away from 47 high-poverty private schools, and redirect approximately $1.7 million to 16 private schools with low numbers of high-poverty students. *Id.* ¶¶ 14–15.

The overall effect of the Department's approach is thus to divert hundreds of millions of dollars of critically needed funds away from public school districts serving low-income communities and millions more away from private schools serving high percentages of low-income students. In the words of the Western District of Washington, "[f]orcing the State to divert funds from public schools ignores the extraordinary circumstances facing the State and its most disadvantaged students. . . . [T]hat harm is, with potentially tragic consequences in this case, irreparable." *Washington*, 2020 WL 5079038, at *10. This is not how Congress wanted to support educators' efforts to address the pandemic.

### B.    The diversion would deprive millions of public school students of critical resources and life-saving services during the pandemic.

The diversion of these substantial funds away from school districts deprives millions of students of exactly the resources these funds were intended to support. The funds made available through the CARES Act were intended, once allocated, to be used for purposes such as purchasing sanitization and cleaning supplies, purchasing personal protective equipment for teachers and students, and planning for and coordinating long-term closures including by providing portable meals and technology services. Millions of students in Council member districts are being denied these critical resources amid a pandemic.

The Council asked its member districts to detail the consequences of the financial losses caused using the Rule's allocation formula, rather than the Title I formula. Exhibit F, ¶¶ 3–4. Broward County Public Schools lost $540,000 and was not able meet the technology needs of its schools as they transitioned to a virtual environment. Baltimore City Public Schools said that if it must provide the additional $2,419,639 to private schools, either the number of students that can

receive a Chromebook to support distance learning will be reduced by 6,050 or the number of students that can be provided a semester of tutoring will be reduced by 3,252. The District of Columbia Public Schools ("DCPS") said that the $1.8 million it would lose could, if retained by DCPS, be used to purchase 2,100 additional laptop devices for low-income students to support their virtual learning. $400,000 could provide mentoring and tutoring services for 400 at-risk students. $1.2 million could purchase internet connectivity for one year for 5,000 low-income students.

The analysis of Texas school districts discussed earlier shows a similar impact across the school districts in that state. The study concludes that the $38 million lost by those districts could "have been used to fund hundreds of counselors, social workers and nurses and to purchase equipment like facemasks and hand sanitizer. It could have been used to support remote learning and other critical services for students and teachers." IDRA Issue Brief at 1.

As positive COVID-19 test results rise in numerous places in the country, school districts are faced with an impossible choice made even more difficult by this diversion of funds: to start school in-person without enough face masks and personal protective equipment, or to start school remotely when often large portions of the student body have neither internet connectivity nor laptop devices to allow them to work remotely? This dilemma was intended to be at least partially alleviated by the availability of CARES Act funds. Instead, the Department continues to exacerbate the problem and deprive public schools of necessary funds through its continued backing of its unlawful Guidance and Rule from earlier this summer, and from its insistence that the injunction ordered by the courts in Washington and California only apply to those states. If the language of the CARES Act itself is properly followed, then Council member districts would

have significantly more funds available to help address current conditions by providing resources necessary for safe in-person instruction and/or equitable remote learning.

The challenges facing public school districts today are real and the potential consequences are grave. School districts are addressing unprecedented issues with scarce resources. The Department's attempt to divert hundreds of millions of dollars should not be allowed to make these difficult tasks even more challenging.

## **<u>CONCLUSION</u>**

For these reasons, the Council of the Great City Schools respectfully suggests that Plaintiffs' motion for partial summary judgment should be granted.

Dated: September 10, 2020        Respectfully submitted,

HUSCH BLACKWELL LLP

By:  /s/ *Steven A. Neeley*
    Steven A. Neeley (D.Md. Bar No. 18812)
    750 17th Street, NW, Suite 900
    Washington, DC 20006
    Phone: (202) 378-2331
    Fax: (202) 378-2319
    steve.neeley@huschblackwell.com

    John W. Borkowski (IL Bar No. 6320147)
    Mary E. Deweese (IL Bar No. 6326512)
    *Pro hac vice motions pending*
    120 South Riverside Plaza, Suite 2200
    Chicago, Illinois 60606
    Phone: (312) 526-1538
    Fax: (312) 655-1501
    john.borkowski@huschblackwell.com
    mary.deweese@huschblackwell.com

    Paige Duggins-Clay (TX Bar No. 24105825)
    *Pro hac vice motion pending*
    111 Congress Avenue, Suite 1400
    Austin, Texas 78701
    Phone: (512) 472-5456

Fax: (512) 479-1101
paige.duggins-clay@huschblackwell.com

Aleksandra O. Rushing (MO Bar No. 68304
Shmuel B. Shulman (MO Bar No. 71175)
*Pro hac vice motions pending*
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63141
Phone: 314-345-6275
Fax: 314-480-1505
aleks.rushing@huschblackwell.com
shmuli.shulman@huschblackwell.com

Attorneys for Amicus Curiae
COUNCIL OF THE GREAT CITY SCHOOLS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 10th day of September, 2020, a copy of the above and foregoing document was filed with the Clerk of Court using the CM/ECF system which sent electronic notification of such filing to all those individuals currently electronically registered with the Court.

_/s/ Steven A. Neeley_

a