# EXHIBIT D



**MEMORANDUM**                                                                July 1, 2020

**To:**        House Committee on Education and Labor

**From:**

**Subject:**   **Analysis of the CARES Act's Equitable Services Provision**

This memorandum[1] responds to your request for an analysis of section 18005 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act)—the equitable services section—which concerns assistance to non-public elementary and secondary school students and teachers.[2] Specifically, the memorandum analyzes whether section 18005(a) requires local educational agencies (LEAs),[3] such as public school boards, to reserve funding for services to private school students and teachers using the method for determining the "proportional share" set forth in section 1117 of the Elementary and Secondary Education Act of 1965 (ESEA); that is, based on the number of children from *low-income families* (low-income children) attending private schools.[4] On July 1, 2020, the Department of Education (Department) issued an interim final rule (IFR) authorizing—and in certain circumstances directing—LEAs to use an alternative method to determine the proportional share based on *total enrollment* in private schools, reasoning that the CARES Act did not mandate "a rigid application of section 1117."[5]

Part I of the memorandum begins by summarizing the equitable services requirements in the CARES Act and the ESEA. Part II discusses the competing interpretations of section 18005(a) that have emerged since

---

[1] Information in this memorandum is drawn from publicly available sources and is of general interest to Congress. As such, all or part of this information may be provided by CRS in memoranda or reports for general distribution to Congress. Your confidentiality as a requester will be preserved in any case.

[2] Pub. L. No. 116-136, div. B, § 18005 (Mar. 27, 2020). Because the slip law is not yet available, this memorandum is based on the text of the Act as shown in the enrolled bill. *See* H.R. 748, 116th Cong., https://www.congress.gov/116/bills/hr748/BILLS-116hr748enr.pdf [hereinafter CARES Act].

[3] The CARES Act defines an LEA by reference to 20 U.S.C. § 7801. CARES Act § 18007(8). In general, an LEA is "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or of or for a combination of school districts or counties that is recognized in a State as an administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 7801(30).

[4] *See* No Child Left Behind Act of 2001, tit. I, § 101, Pub. L. No. 107-110, 115 Stat. 1439, 1508 (adding § 1120, later renumbered to § 1117, to the ESEA) (codified as amended at 20 U.S.C. § 6320).

[5] CARES Act Programs; Equitable Services to Students and Teachers in Non-Public Schools, 85 Fed. Reg. 39,479, 39,480 (interim final rule with request for comments) (effective July 1, 2020) [hereinafter IFR]; *see also* Dep't of Educ., *Secretary DeVos Issues Rule to Ensure CARES Act Funding Serves All Students*, ED.GOV (June 25, 2020) (issuing draft text of the IFR).

the CARES Act's enactment, including the Department's position as set forth in the IFR. Part III analyzes the meaning of section 18005(a). It first discusses the possible meanings of key terms used in that section before analyzing the provision's meaning as a whole. Part III then considers the provision's context within the CARES Act and against the broader background of the ESEA's equitable services requirements. This part concludes with a discussion of the limited legislative history of the equitable services section in the CARES Act.

As discussed in detail below, a straightforward reading of section 18005(a) based on its text and context suggests that the CARES Act requires LEAs to follow section 1117's method for determining the proportional share, and thus to allocate funding for services for private school students and teachers based on the number of low-income children attending private schools. However, for the reasons discussed in Part IV, if, in a legal challenge to the IFR, a court were to instead find that section 18005(a) is not clear on this point, additional analysis is required to evaluate what, if any, deference a court might accord to the Department's contrary interpretation.[6]

# I. Equitable Services Requirements in the CARES Act and the ESEA

The CARES Act established three emergency relief funds to be administered by the Secretary of Education, two of which—the Governor's Emergency Education Relief (GEER) Fund and the Elementary and Secondary School Emergency Relief (ESSER) Fund—are relevant to this discussion.[7] Both funds may be used to provide grants to states for various authorized purposes, and both are subject to an equitable services requirement as discussed below.

## CARES Act and Section 18005

The GEER Fund provides funds, based on a statutory formula, to state governors to "provide emergency support" to LEAs that a state educational agency has deemed "most significantly impacted by coronavirus" to support the LEAs' "on-going functionality" and continued provision of educational services to their students.[8] The CARES Act does not further specify any particular formula under which GEER Fund grants are to be distributed to LEAs.

Under the ESSER program, at least 90% of grants made to state educational agencies must be subgranted to LEAs in proportion to the amount of funds those LEAs received in the most recent fiscal year under part A of title I of the ESEA (Title I-A funds).[9] Ordinarily, LEAs receive Title I-A allocations based in part on the number of students from families below the federal poverty level;[10] they use such allocations to provide "assistance to meet the special needs of educationally disadvantaged children" and fund "supplementary educational and related services to low-achieving and other students attending elementary and secondary schools with relatively high concentrations of students from low-income families."[11] While the CARES Act provides that an LEA receives ESSER funds based on its most recent Title I-A share, the statute allows the LEA to use those ESSER funds for a broader set of purposes than ordinary Title I-A funds, including for: "[a]ny activity authorized by the ESEA of 1965"; a range of coronavirus response

---

[6] See infra "Conclusion and Additional Considerations."

[7] CARES Act §§ 18002–18004; see also CRS Report R46378, CARES Act Education Stabilization Fund: Background and Analysis, by Rebecca R. Skinner et al.

[8] CARES Act § 18002(c)(1).

[9] Id. § 18003(c).

[10] 20 U.S.C. § 6333(a), (c)(1).

[11] CRS Report R45141, Analysis of the Elementary and Secondary Education Act Title I-A Allocation Formulas: Factors, Design Elements, and Allocation Patterns 1, by Rebecca R. Skinner and Leah Rosenstiel.

measures; support for "the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth"; and necessary activities to maintain the LEA's operations and continuity of services.[12]

Section 18005(a) of the CARES Act—the equitable services provision—requires an LEA receiving GEER or ESSER funds (relief funds) to "provide equitable services *in the same manner as* provided under section 1117 of the ESEA . . . to students and teachers in non-public schools, as determined in consultation with representatives of non-public schools."[13]

## ESEA and Sections 1117 and 8501

Ordinarily, ESEA section 1117 (codified at 20 U.S.C. § 6320) requires an LEA to use a portion of its Title I-A funds to provide certain services to eligible children in the school district served by that LEA[14] who are enrolled in private elementary and secondary schools.[15] The portion of an LEA's Title I-A funds to be used under section 1117 is based on the number of private-school children from low-income families residing in the LEA's participating public school attendance areas.[16] Although poverty data is used to determine private schools' *proportional share*, the Department of Education does not consider poverty to be a criterion for *eligibility to receive services*.[17] Instead, "eligible children" for purposes of section 1117 include certain students at risk of failing to meet the state's academic standards and "[c]hildren who are economically disadvantaged, children with disabilities, migrant children or English learners."[18] A Department regulation further specifies that eligible children must also reside in a Title I-A public school attendance area within that LEA and attend private schools inside or outside that LEA.[19] Under the ESEA, the services and benefits covered by section 1117 are: "special educational services, instructional services . . . , counseling, mentoring, one-on-one tutoring, or other benefits under [Title I-A] (such as . . . mobile educational services and equipment) that address their needs."[20]

---

[12] CARES Act § 18003(d).

[13] *Id.* § 18005(a) (emphasis added). The CARES Act defines "non-public school" as "a non-public elementary and secondary school that (A) is accredited, licensed, or otherwise operates in accordance with State law; and (B) was in existence prior to the date of the qualifying emergency for which grants are awarded under this section." *Id.* § 18007(6). Because CARES Act section 18007 incorporates the meaning of terms defined in section 8101 of the ESEA, *id.* § 18007(8), non-public schools are limited to *nonprofit* elementary and secondary schools. *See* 20 U.S.C. § 7801(19), (45). For simplicity, this memorandum refers to "non-public schools" as "private schools."

[14] For brevity, the memorandum refers to attendance areas within an LEA's boundaries as being "within the LEA" and schools located outside that area as being "outside the LEA."

[15] *See* 20 U.S.C. § 6320(a)(1).

[16] *Id.* § 6320(a)(4)(A); *see also* 34 C.F.R. § 200.64(a)(1).

[17] *See* Dep't of Educ., Providing Equitable Services to Eligible Private School Children, Teachers, and Families 30 (Oct. 7, 2019), https://www2.ed.gov/about/inits/ed/non-public-education/files/equitable-services-guidance-100419.pdf [hereinafter Title I-A Equitable Services Guidance].

[18] 20 U.S.C. § 6315(c); *see also id.* § 6320 (directing LEAs to provide equitable services "[t]o the extent consistent with the number of eligible children identified under section 1115(c) [(20 U.S.C. § 6315(c))]").

[19] 34 C.F.R. § 200.62(b); Title I-A Equitable Services Guidance, *supra* note 17, at 8.

[20] 20 U.S.C. § 6320(a)(1)(A).

ESEA section 1117 imposes a number of requirements,[21] most of which are directed at LEAs and which are divided into five subsections.[22] Because the structure and wording of these requirements is important to the statutory interpretation analysis, the relevant requirements are summarized below.

Subsection (a) sets out "general requirement[s]" relating to the nature of the services that LEAs must provide to private school students and the method for determining the amount of funding to allocate to services for private school students.[23]

Paragraph (1), captioned "In general," states that LEAs must:

- "provide" the special educational and instructional services listed above;
- to "eligible children identified under section 1115(c) in the school district served by [the LEA] who are enrolled in private elementary schools and secondary schools";[24]
- "on an equitable basis";
- "individually or in combination, as requested by the [appropriate private school] officials to best meet the needs of such children";[25] and
- "after timely and meaningful consultation with appropriate private school officials."

Paragraphs (2) and (3) specify that services and benefits must be:

- "secular, neutral, and nonideological";
- "equitable in comparison to services and other benefits" for participating public school children; and
- "provided in a timely manner."

Paragraph (4), captioned "Expenditures," states, inter alia, that expenditures for services and benefits to eligible private school students must be "equal to the proportion of funds allocated to participating school attendance areas based on the number of children from *low-income* families who attend private schools."[26]

---

[21] Provisions in section 1117 that use the word "shall" appear to introduce a mandatory requirement, whereas provisions that use the word "may" appear to give the agency discretion to choose between two or more options. *Compare, e.g.*, 20 U.S.C. § 6320(b)(1) (stating that an LEA "*shall* consult with appropriate private school officials during the design and development of such agency's programs") (emphasis added), *with id.* § 6320(a)(5) (stating that an LEA "*may* provide services under this section directly or through contracts with public and private agencies, organizations, and institutions"). *See* Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1977 (2016) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty."). Accordingly, this memorandum uses the term "must" in paraphrasing provisions that use the word "shall" where the context indicates that the provision is mandatory.

[22] 20 U.S.C. § 6320(a)–(e).

[23] *Id.* § 6320(a).

[24] The language "such children" in (a)(1)(A) appears to refer back to the opening phrase: "To the extent consistent with the number of eligible children identified under section 1115(c) in the school district served by [an LEA] who are enrolled in private elementary schools and secondary schools." 20 U.S.C. § 6320(a)(1). *Cf.* Sullivan v. Finkelstein, 496 U.S. 617, 627 (1990) ("The phrase 'such additional evidence' [in the second half of the sixth sentence] refers in turn to the 'additional evidence' mentioned in the first half of the sixth sentence.").

[25] Section 1117 also requires the LEA to "ensure that teachers and families of the children participate, on an equitable basis, in services and activities developed pursuant to section 1116 [(20 U.S.C. § 6318)]," relating to parent and family engagement. 20 U.S.C. § 6320(a)(1)(B).

[26] *Id.* § 6320(a)(4)(A)(i) (emphasis added).

Paragraph (5), captioned "Provision of Services," states that the LEA may provide services "directly or through contracts with public and private" entities.

Subsection (b) contains detailed "consultation" requirements for LEAs, beginning with the mandate to "consult with appropriate private school officials during the design and development of such agency's programs" with "the goal of reaching agreement on how to provide equitable and effective programs for eligible private school children."[27] Among other topics, the consultation process must include:

- "the size and scope of the equitable services to be provided to the eligible private school children, the proportion of funds that is allocated under subsection (a)(4)(A) for such services, and how that proportion of funds is determined";[28] and

- "the method or sources of data that are used under subsection (c) and section 1113(c)(1) to determine the number of children from low-income families in participating school attendance areas who attend private schools."[29]

Subsection (c), titled "Allocation for equitable service to private school students," gives an LEA "final authority . . . to calculate the number of children, ages 5 through 17, who are from low-income families and attend private schools" through one of four calculation methods.[30]

Subsection (d) on the "Public control of funds," while not directed at LEAs specifically, mandates in paragraph (1) that a public agency control and administer Title I-A funds.[31] Paragraph (2) of this subsection, captioned "Provision of services," requires services under section 1117 to be provided by employees of a public agency or through a public agency's contract with another entity that is independent of the private school or a religious organization.[32]

Subsection (e) provides a bypass mechanism through which the Secretary of Education must arrange for the provision of equitable services to eligible children if an LEA is prohibited by law from providing equitable services to private school children or has substantially failed, or is unwilling, to do so.[33]

Section 1117 is not the only equitable services requirement in the ESEA. As discussed in more detail in Part III's section on "Statutory Context," section 1117 provides the equitable services requirements for Title I-A funds, while section 8501 of the ESEA contains similar requirements for programs under other titles of the ESEA. However, unlike section 1117, section 8501 does *not* require LEAs to base private schools' proportional share on the number of low-income children living in Title I-A attendance areas who attend private schools.[34] Instead, section 8501 provides that "[e]xpenditures for educational services and other benefits provided under this section for eligible private school children, their teachers, and other educational personnel serving those children *shall be equal, taking into account the number and educational needs of the children to be served, to the expenditures for participating public school children*."[35]

---

[27] *Id.* § 6320(b)(1).

[28] *Id.* § 6320(b)(1)(E).

[29] *Id.* § 6320(b)(1)(F).

[30] *Id.* § 6320(c).

[31] *Id.* § 6320(d)(1).

[32] *Id.* § 6320(d)(2).

[33] *Id.* § 6320(e).

[34] *See id.* § 7881(a)(4)(A).

[35] *Id.* (emphasis added).

## II. Competing Interpretations of Section 18005(a)

In interpreting section 18005(a) of the CARES Act, disputes have arisen as to what it means for LEAs to "provide equitable services *in the same manner* as provided under section 1117 of the ESEA."[36] In guidance issued on April 30, 2020 (April 30th guidance), the Department interpreted section 18005(a) of the CARES Act to give the Department discretion to harmonize the Act's equitable services provision with its counterpart in the ESEA.[37] To give "meaning to" the ESEA's equity provision—that services and benefits for eligible private school children be "*equitable in comparison*" to services and other benefits for public school children—the Department concluded that it must account for "the significantly broader eligibility and uses of funds authorized under the CARES Act as compared to [ESEA] Title I, Part A."[38] In the April 30th guidance, the Department initially advised LEAs to base the proportional share on *total enrollment* in participating private schools in the LEA, rather than the number of *low-income* children living in Title I-A attendance areas in the LEA and attending private schools inside or outside the LEA.[39]

In response to objections from "[a] number of states," the Department later revised its instructions in the July 1, 2020 IFR to offer LEAs options for determining the proportional share.[40] Under the IFR, an LEA that spends CARES Act relief funds *only* on services for schools participating in Title I-A has three options for determining the proportional share.[41] Specifically, an LEA receiving CARES Act relief funds may determine the proportional share:

(1) based on total enrollment in participating private schools,[42] consistent with the April 30th guidance;

(2) using the proportional share the LEA calculated under section 1117(a)(4)(A) for the 2019–2020 school year,[43] which would have been based on low-income children living in Title I-A attendance areas and attending private schools inside or outside the LEA; or

(3) based on the number of low-income children attending private schools located in the LEA that plan to participate in CARES Act programs.[44]

---

[36] CARES Act § 18005(a). *See* Cory Turner, *DeVos Faces Pushback Over Plan to Reroute Aid to Private School Students*, NPR (May 21, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/05/21/860352150/devos-faces-pushback-over-plan-to-reroute-aid-to-private-school-students.

[37] *See* Dep't of Educ., Providing Equitable Services to Students and Teachers in Non-Public Schools Under the CARES Act Programs at 3 (Apr. 30, 2020), https://web.archive.org/web/20200625160043/https://oese.ed.gov/files/2020/04/FAQs-Equitable-Services.pdf [hereinafter April 30th Guidance] ("This requirement, on its face, necessitates that the Department interpret how the requirements of section 1117 apply to the CARES Act programs, given that an LEA under the CARES Act programs may serve all non-public school students and teachers without regard to family income, residency, or eligibility based on low achievement.").

[38] *Id.*

[39] *Id.* at 4, 6. *See, e.g.*, Tex. Educ. Agency, Providing Equitable Services to Students and Teachers in Participating Private Non-Profit Schools Under the CARES Act Programs (updated June 4, 2020), https://tea.texas.gov/sites/default/files/covid/COVID-19-CARES-Act-Equitable-Services-FAQ.pdf ("Using the proportion of students who are enrolled in participating [private] schools [located within the LEA's boundaries], the LEA determines the amount of funds available for equitable services based on that proportional share of the LEA's total allocation under each CARES Act program separately.").

[40] IFR, 85 Fed. Reg. at 39,480.

[41] *Id.* at 39,482 (explaining that "the LEA has two options in addition to using enrollment to determine the proportional share").

[42] *Id.* at 39,488 (to be codified at 34 C.F.R. § 76.665(c)(1)(i), (c)(1)(ii)).

[43] *Id.* (to be codified at 34 C.F.R. § 76.665(c)(1)(i)(A)).

[44] *Id.* (to be codified at 34 C.F.R. § 76.665(c)(1)(i)(B)). This option differs from the current method for determining the Title I-A proportional share, which is based on the number of low-income students *living in Title I-A attendance areas in the LEA* who attend private school, regardless of whether their private school is located *inside or outside of the LEA*. *See id.* at 39,481 (stating that "[u]nder Title I, funds for equitable services are generated by students from low-income families who reside in a

However, if an LEA provides services with CARES Act relief funds to *any* non-Title I-A school, the LEA *must* base the proportional share on total enrollment in participating private schools.[45] The Department concluded that it is authorized to promulgate these regulations "in the exercise of [its] interpretive discretion," because the CARES Act's "in the same manner as" language is "facially ambiguous."[46]

In contrast to the Department's interpretation, some federal lawmakers and state officials have argued that the CARES Act *requires* LEAs to base relief funds for equitable services on the number of low-income children attending private schools, and that the Department does not have discretion to depart from this allocation method.[47] In support of this view, they cite the expenditure provision in ESEA section 1117(a)(4),[48] which, as noted, bases eligible private school students' proportional share of services on the number of low-income children attending private schools.[49]

## III. Analysis of Section 18005(a)

Interpreting section 18005(a) begins with the section's text, starting with the meaning of key phrases from that text.[50] These phrases must not be analyzed in isolation, but instead be read with a view toward how they "relate to each other" and their place in the overall statutory scheme.[51] Legislative history can inform the analysis but generally will not override an interpretation that is clearly expressed in the statutory text.[52]

### Meaning of Key Language

CARES Act section 18005(a)'s meaning depends, in large part, on the meaning of the phrases "*provide equitable services*" and "*in the same manner as provided under section 1117*." However, the Act does not define key terms such as "provide," "equitable services," or "manner."[53] The Supreme Court has said that when a statutory term is not defined, it generally should be given its "ordinary meaning"—typically, its dictionary definition.[54] Whether a term's dictionary definition applies—or which one of several possible

---

participating Title I public school attendance area and attend a non-public school (citing 20 U.S.C. § 6320(a)(4)(A)(i) and 34 C.F.R. § 200.64(a))).

[45] *Id.* at 39,488 (to be codified at 34 C.F.R. § 76.665(c)(1)(ii)).

[46] *Id.* at 39,481.

[47] *See, e.g.*, Letter to LEA Superintendents et al. from Jennifer McCormick, Superintendent of Public Instruction, Ind. Dep't of Educ. 1 (May 12, 2020), https://www.doe.in.gov/sites/default/files/grants/final-language-equitable-share-cares-51220.pdf ("This final decision ensures that the funds are distributed according to Congressional intent and a plain reading of the law, which prioritizes communities and schools with high-poverty who are at most risk and in need of the additional funds."); Minn. Dep't of Educ., *CARES Act Funding Information*, https://education.mn.gov/MDE/dse/health/covid19/cares/ (last visited July 1, 2020) ("[T]here has been some confusion around the language and intent of the CARES Act and the guidance provided by the U.S. Department of Education. The state of Minnesota has decided to follow the intent and language of the law and distribute the federal funds to nonpublic schools, according to the number of children living in low-income households to prioritize those students with the greatest need.").

[48] *See* Letter to Betsy DeVos, Sec. of Educ., from Robert C. Scott, Chair, H. Comm. on Educ. & Labor et al. 2 n.5 (May 20, 2020), https://edlabor.house.gov/imo/media/doc/2020-5-20%20Ltr%20to%20DeVos%20re%20Equitable%20Services.pdf.

[49] 20 U.S.C. § 6320(a)(4)(A).

[50] *See* Babb v. Wilkie, 140 S. Ct. 1168, 1172 (2020) (stating that to resolve a dispute over the proper interpretation of a statute, the Court "start[s] with the text of the statute"). *See infra* "Meaning of Key Language."

[51] *Babb*, 140 S. Ct. at 1168 ("To explain the basis for our interpretation, we will first define the important terms in the statute and then consider how they relate to each other."). *See infra* "Statutory Context."

[52] Bostock v. Clayton Cty., 590 U.S. ---, No. 17-1618, slip op. at 24 (2020). *See infra* "Legislative History."

[53] *See* CARES Act § 18007 (defining terms for purposes of §§ 18001–06).

[54] *See* Kouichi Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

definitions was intended—depends on the context in which the term is used.[55] For example, a term's ordinary meaning may not apply if the word or phrase is a term of art because it has a technical or settled meaning in the relevant subject area or legal field.[56]

### *"Provide Equitable Services"*

The first question is what it means for an LEA to "provide equitable services," a phrase which is not defined in the CARES Act or the ESEA.[57] The word "provide" can have different meanings depending on the context. Most commonly, it means either: (1) "to supply or make available (something wanted or needed)" (e.g., "*provide* the children with free balloons"); or (2) "to have as a condition" or "stipulate" (e.g., "the contract *provides* that certain deadlines will be met").[58] Because the object of "provide" is "equitable services," the context of the provision suggests that Congress intended the first meaning (i.e., to supply or make available). Neither the CARES Act nor the ESEA expressly defines "equitable services," and the Supreme Court has not interpreted the phrase.[59] However, two separate sections of the ESEA contain "equitable services" requirements: sections 1117 and 8501.[60] Both sections require LEAs to provide services to eligible children attending private schools that are "equitable in comparison to services and other benefits for [participating] public school children."[61] And both sections appear to use the term "equitable services" as a shorthand for this concept in subsequent provisions of the same section.[62]

Accordingly, section 18005(a)'s directive for LEAs to "provide equitable services" appears to mean, at a minimum, that LEAs must "supply or make available" services to private school students that are "equitable in comparison to services and other benefits for [participating] public school children."[63] "Equitable," in ordinary usage, means "having or exhibiting equity"—that is, "freedom from bias or favoritism"—or "dealing fairly and equally with all concerned."[64] Thus, standing alone, the directive to "provide equitable services" suggests that LEAs must provide unbiased, fair, and equal services to private school students, which could speak to the quality *or* the quantity of those services. However, CARES Act section 18005(a) expressly references ESEA section 1117, and as explained *infra* in the section on

---

[55] *See* Yates v. United States, 574 U.S. 528, 537 (2015) (plurality opinion) ("Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things.").

[56] *See, e.g.*, Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 297 (2006) (declining to interpret "costs" according to its "ordinary usage" as expenses incurred because "'costs' is a term of art that generally does not include expert fees" (internal quotation marks and citation omitted)); Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 740 (1989) (noting that the term "scope of employment" is a "widely used term of art in agency law").

[57] *See* CARES Act § 18007; 20 U.S.C. § 7801.

[58] *Provide*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/provide (last visited July 1, 2020).

[59] *See* CARES Act § 18007. *But cf.* Wheeler v. Barrera, 417 U.S. 402, 407 n.6, 415 n.11, 419 (1974) (interpreting 45 C.F.R. § 116.19(b), which at that time required LEAs to provide "comparable" services to private school students) ("The choice of programs is left to the State with the proviso that comparable (not identical) programs are also made available to eligible private school children.").

[60] 20 U.S.C. §§ 6320, 7881.

[61] *Id*. §§ 6320(a)(3)(A), 7881(a)(3)(A).

[62] *E.g.*, 20 U.S.C. § 6320(b)(1)(E), (J), (b)(4), (c) (caption only); *id*. § 7881(a)(3)(B), (c)(1)(E), (H), (c)(4). *See* IBP, Inc. v. Alvarez, 546 U.S. 21, 34 (2005) (observing "the normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning").

[63] *See* Azar v. Allina Health Servs., 139 S. Ct. 1804, 1812 (2019) (reasoning that when the same term is used "in the same or related statutes," courts do not "lightly assume" that Congress intended for the term to have different meanings across those provisions).

[64] *Equitable*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/equitable (last visited July 1, 2020); *Equity*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/equity (last visited July 1, 2020).

"Statutory Context," ESEA section 1117 includes a significant amount of detail on how LEAs are to provide services to eligible private school students in an unbiased, fair, and equal manner in the context of Title I-A. Therefore, the term "equitable services" may be interpreted with the context of the ESEA in mind, and with an eye towards how "equitable services" are understood in that section specifically.[65]

### *"In the Same Manner as Provided Under Section 1117"*

Because the phrase "in the same manner" does not appear to be a term of art with a settled meaning,[66] one must consider the ordinary meaning of the words "same" and "manner" before construing them together and alongside the reference to section 1117.[67] The ordinary meaning of the word "same" appears to be settled as meaning "identical." *Merriam-Webster* defines the word "same," in the first instance, as: (1) "resembling in every relevant respect"; and (2) "conforming in every respect—used with *as*."[68] The legal dictionary *Black's Law Dictionary* similarly defines the word as "identical or equal" or "resembling in every relevant respect."[69] Section 18005(a) uses the term "same" in conjunction with the word "as"— "in the *same* manner *as* provided under section 1117"—suggesting the "conforming in every respect" definition might apply here.[70] But the adjective "same" also modifies the noun "manner" and must be considered in that context.[71]

The ordinary meaning of the word "manner" is not nearly as uniform as the meaning of "same."[72] *Merriam-Webster* defines "manner" in three different ways, as: (1) "a characteristic or customary mode of

---

[65] *See* United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988) (explaining that a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear"). *Cf.* FCC v. AT&T Inc., 562 U.S. 397, 407–08 (2011) ("The meaning of 'personal privacy' in Exemption 7(C) [of the Freedom of Information Act (FOIA)] is further clarified by the rest of the statute. Congress enacted Exemption 7(C) against the backdrop of pre-existing FOIA exemptions, and the purpose and scope of Exemption 7(C) becomes even more apparent when viewed in this context.").

[66] *See, e.g.*, Ass'n of Irritated Residents v. EPA, 790 F.3d 934, 948 (9th Cir. 2015) (suggesting that "'in the same manner'" could be "a procedural or substantive requirement"); United States v. Lewis Cty., 175 F.3d 671, 677–78 (9th Cir. 1999) (reasoning that "[t]he requirement that federally-held property be subject to taxation 'in the same manner' as other property" could "refer to the time when the tax is due, the manner of valuation, or any number of other elements of the state taxing process" (quoting 7 U.S.C. § 1984)). *But see* Wilder's S.S. Co. v. Low, 112 F. 161, 164 (9th Cir. 1901) ("[T]he phrase 'in the same manner' has a well-understood meaning in legislation, and that meaning is not one of restriction or limitation, but of procedure. It means by similar proceedings, so far as such proceedings are applicable to the subject-matter.").

[67] *See* Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

[68] *Same*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/same (last visited July 1, 2020).

[69] *Same*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[70] *See Same*, MERRIAM-WEBSTER UNABRIDGED, https://unabridged.merriam-webster.com/unabridged/same (last visited July 1, 2020) (giving as examples of this usage: "eat the *same* rations as the captain" and "gave him the *same* answer as before").

[71] *Cf.* Booth v. Churner, 532 U.S. 731, 738–39 (2001) (interpreting the phrase "until such administrative remedies as are available have been exhausted" and reasoning: "While the modifier 'available' requires the possibility of some relief for the action complained of . . ., the word 'exhausted' has a decidedly procedural emphasis. It makes sense only in referring to the procedural means, not the particular relief ordered. . . . [O]ne 'exhausts' processes, not forms of relief . . . .").

[72] For example, in 2020, a panel of the U.S. Court of Appeals for the D.C. Circuit interpreted the Federal Death Penalty Act's requirement that executions be conducted "'in the manner prescribed' by state law," exploring whether "manner" referred only to the execution method or to both the method and the "precise procedures" for carrying it out. *In re* Fed. Bureau of Prisons' Execution Protocol Cases, 955 F.3d 106, 111 (D.C. Cir. 2020) (per curiam), *cert. denied sub nom.* Bourgeois v. Barr, No. 19-1348 (June 29, 2020). The judges turned to dictionary definitions of the word "manner" but ultimately emphasized the context in which Congress used this language. *See id.* (Katsas, J., concurring) (arguing that the statute's "text, structure, and history show that 'manner' refers only to the method of execution"); *id.* (Rao, J., concurring) (arguing that "'manner'. . . cannot be interpreted in isolation" because it "is a broad, flexible term whose specificity depends on context"); *id.* (Tatel, J., dissenting) (agreeing "with Judge Rao that the term 'manner' refers to more than just general execution method" but analyzing the statutory context

acting" (e.g., "custom"); (2) "a mode of procedure or way of acting" (e.g., "fashion");[73] or (3) a "method of artistic execution or mode of presentation" (e.g., "style").[74] While the 2019 edition of *Black's Law Dictionary* does not define "manner," a previous edition defined the term as a "way, mode, method of doing anything, or mode of proceeding in any case or situation."[75] *Ballentine's Law Dictionary* also lists "method" as a possible meaning.[76] While these definitions differ, they all connote the *way* someone or something operates.[77] And courts gauging the ordinary meaning of the phrase "in the same manner as" appear to agree. For instance, in a 1998 decision, the U.S. Court of Appeals for the First Circuit (First Circuit) interpreted a federal law allowing a court to enforce a restitution order "in the same manner as a judgment in a civil action."[78] The defendant in a criminal action argued that to enforce a restitution order against him, the United States first had to obtain a judgment in a civil action.[79] The court disagreed, opining that "[s]uch a reading impermissibly reads the 'in the same manner as' language out of the statute."[80] The court held that a "restitution order may be enforced in *like manner* as a civil judgment; it need not be reduced first to a civil judgment."[81] To determine how an order could be enforced in a "like manner," the court consulted the rule of civil procedure governing "the mechanism" for enforcing a judgment for monetary payment.[82] As the First Circuit decision illustrates, use of the "same manner" does not suggest that equitable services under the CARES Act and Title I-A share all of the same characteristics: only that they must be provided in a "like manner" or according to the same "mechanism."[83]

A question remains as to whether the manner or way of providing equitable services should be assessed by looking at (1) how LEAs *customarily* provide services under section 1117, with, perhaps, LEAs' past practices as Title I-A funding recipients serving as that custom, or (2) the specific *procedures* in section 1117 itself. Because section 18005(a) expressly references section 1117, the more likely meaning—one that gives effect to that cross-reference—is that LEAs must follow the "methods" or "procedures" for providing equitable services specified in section 1117. In *NFIB v. Sebelius*, the Supreme Court interpreted an Affordable Care Act provision stating that the "penalty" for noncompliance with the Act's individual mandate "shall be assessed and collected *in the same manner as* an assessable penalty under subchapter B of chapter 68," which, in turn, specified that penalties "shall be assessed and collected in the same manner as taxes."[84] The Supreme Court agreed with the government that this language was "a directive only to the Secretary of the Treasury to use the same 'methodology and procedures' to collect

---

and purpose to determine whether state procedures were included).

[73] The unabridged version adds to this usage "the mode or method in which something is done or happens." *Manner*, MERRIAM-WEBSTER UNABRIDGED, https://unabridged.merriam-webster.com/unabridged/manner (last visited July 1, 2020).

[74] *Manner*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/manner (last visited July 1, 2020).

[75] *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 114 (Katsas, J., concurring) (quoting *Manner*, BLACK'S LAW DICTIONARY (6th ed. 1990)).

[76] *Manner*, BALLENTINE'S LAW DICTIONARY (2010) ("Way of performing or executing; method; custom; habitual practice.").

[77] *See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 130 (Rao, J., concurring) ("'Manner' may therefore refer to a general way of doing something or the more specific way in which an action is carried out.").

[78] *See* United States v. Timilty, 148 F.3d 1, 3 (1st Cir. 1998) (internal quotation marks omitted) (quoting 18 U.S.C. § 3663(h)(1)(B)).

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.* at 5.

[83] *Cf. id.* at 3, 5.

[84] Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 545 (2012) (internal quotation marks omitted) (quoting 26 U.S.C. § 5000A(g)(1) (emphasis added); 26 U.S.C. § 6671(a)).

the penalty that he uses to collect taxes."[85] To determine which provisions governed the methodology and procedures for collecting taxes, the Court looked to the "chapters of the Internal Revenue Code providing the Secretary authority to assess and collect taxes, and generally specifying the means by which he shall do so."[86] The Court then concluded that the statute's "command that the penalty be 'assessed and collected in the same manner' as taxes is best read as referring to those chapters and giving the Secretary the same authority and guidance with respect to the penalty."[87] The *NFIB* decision suggests that when the phrase "in the same manner" references a specific provision in law, that specific reference supplies the methods or procedures for the agency to follow. Accordingly, the phrase "in the same manner as provided under section 1117" in section 18005(a) means, at a minimum, that LEAs must provide equitable services in the same *way* as under section 1117, and likely means according to identical *methods* or *procedures*.[88]

In its recent IFR, the Department reasons that "Congress did not need to add the words 'in the same manner' if it simply intended to incorporate 'section 1117 of the ESEA of 1965' by reference in the CARES Act," suggesting that Congress did not intend to require "mechanistic[]" compliance with *all* of section 1117's requirements.[89] To avoid rendering the words "in the same manner" superfluous, the Department construes the phrase to authorize the Department to "harmonize" section 1117's requirements with other statutory provisions and to bypass requirements that are, in the Department's view, "inconsistent" with the appropriations for relief funds in the CARES Act.[90]

The Department correctly gives effect to the language "in the same manner";[91] but reading the phrase "in the same manner as provided under section 1117" to allow the Department to read certain procedural requirements *out of* section 1117 is not the most natural reading of that language.[92] Moreover, interpreting "same manner" to incorporate section 1117's process-oriented requirements does not render the word "manner" superfluous. Reading "in the same manner" as "in the same way" preserves key distinctions between CARES Act relief funds and Title I-A funds. As the Department points out, CARES Act relief funds can be used for a broader range of services than the Title I-A special education and instructional services and materials discussed in section 1117.[93] And, as the Department further observes, the beneficiaries of equitable services under the CARES Act do not appear to be limited to "eligible children" within the meaning of section 1117.[94] By directing LEAs to provide equitable services "in the same

---

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *See* United States v. Young, 458 F.3d 998, 1007 (9th Cir. 2006) ("Congress knows how to define terms when it wants to give them specific definitions at odds with everyday understanding.").

[89] IFR, 85 Fed. Reg. at 39,481.

[90] *Id.* at 39,479, 39,482.

[91] *See* Maine Cmty. Health Options v. United States, 590 U.S. ---, 140 S. Ct. 1308, 1323 (2020) (noting that the Court hesitates to adopt an interpretation of a congressional enactment that renders other statutory language superfluous).

[92] *See* Gabelli v. SEC, 568 U.S. 442, 448 (2013) (applying the "most natural reading of the statute" instead of the alternative construction advanced by the government).

[93] *See* 20 U.S.C. § 6320 (authorizing funds to private school students for "special educational services, instructional services . . . , counseling, mentoring, one-on-one tutoring, or other benefits *under this part* . . . that address their needs" (emphasis added)); IFR, 85 Fed. Reg. at 39,481 ("[T]he CARES Act is a separate appropriation allowing separate permissible uses of taxpayer funds.").

[94] *See* 20 U.S.C. § 6320(a)(1)(A) (stating that "to the extent consistent with the number of *eligible children identified under section 1115(c)* in the school district served by a local educational agency who are enrolled in private elementary schools and secondary schools, a local educational agency shall . . . provide *such children*, on an equitable basis . . . special educational services, instructional services . . ., or other benefits . . . that address their needs"); IFR, 85 Fed. Reg. at 39,480 (reasoning that "services under the CARES Act programs can be available for all students—public and non-public—without regard to poverty, low achievement, or residence in a participating Title I public school attendance area").

manner as" provided under section 1117, Congress likely meant to indicate *how* LEAs should provide equitable services with relief funds rather than *for what* or *to whom*—questions largely addressed in the sections establishing the relief funds.[95] But it does not necessarily follow from this observation that "manner" refers to all the ways in which LEAs provide services under section 1117 *except for* how LEAs determine the proportional share,[96] particularly when, as explained below, statutory context suggests that the method of determining the proportional share is part of the "manner" of providing services.[97]

## Statutory Context

To determine whether CARES Act section 18005(a)'s reference to the manner of providing services under ESEA section 1117 includes that section's expenditure determination, it is necessary to look at CARES Act section 18005 as a whole, ESEA section 1117 as a whole, and section 1117's place in the broader context of the ESEA's equitable-services requirements.[98]

### *CARES Act Section 18005*

As shown in the annotated text below, section 18005 addresses two requirements—consultation and public control of funds—that are also covered in section 1117.

> ASSISTANCE TO NON-PUBLIC SCHOOLS
>
> SEC. 18005. (a) IN GENERAL.—A[n] [LEA] receiving funds under sections 18002 or 18003 of this title shall provide equitable services in the same manner as provided under section 1117 of the ESEA of 1965 to students and teachers in non-public schools, **[1]** as determined in consultation with representatives of non-public schools.
>
> (b) **[2]** PUBLIC CONTROL OF FUNDS.—The control of funds for the services and assistance provided to a non-public school under subsection (a), and title to materials, equipment, and property purchased with such funds, shall be in a public agency, and a public agency shall administer such funds, materials, equipment, and property and shall provide such services (or may contract for the provision of such services with a public or private entity).

While some of the language in the consultation clause and the public control subsection echoes section 1117's text, such redundancy may reflect Congress's emphasis of these requirements. And differences between the CARES Act relief funds and Title I-A funds may account for the separate treatment of these provisions. As explained below, these observations about section 18005's structure do not undermine, and in some instances seem to reinforce, the view that "manner" refers to section 1117's procedures, including its method for determining the proportional share.

---

[95] *Cf.* United States v. Timilty, 148 F.3d 1, 3 (1st Cir. 1998) ("A restitution order may be enforced in *like manner* as a civil judgment; it need not be reduced first to a civil judgment.").

[96] *See* IFR, 85 Fed. Reg. at 39,481 (stating that: "By definition, the provisions in section 1117 relating to funding and eligibility for services, e.g., section 1117(a)(1)and(4) and (b)(1)(E) and (J)(ii), are inapposite in a CARES Act frame. However, the provisions in section 1117 relating to the 'manner' in which services are delivered, e.g., section 1117(a)(2), (3), and (b)(1)(A)-(D), (F)-(I), and (K), arguably do fit within and can be applied under the CARES Act.").

[97] For this reason, the Department's observation that Congress could have used a different formulation—"as provided in"—to achieve a result the Department thinks Congress *did not intend* is beside the point. *See id.* In any event, even if Congress's meaning could have been conveyed with fewer words, that does not necessarily mean that the text of section 18005(a), as written, is ambiguous. *See* Lamie v. U.S. Tr., 540 U.S. 526, 536 (2004) (favoring a construction in which the text is plain but contains surplusage versus one in which there is no surplusage but the text is ambiguous).

[98] *See* United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . .").

## Consultation

While the effect of section 18005(a)'s consultation clause is not entirely clear, to the extent it suggests anything about providing services in the same "manner" as section 1117, it is that determining the proportional share based on low-income children is normally part of the Title I-A consultation process. It is possible that, in referring to consultation separately, Congress intended to impose a general meet-and-confer requirement in place of section 1117(b)'s specific consultation requirements.[99] Another plausible reading is that Congress intended to emphasize the need for consultation in accordance with section 1117 as part of the process of providing equitable services. The structure of the consultation clause—"as determined in consultation with representatives of non-public schools"—appears to track the general directive in section 1117(a) that LEAs provide services to eligible private school students "after timely and meaningful consultation with appropriate private school officials."[100] Those general references to consultation have little meaning without section 1117(b), which specifies the topics to be covered in the consultation.[101] Notably, those topics include a discussion of "the size and scope of the equitable services to be provided to the eligible private school children, the proportion of funds that is allocated under subsection (a)(4)(A) for such services, and how that proportion of funds is determined."[102] But the "proportion of funds" is not left entirely to the public and private school officials' discretion. In particular, the consultation must include "the method or sources of data that are used under subsection (c) and section 1113(c)(1) to determine *the number of children from low-income families* in participating school attendance areas who attend private schools."[103] And the parties must discuss:

> whether to provide equitable services to eligible private school children—
>
> (i) by creating a pool or pools of funds with all of the funds allocated under subsection (a)(4)(A) based on *all the children from low-income families* in a participating school attendance area who attend private schools; or
>
> (ii) in the agency's participating school attendance area who attend private schools with the proportion of funds allocated under subsection (a)(4)(A) based on *the number of children from low-income families* who attend private schools.[104]

---

[99] It is unclear whether the Department views section 18005(a)'s consultation clause as displacing or incorporating section 1117(b). In the IFR, the Department cites the consultation clause as evidence that Congress did not intend to incorporate section 1117's requirements "wholesale." IFR, 85 Fed. Reg. at 39,481. However, the Department also concludes in the IFR that "[c]onsultation must be 'in the same manner' as conducted under section 1117" and adopts all of section 1117's consultation requirements *except for* those relating to determining the proportional share based on low-income children. *Id.* at 39,482; *see also id.* at 39,488 (to be codified at 34 C.F.R. § 76.665(b)(2)) (stating that "[c]onsultation must occur in accordance with section 1117(b) of the ESEA, except to the extent inconsistent with the CARES Act and this section, such as section 1117(b)(1)(E) and (J)(ii)").

[100] 20 U.S.C. § 6320(a)(1)(A). The comma separating the consultation clause suggests that the language "as determined in consultation with representatives of non-public schools" modifies the whole requirement that LEAs "provide equitable services in the same manner as provided under section 1117 . . . to students and teachers in nonpublic schools." *Cf.* Bingham, Ltd. v. United States, 724 F.2d 921, 925 n.3 (11th Cir. 1984) ("Where the modifier *is* set off from two or more antecedents by a comma, the supplementary 'rule of punctuation' states that the comma indicates the drafter's intent that the modifier relate to more than the last antecedent."). Moreover, if the clause modified only the immediately preceding words "students and teachers," it would direct the parties to "determine[]" students and teachers, which makes less sense grammatically than a requirement that the parties agree on the way to provide equitable services.

[101] *See* Rimini Street, Inc. v. Oracle USA, Inc., 586 U.S. ---, 139 S. Ct. 873, 881 (2019) ("If one possible interpretation of a statute would cause some redundancy and another interpretation would avoid redundancy, that difference in the two interpretations can supply a clue as to the better interpretation of a statute. But only a clue. Sometimes the better overall reading of the statute contains some redundancy.").

[102] 20 U.S.C. § 6320(b)(1)(E).

[103] *Id.* § 6320(b)(1)(F) (emphasis added).

[104] *Id.* § 6320(b)(1)(J) (emphasis added).

Thus, ordinarily the consultation process under ESEA section 1117 includes the question of *how* to calculate the number of low-income children who attend private schools, but not *whether* to base private schools' proportional share on low-income children, which is a separate statutory requirement addressed in sections (a)(4)(A) and (c).

## Public Control of Funds

Congress separately addressed the public control of funds in section 18005(b), authorizing a public agency to "provide" equitable services with CARES Act relief funds itself or to "contract for the provision of such services with a public or private entity."[105] The inclusion of subsection (b) suggests that Congress intended for this more specific public control language to control over ESEA section 1117(d) on the public control of funds;[106] otherwise, subsection (b) would be superfluous.[107] However, it does not follow from this observation that Congress did not intend to require general adherence to section 1117's procedures for providing equitable services, including section 1117's method for determining the proportional share.[108] Congress may have included a separate public control provision for clarity. ESEA section 1117(d) applies only to the "control of funds provided under this part" (i.e., Title I-A funds) and "title to materials, equipment, and property purchased with such funds."[109] CARES Act section 18005(b), in contrast, applies to the "control of funds for the services and assistance provided to a non-public school under subsection (a)" (i.e., CARES Act equitable services), and "title to materials, equipment, and property purchased with such funds."[110] Additionally, section 18005(a) imposes the "same manner" requirement directly on LEAs, whereas the public control subsection, as in section 1117 of the ESEA, requires that a "public agency" control and administer the federal funds.[111]

## The Rule Against Surplusage

In the Department's view, the "separate consultation requirement in section 18005(a)" and "public control of funds provision in section 18005(b)" signal that Congress did not intend "to incorporate 'section 1117 of the ESEA of 1965' wholesale into the CARES Act"—otherwise these provisions would be superfluous.[112] The "rule against surplusage," a canon of statutory interpretation, counsels that the reader "should not interpret any statutory provision in a way that would render it or another part of the statute inoperative or redundant."[113] But the rule assists the reader "only where a competing interpretation gives effect 'to every clause and word of a statute'" and "avoids excess language."[114] Here, the Department concludes that many of section 1117's consultation requirements describe the "manner" of providing services for purposes of the CARES Act even though section 18005(a) refers to consultation separately.[115]

---

[105] CARES Act § 18005(b).

[106] *See* Gozlon-Peretz v. United States, 498 U.S. 395, 407 (1991) ("A specific provision controls one of more general application.").

[107] Corley v. United States, 556 U.S. 303, 314 (2009) (describing "one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'" (internal citations omitted)).

[108] *See infra* notes 112–19 and accompanying text.

[109] 20 U.S.C. § 6320(d)(1).

[110] CARES Act § 18005(b).

[111] *Compare* CARES Act § 18005(b), *with* 20 U.S.C. § 6320(d).

[112] IFR, 85 Fed. Reg. at 39,481.

[113] CRS Report R45153, *Statutory Interpretation: Theories, Tools, and Trends* 28, by Valerie C. Brannon.

[114] Microsoft Corp. v. i4i Ltd. P'ship, 564 U.S. 91, 106 (2011) (citation omitted).

[115] IFR, 85 Fed. Reg. at 39,481 ("[T]he provisions in section 1117 relating to the 'manner' in which services are delivered, e.g., section 1117(a)(2), (3), and (b)(1)(A)-(D), (F)-(I), and (K), arguably do fit within and can be applied under the CARES Act.").

Because the Department's construction does not "avoid[] excess language," the overlap between section 18005 and section 1117 is "both inescapable and unilluminating."[116]

Moreover, the Department does not explain why separately addressing consultation and public control undercuts—rather than *reinforces*—the interpretation that Congress intended to adopt section 1117's method of determining the proportional share. As explained in Part I, section 1117 contains five subsections. If "manner" refers to neither consultation nor public control of funds, that leaves three subsections: subsection (a) "General requirement"; subsection (c) "Allocation for equitable service to private school students"; and subsection (e) "Standards for a bypass."[117] Section 1117's expenditure determination is part of subsection (a)'s general requirements.[118] And subsection (c) is dedicated entirely to the calculation methods for determining the number of low-income children to be used to determine the equitable share and the complaint process for contested calculations.[119] Accordingly, if Congress intended for "manner" to mean something *other than* consultation and public control, then the manner of providing equitable services must be found among section 1117's *remaining* requirements, many of which govern the method for determining the proportional share.

### Section 1117

Section 1117's text and structure suggest that the "manner" of providing equitable services is broader than simply the delivery (i.e., supplying) of those services and instead encompasses all of the procedures in section 1117 that govern the way in which LEAs make services available to private schools students. The first subsection in section 1117, titled "General requirement," establishes the basic framework for providing equitable services.[120] Paragraph (1) states that after consulting with private school officials, an LEA must "provide" services to eligible private school children "on an equitable basis."[121] This paragraph is immediately followed by the three requirements in paragraphs (2) through (4): (2) that services be "secular, neutral, and nonideological"; (3) that services be "equitable in comparison to services and other benefits for [participating] public school children" and "provided in a timely manner"; and (4) that expenditures for services "be equal to the proportion of funds allocated to participating private school attendance areas based on the number of children from low-income families who attend private schools."[122] Each of the requirements in paragraphs (2) through (4), including the expenditure determination, appears to elaborate on *the way* to "provide" services "on an equitable basis."[123] Indeed, section 1117 refers to the result of the expenditure determination (i.e., the proportional share) as the "equitable share."[124] And the Department's Title I-A equitable services regulations state, in a section captioned "Services on an equitable basis," that "[s]ervices are equitable if," in addition to other standards, "the LEA . . . [m]eets the equal expenditure requirements under paragraph (a) of this section"—referring to the proportional share.[125]

---

[116] Seila Law, LLC v. Consumer Fin. Prot. Bureau, 591 U.S. ---, slip op. at 34 (2020) (plurality opinion) (concluding that the inclusion of a severability clause with respect to one part of a larger statute did not affect the reach of a severability clause applicable to the entire statute despite the redundancy).

[117] 20 U.S.C. § 6320(a), (c), (e).

[118] *Id.* § 6320(a)(4)(A).

[119] *Id.* § 6320(c).

[120] *Id.* § 6320(a).

[121] *Id.* § 6320(a)(1)(A).

[122] *Id.* § 6320(a)(2)–(4).

[123] *Id.* § 6320(a)(1)(A).

[124] *Id.* § 6320(a)(4)(D).

[125] 34 C.F.R. § 200.64(b); *see also id.* § 200.64(a)(1) ("Funds expended by an LEA under this subpart for services for eligible

While narrower interpretations of the "manner" of providing services under section 1117 are also possible, there are persuasive reasons to reject these alternative readings. For example, one could read the "manner" of providing services under section 1117 to be limited to that section's directive to provide services "in a timely manner"[126] or to the two paragraphs expressly captioned "provision of services."[127] The Department does not take such a constrained view of the text and instead distinguishes the expenditure provision in section 1117(a)(4) from provisions "relating to the 'manner' in which services are *delivered*, e.g., section 1117(a)(2), (3), and (b)(1)(A)–(D), (F)–(I), and (K)," which, in the Department's view, "arguably do fit within and can be applied under the CARES Act."[128] But had Congress wanted only certain paragraphs of section 1117 to apply to the CARES Act, it could have referenced them directly.[129] Moreover, many of the provisions the Department cites, instead of specifying *how* services should be delivered, describe the *nature* of the services themselves,[130] or the required topics for *consultation* before the delivery of services.[131]

In its recent IFR, the Department reasons that achieving "equity" under the CARES Act requires a different method for determining the proportional share.[132] Specifically, the Department states that "[i]f the CARES Act does not limit services based on residence and poverty, then it stands to reason that an LEA should not use residence and poverty to determine the proportional share of available funds for equitable services to non-public school students."[133] This argument may elevate a general conception of equity—parity between "similarly situated" students in public and private schools[134]—over the specific procedures set out in section 1117 for providing equitable services. The differences in the populations to be served by relief funds and Title I-A funds would support a different input for determining the proportional share if section 1117's *allocation* method was based on Title I-A's *eligibility* criteria. Under section 1117, however, the expenditure determination and the eligibility criteria to receive services are separate determinations.[135] Several categories of students qualify for Title I-A equitable services independent of income status, including certain students at risk of failing to meet the state's academic standards, "children with disabilities," "migrant children," and "English learners."[136] But under

---

private school children in the aggregate must be equal to the proportion of funds generated by private school children from low-income families who reside in participating public school attendance areas . . . .").

[126] Section 1117 uses the word "manner" only once in connection with the provision of services, stating that services "shall be provided in a timely manner." 20 U.S.C. § 6320(a)(3)(A). *Cf. id.* § 6320(a)(4)(C) (requiring state educational agencies to notify private school officials of LEAs' expenditures determinations in a "timely manner").

[127] *See* 20 U.S.C. § 6320(a)(5), (d)(2); No Child Left Behind Act of 2002, tit. I, § 101, Pub. L. No. 107-110, 115 Stat. 1439, 1509–10.

[128] IFR, 85 Fed. Reg. at 39,481 (emphasis added).

[129] *See* NLRB v. SW Gen., Inc., 580 U.S. ---, 137 S. Ct. 929, 938–39 (2017) ("Congress often drafts statutes with hierarchical schemes—section, subsection, paragraph, and on down the line. Congress used that structure in the [statute] and relied on it to make precise cross-references. When Congress wanted to refer only to a particular subsection or paragraph, it said so." (internal citations omitted)).

[130] *See* 20 U.S.C. § 6320(a)(2) ("Such educational services or other benefits, including materials and equipment, shall be secular, neutral, and nonideological.").

[131] *See id.* § 6320(b)(1)(A)–(B) (requiring consultation to include "issues such as . . . how the children's needs will be identified; [and] . . . what services will be offered").

[132] IFR, 85 Fed. Reg. at 39,481.

[133] *Id.* at 39,482–43.

[134] *Id.* at 39,481.

[135] *Compare* 20 U.S.C. § 6320(a)(1) (defining eligibility by cross-referencing § 6315(c), which is broader than low-income children), *with id.* § 6320(a)(4) and (c) (defining proportional share for expenditures expressly in terms of "the number of children from *low-income* families" (emphasis added)).

[136] Section 1117 states that LEAs must provide services "[t]o the extent consistent with the number of eligible children identified under section 1115(c) [*id.* § 6315(c)] in the school district served by a local educational agency who are enrolled in private

section 1117(a)(4)(A)(i), an LEA still determines private schools' proportional share based *only* on the number of low-income children attending those schools.[137] Therefore, even under Title I-A, the proportional share for equitable services is determined based on a metric—low-income status—that is under-inclusive of all eligible children. As a result, the fact that the CARES Act relief funds may serve a wider swath of students and teachers does not necessarily resolve whether Congress intended to depart from section 1117's express directive to count low-income children as the way (i.e., manner) to determine the equitable share.

The Department observes that "Congress has already taken poverty into consideration in allocating CARES Act funds to LEAs" because an "LEA receives ESSER funds based on its proportionate share of Title I funds" and "40 percent of the GEER funds a Governor receives is based on the State's share of Title I formula children."[138] But ESEA section 1117 itself accounts for family income in the distribution of equitable services *even though* the underlying Title I-A funds originally were allocated to states based in part on family income.[139] There is no inherent tension in Congress directing the equitable share of a fund that is, at least in part, income-based to be distributed based on income. That, in the Department's words, "Congress targeted both ESSER and GEER funds to high-poverty areas to reflect their need,"[140] suggests, if anything, that calculating the proportional share for services to private school students and teachers based on the proportion of low-income students living in those areas is consistent with the statutory scheme.

## ESEA Section 8501

Expanding the lens further to consider the equitable services standards that existed before the CARES Act reinforces the conclusion that, under a straightforward reading of the statute, the CARES Act adopts section 1117's specific method for determining what is an equitable amount of expenditures. As noted, the ESEA contains two equitable services sections: section 1117, which applies to Title I-A funds, and section 8501, which applies to other programs.[141] While their eligibility criteria is program-specific, these sections are similarly structured and their general requirements relating to the nature of the services provided and "provision of services" paragraphs largely mirror each other.[142] However, the sections differ in their expenditure determinations. Section 1117's expenditure allocation, as noted, is based on the number of low-income children within the LEA who attend private schools.[143] In contrast, section 8501's allocation is equal to "the expenditures for participating public school children," accounting for "the number and educational needs of the children to be served."[144] As implemented, this means that in

---

elementary schools and secondary schools." *Id.* § 6320(a)(1). Section 1115(c) defines the eligibility criteria. *Id.* § 6315(c).

[137] *Id.* § 6320(a)(4)(A)(i).

[138] IFR, 85 Fed. Reg. at 39,482 (citing CARES Act § 18003(c) and § 18002(b)(2)).

[139] *See supra* Part I.

[140] IFR, 85 Fed. Reg. at 39,482.

[141] *Compare id.* § 6320, *with id.* § 7881.

[142] *Compare id.* § 6320(a)(2), (a)(3), (a)(5), *and* (d)(2), *with id.* § 7881(a)(2), (a)(3), (a)(5), *and* (d)(2).

[143] *Id.* § 6320(a)(1)(A).

[144] *Id.* § 7881(a)(4)(A). One consultation requirement in subsection (c)(1)(H) references the option of pooling funds for services "based on" low-income children in private schools, but in guidance interpreting the consultation provisions, the Department did not interpret this requirement to engraft an allocation based on low-income onto the general expenditure provision in (a)(4)(A). *See* Dep't of Educ., Non-Regulatory Guidance: Fiscal Changes and Equitable Services Requirements Under the Elementary and Secondary Education Act of 1965 (ESEA), as Amended by the Every Student Succeeds Act (ESSA), at 34 (Nov. 21, 2016), https://www2.ed.gov/policy/elsec/leg/essa/essaguidance160477.pdf [hereinafter Equitable Services Requirements Under ESEA] ("The topics subject to consultation have been expanded to include the following: . . . Whether to provide equitable services to eligible private school participants (1) by creating a pool or pools of funds with all of the funds allocated under programs covered under section 8501(b) or (2) on a school-by-school basis based on each the proportionate share

general, LEAs compare the number of participating public school children with the number of participating private school children.[145] Accordingly, had Congress wanted LEAs to determine private schools' share of CARES Act relief funds based on the number of participating students, rather than the number of low-income children, while retaining language about neutrality and equity,[146] Congress could have cited ESEA section 8501 in CARES Act section 18005.[147]

In addressing the costs of implementing the IFR, the Department appears to acknowledge the similarities between section 8501's method of determining the proportional share and the enrollment method promulgated in the IFR:

> For LEAs using CARES Act funds to serve students and teachers in both Title I and non-Title I schools, the interim final rule requires the use of enrollment data to determine the proportional share. For the majority of these LEAs, enrollment data should already be available for non-public schools that participate in equitable services under ESEA programs other than Title I. Equitable services under those programs are governed by section 8501 of the ESEA, which requires in determining expenditures for equitable services that an LEA take into account the number of non-public school students to be served. In complying with this requirement, an LEA customarily obtains enrollment data from participating non-public schools. For such LEAs, complying with the interim final rule accordingly imposes no additional burden with respect to those schools.[148]

The Department suggests that using total enrollment in participating private schools effectuates Congress's intent to provide "equitable services" under the CARES Act, notwithstanding Congress's specific reference to the "manner" of providing services under section 1117 (i.e., like Title I-A).[149] Yet, it is unclear why, if Congress wanted to equalize expenditures based on participation alone, it did not simply cite the very section applicable to "ESEA programs other than Title I[-A]" in which "an LEA customarily obtains enrollment data from participating [private] schools."[150] That Congress cited section 1117 instead of section 8501 or another ESEA program, tends to support the view that Congress wanted LEAs to use section 1117's method of determining expenditures for private schools' equitable share of services.[151]

## Legislative History

Where a question of federal law turns on statutory language that is unclear, courts have sometimes looked to the legislative history of the provision in question to clarify its meaning.[152] Common sources of legislative history include conference and committee reports, Members' statements during consideration

---

of funds available to provide services in each school.").

[145] For example, in the Title II-A program, which is subject to section 8501, the Department has instructed LEAs to "determine[] the amount of funds available for . . . equitable services for private school teachers and other educational personnel by calculating, on a per-pupil basis, the amount available for all public and private school students enrolled in participating private elementary and secondary schools in areas served by the LEA (regardless of a student's residency), taking into consideration the number and needs of the children, their teachers and other educational personnel to be served." *See, e.g.*, Equitable Services Requirements Under ESEA, *supra* note 144, at 35.

[146] *See, e.g.*, 20 U.S.C. § 7881(a)(2)–(3)(A).

[147] *See* Gustafson v. Alloyd Co., 513 U.S. 561, 569 (1995) (instructing that a statute should be "interpreted as a symmetrical and coherent regulatory scheme").

[148] IFR, 85 Fed. Reg. at 39,485.

[149] *See id.* at 39,481.

[150] *See id.* at 39,485.

[151] *See* Azar v. Allina Health Servs., 587 U.S. ---, 139 S. Ct. 1804, 1813 (2019) ("Congress's choice to include a cross-reference to one but not the other of the APA's neighboring exemptions strongly suggests it acted 'intentionally and purposefully in the disparate' decisions." (citation omitted)).

[152] *E.g.*, Blum v. Stenson, 465 U.S. 886, 896 (1984).

of the legislation, and the record of Congress's deliberations when enacting a law.[153] However, the Supreme Court has noted that "legislative history is not the law," and while *clear* legislative history can clarify ambiguities in statutory text, ambiguous legislative history cannot "muddy clear statutory language."[154] Additionally, the Court has characterized *post-enactment* legislative history[155] as "not a legitimate tool of statutory interpretation" because it cannot have had an effect on the congressional vote.[156]

In the case of the CARES Act, the legislative record appears to be silent as to the intent of section 18005. The legislation originally introduced as the CARES Act, S. 3548, did not contain a title on elementary and secondary education funding and, consequently, did not include any equitable services language.[157] The text of the relief fund provisions, including section 18005, was added in an amendment in the nature of a substitute, and passed by the House and Senate through a different legislative vehicle, H.R. 748, without any committee reports. Although summaries of the bill's final language and floor statements reference the relief funds generally, no mention of the equitable services provision is made.[158]

## IV. Conclusion and Additional Considerations

For the reasons discussed above, section 18005(a)'s text and context suggest that the most straightforward reading of the provision is that it requires LEAs to follow section 1117's method for determining the proportional share and thus to allocate funding for services for private school students and teachers based on the number of low-income children attending private schools. However, if a court were to conclude that the statute is ambiguous with respect to the method of determining the proportional share, that would then require the court to address whether the Department is entitled to deference under *Chevron*[159] or a related doctrine—questions that this memorandum does not analyze.[160]

The question addressed in this memorandum—whether the CARES Act can be plausibly read to require LEAs to apply section 1117's method of determining the proportional share—is relevant under a *Chevron* analysis because the first step of that analysis is whether "the intent of Congress is clear" on the issue in question.[161] If so, the court does not reach the second question of whether the agency's interpretation was reasonable, because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[162] If, however, "the language of the statute is open or ambiguous—that is, if

---

[153] *See* CRS Report R45153, *supra* note 113, at 36–41.

[154] Bostock v. Clayton Cty., 590 U.S. ---, No. 17-1618, slip op. at 24 (2020); Azar v. Allina Health Servs., 139 S. Ct. at 1814 (citing Epic Sys. Corp. v. Lewis, 584 U.S. ---, 138 S. Ct. 1612, 1631 (2018); Milner v. Dep't of Navy, 562 U.S. 562, 572 (2011)).

[155] Examples of post-enactment legislative history in this case may include statements by Members of Congress expressing their views of a provision after it has become law, or subsequent legislation considered by Congress. *See, e.g.*, Turner, *supra* note 36; H.R. 6800, § 10604 (amending section 18005 of the CARES Act).

[156] Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011).

[157] Similarly, a competing House version under consideration at the same time as the CARES Act would have created a state fiscal stabilization fund in the Department of Education, but did not include an express equitable services provision akin to section 18005(a). *See* H.R. 6379, 116th Cong. (2020).

[158] Cong. Rec. H1823, H1852, H1862 (Mar. 27, 2020); Senate Appropriations Committee, *$340 Billion Surge in Emergency Funding to Combat Coronavirus Outbreak*, at 15–16 (Mar. 25, 2020), https://www.appropriations.senate.gov/imo/media/doc/Coronavirus%20Supplemental%20Appropriations%20Summary_FINAL.pdf.

[159] Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).

[160] *Cf.* Ass'n of Irritated Residents v. EPA, 790 F.3d 934, 948 (9th Cir. 2015) ("The statute itself does not clearly state whether 'in the same manner' is a procedural or substantive requirement. Because Congress has not directly spoken to the issue at hand, the court will proceed to the second *Chevron* step.").

[161] *Chevron*, 467 U.S. at 842.

[162] *Id.* at 842–43.

Congress left a 'gap' for the agency to fill," then under *Chevron*, a court must uphold the agency's interpretation "as long as it is reasonable."[163] Thus, the statutory interpretation analysis in this memorandum is part of the first step, but not necessarily the entirety of the *Chevron* analysis.

In these circumstances, there are at least three additional questions related to deference that must be considered to complete the analysis. Because the IFR took effect before a formal notice-and-comment period, the first question is whether the IFR is entitled to *Chevron* deference.[164] Assuming *Chevron* applies, the second question is whether section 1117 unambiguously forecloses the Department's interpretation. Moreover, assuming the text of section 18005 is ambiguous and a court proceeds to step two, an examination must occur as to whether the Department's interim regulations reflect a "reasonable" interpretation of the CARES Act. And finally, if a court concludes that the IFR is not entitled to *Chevron* deference, a court may still have to consider whether the IFR "merit[s] some deference" under other judicial doctrines.[165] A memorandum analyzing these additional considerations can be prepared upon request.

---

[163] Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. 81, 89 (2007) (citing *Chevron*, 467 U.S. at 842–43).

[164] The Supreme Court has distinguished between "notice-and-comment rulemaking," which is eligible for *Chevron* review, and less formal interpretations like nonbinding guidance documents, which typically are not. Christensen v. Harris Cty., 529 U.S. 576, 587 (2000). While the IFR contains regulations with the force of law and the Department has solicited comments on the IFR, the IFR took effect immediately upon publication before a formal notice-and-comment period. *See* IFR, 85 Fed. Reg. at 39,479. *See generally* OFFICE OF FED. REGISTER, A GUIDE TO THE RULEMAKING PROCESS 9 (2011) (noting that an interim final rule "becomes effective immediately upon publication," but that in "most cases, the agency stipulates that it will alter the interim rule if warranted by public comments"). At least one federal court has analyzed an interim rule under the *Chevron* framework. *See* Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv., 416 F. Supp. 2d 92, 99 (D.D.C. 2006).

[165] *See* United States v. Mead Corp., 533 U.S. 218, 234 (2001) ("*Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." (internal citations omitted) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 139–40 (1944))).